**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| STATE TEACHERS RETIREMENT SYSTEM OF OHIO, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> CHARLES RIVER LABORATORIES INTERNATIONAL, INC., JAMES C. FOSTER and DAVID R. SMITH, <br><br> Defendants. | Honorable Denise J. Casper <br> Case No. 1:23-cv-11132 <br><br> Leave to file granted March 8, 2024 |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE COMPLAINT**

**KAPLAN FOX & KILSHEIMER LLP**
Frederic S. Fox (admitted *pro hac vice*)
Jeffrey P. Campisi (admitted *pro hac vice*)
Brandon Fox (*pro hac vice* forthcoming)
Carihanna Morrison (*pro hac vice* forthcoming)
800 Third Avenue, 38th Floor
New York, NY 10022

*Lead Counsel for Lead Plaintiff State Teachers
Retirement System of Ohio and the Proposed Class*

**SHAPIRO HABER & URMY LLP**
Edward F. Haber (BBO# 215620)
Patrick J. Vallely (BBO# 663866)
One Boston Place, Suite 2600
Boston, MA 02108

*Liaison Counsel for Lead Plaintiff State Teachers
Retirement System of Ohio and the Proposed Class*

Dated: March 15, 2024

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ........................................................................................... ii

I.    PRELIMINARY STATEMENT .................................................................................. 1

II.   FACTS ......................................................................................................................... 3

    A.    Before the Class Period, Charles River Loses it Macaque Supply in China
         and Pivots to Cambodian Suppliers ........................................................... 4

    B.    Defendants' Fraudulent Conduct ................................................................ 4

    C.    The DOJ and FWS Investigate the Company's Non-Preferred Suppliers ............. 7

    D.    The DOJ and FWS Block Charles River's Macaque Imports ............................... 8

    E.    The Indictment of Cambodian Macaque Suppliers ................................................ 8

    F.    Foster's Partial Disclosures and Blatant Lies to Investors...................................... 9

    G.    Foster Suspiciously Sells Stock Days before the Stock Crashes ........................... 9

III.  ARGUMENT ............................................................................................................. 10

    A.    The Complaint Adequately Alleges Falsity............................................................ 11

        1.    Representations in Response to the Indictment ........................................ 11

        2.    Representations Concerning Engagement with Non-Preferred
            Suppliers ................................................................................................... 12

        3.    Representations Concerning Purpose-Bred and SPF Macaques............... 15

        4.    Representations Concerning Supply Chain Concentration....................... 15

        5.    Representations Concerning Macaque Demand and Inventory................ 16

        6.    Representations Concerning Legal Compliance and Code of
            Conduct .................................................................................................... 18

    B.    The Complaint Adequately Alleges a Strong Inference of Scienter..................... 20

    C.    The Complaint Adequately Alleges Loss Causation ........................................... 25

IV.   CONCLUSION............................................................................................................. 28

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
  512 F.3d 46 (1st Cir. 2008) ................................................................................. 28

*Aldridge v. A.T. Cross Corp.*,
  284 F.3d 72 (1st Cir. 2002) ............................................................................ 20, 22

*Aronson v. Ad. Cell Tech., Inc.*,
  972 F. Supp. 2d 123 (D. Mass. 2013)................................................................... 13

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................. 10

*Ass'n of Co. v. Abiomed, Inc.*,
  778 F.3d 228 (1st Cir. 2015) ............................................................................... 21

*Auto. Indus. Pen. Tr. Fund v. Textron, Inc.*,
  682 F.3d 34 (1st Cir. 2012) ................................................................................. 21

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................. 11

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008)................................................................................ 22

*Brumbaugh v. Wave Sys. Corp.*,
  416 F. Supp. 2d 239 (D. Mass. 2006)................................................. 12, 21, 23, 28

*City of Dearborn Heights Act 345 Pol. & Fire Ret. Sys. v. Waters Corp.*,
  632 F.3d 751 (1st Cir. 2011) ............................................................................... 21

*City of Fort Lauderdale Police and Firefighters Ret. Sys. v. Pegasystems, Inc.*,
  2023 WL 4706741 (D. Mass. July 24, 2023) ....................................................... 19

*City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. CVS Health Corp.*,
  46 F.4th 22 (1st Cir. 2022) .................................................................................. 14

*Collier v. ModusLink Glob. Sols., Inc.*,
  9 F. Supp. 3d 61 (D. Mass. 2014)......................................................................... 20

*Constr. Indus. & Lab. Jt. Pen. Tr. v. Carbonite, Inc.*,
  22 F. 4th 1 (1st Cir. 2021) ............................................................................ *passim*

*Coyne v. Metabolix, Inc.*,
  943 F. Supp. 2d. 259 (D. Mass. 2013)....................................................................... 26

*Crowell v. Ionics, Inc.*,
  343 F. Supp. 2d 1 (D. Mass. 2004)........................................................................... 24

*Dahhan v. OvaScience, Inc.*,
  321 F. Supp. 3d 247 (D. Mass. 2018)....................................................................... 23

*Dura Pharma. Inc. v. Broudo*,
  544 U.S. 336 (2005) ................................................................................................. 25

*Findwhat Investor Group v. Findwhat.com*,
  658 F.3d 1282 (11th Cir. 2011).............................................................................. 27

*Gerneth v. Chiasma, Inc.*,
  2018 WL 935418 (D. Mass. Feb. 15, 2018)............................................................. 14

*Greebel v. FTP Software, Inc.*,
  194 F.3d 185 (1st Cir. 1999) ................................................................................... 21

*In re Allaire Corp. Sec. Litig.*,
  224 F. Supp. 2d 319 (D. Mass. 2002)............................................................ 12, 13, 21, 23

*In re Biogen Sec. Litig.*,
  193 F. Supp. 3d 5 (D. Mass. 2016)........................................................................... 18

*In re Bioscrip Sec. Litig.*,
  95 F. Supp. 3d 711 (S.D.N.Y. 2015) ....................................................................... 19

*In re Bos. Sci. Corp. Sec. Litig.*,
  646 F. Supp. 3d 249 (D. Mass. 2022)................................................................. 24, 25

*In re Brooks Auto., Inc. Sec. Litig.*,
  2007 WL 4754051 (D. Mass. Nov. 6, 2007)........................................................... 28

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002) ..................................................................................... 20

*In re CS-AOL Sec. Litig.*,
  465 F. Supp. 2d 34.................................................................................................... 25

*In re Lernout & Hauspie Sec. Litig.*,
  230 F. Supp. 2d 152 (D. Mass. 2002)...................................................................... 23

*In re PerkinElmer, Inc. Sec. Litig.*,
  286 F. Supp. 2d 46 (D. Mass. 2003)........................................................................ 23

iii

*In re Smith & Wesson Hold. Corp. Sec. Litig.*,
  604 F. Supp. 2d 332 (D. Mass. 2009)..................................................................... 18

*In re Raytheon Sec. Litig.*,
  157 F. Supp. 2d 131 (D. Mass. 2001)..................................................................... 13

*In re Van der Moolen Hold. N.V. Sec. Litig.*,
  405 F. Supp. 2d 388 (S.D.N.Y. 2005) .................................................................... 17

*Kafenbaum v. GTECH Holdings Corp.*,
  217 F. Supp. 2d 238 (D.R.I. 2002) .................................................................. 24, 25

*Karth v. Keryx Biopharma., Inc.*,
  2018 WL 3518497 (D. Mass. July 19, 2018) ......................................................... 16

*Kiken v. Lumber Liqs. Hold., Inc.*,
  155 F. Supp. 3d 593 (E.D. Va. 2015)......................................................... 15, 17, 23

*Kushner v. Beverly Enters., Inc.*,
  317 F.3d 820 (8th Cir. 2003)................................................................................. 19

*Leung v. Bluebird Bio, Inc.*,
  599 F. Supp. 3d 49 (D. Mass. 2022)...................................................................... 25

*Lipow v. Net1 UEPS Tech, Inc.*,
  131 F. Supp. 3d 144 (S.D.N.Y. 2015) .................................................................... 19

*Loos v. Immersion Corp.*,
  762 F.3d 880 (9th Cir. 2014)................................................................................. 28

*Mass. Ret. Sys. v. CVS Caremark, Corp.*,
  716 F.3d 229 (1st Cir. 2023) ..................................................................... 25, 26, 27

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) .......................................................................................... 10, 15

*Meyer v. Green*,
  710 F.3d 1189 (11th Cir. 2013).............................................................................. 28

*Miss. Pub. Emps. Ret. Sys. v. Bos. Sci. Corp.*,
  523 F.3d 75 (1st Cir. 2008) ............................................................................. 11, 21

*Omnicare, Inc. v. Lab. Dist. Council Const. Indus. Pen. Fund*,
  575 U.S. 175 (2015) .............................................................................................. 19

*Ponsa-Rabell v. Santander Sec. LLC*,
  35 F.4th 26 (1st Cir. 2022) ................................................................................... 16

*Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*,
    769 F.3d 313 (5th Cir. 2014)................................................................... 27, 28

*Pyramid Hold., Inc. v. Inverness Med. Innov. Inc.*,
    638 F. Supp. 2d 120 (D. Mass. 2009)............................................................ 14

*Shaw v. Digital Equip. Corp.*,
    82 F.3d 1194 (1st Cir. 1996) ................................................................... 18, 21

*Sloman v. Presstek, Inc.*,
    2007 WL 2740047 (D.N.H. Sept. 18, 2007) ........................................... 24, 25

*Solta Med., Inc. v. Lumenis, Inc.*,
    454 F. Supp. 3d 107 (D. Mass. 2020)............................................................ 12

*Sousa v. Sonus Networks, Inc.*,
    261 F. Supp. 3d 112 (D. Mass. 2017)............................................................ 22

*Sp. Sits. Fund III, L.P. v. Am. Dental Partners, Inc.*,
    775 F. Supp. 2d 227 (D. Mass. 2011)....................................................... 14, 25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ..................................................................................... 20

*Tutor Perini Corp. v. Banc of Am. Sec. LLC*,
    842 F.3d 71 (1st Cir. 2016) ........................................................................... 14

*Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*,
    28 F. Supp. 3d 93 (D. Mass. 2014)................................................................ 23

*Yan v. ReWalk Robotics Ltd.*,
    973 F.3d 22 (1st Cir. 2020) ........................................................................... 18

*Yannes v. SCWorx Corp.*,
    2021 WL 2555437  (S.D.N.Y. June 21, 2021)................................................ 23

**Statutes**

15 U.S.C. § 78t(a) ............................................................................................ 28

15 U.S.C. § 78u-4(b)......................................................................................... 3

**Rules**

Fed. R. Civ. P. 8(a) ..................................................................................... 3, 25

Fed. R. Civ. P. 9(b) ..................................................................................... 3, 25

Fed. R. Civ. P. 15............................................................................................ 28

## I.    PRELIMINARY STATEMENT

The Amended Complaint (the "Complaint") (ECF No. 36) alleges securities fraud claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") against Defendants.[1]  The Complaint alleges a classic case of securities fraud. Defendants made materially false and misleading statements that concealed material, negative risks facing the Company that artificially inflated the price of the Company's stock. CEO Foster and CFO Smith, the Company's most senior executive officers, sold over $67 million in stock at suspicious times while knowing of, or at least disregarding with a high degree of recklessness, the undisclosed material, negative risks facing the Company, and the Company's stock price crashed after a series of partial disclosures that revealed Defendants' wrongful conduct.

Defendants' arguments rely on a cropped version of the Complaint's allegations that improperly cherry-picks facts and considers them in isolation, ignores key allegations, and disputes facts.  For example:

- Defendants argue that there are no allegations connecting Charles River to the individuals indicted by the U.S. Department of Justice ("DOJ") for trafficking Cambodian long-tailed macaques ("Macaques") into the U.S. or the alleged illegality. MTD at 1-2.  Defendants ignore that several indicted individuals are executives of a group of suppliers (Vanny Group) from whom Charles River acquired Macaques, and that Charles River acquired Macaques from suppliers who are alleged co-conspirators. ¶¶17, 31-33, 124-29, 315-18.

- Defendants repeatedly argue that the Complaint does not "allege any facts showing that

---

[1] "Defendants" refers to Charles River Laboratories International, Inc. ("Charles River" or the "Company"), James C. Foster, the Company's President, Chief Executive Officer ("CEO") and chair of the Company's board of directors ("Foster"), and David R. Smith, the Company's former Chief Financial Officer ("CFO") ("Smith"). Defendants' Memorandum of Law (ECF No. 43) is referred to as "MTD." Citations to "¶_" refer to paragraphs of the Complaint.

Charles River purchased Macaques from any 'non-preferred vendors.'" MTD at 12. However, Defendants ignore the allegations (based on government records) that Charles River purchased thousands of Cambodian Macaques from non-preferred suppliers and brokers, who Foster admitted at the end of the Class Period were disreputable and did not "care where the animals come from" or "what the background is." ¶¶13, 17, 31, 50, 124-26, 133-35, 348.

- Defendants argue that the Complaint fails to allege sufficient context to show Foster and Smith's massive stock sales were unusual or suspicious. MTD at 18-19. However, Defendants ignore that the Complaint alleges sales as the stock price rose and near Class Period-high price per share (¶19, chart showing stock sales), that CEO Foster sold 41% of his shares for net proceeds of over $58 million (¶65), that CFO Smith sold 54% of his shares for over $9 million in net proceeds (¶67), and that their sales suspiciously occurred shortly after their misrepresentations and at other suspicious times. Tellingly, Defendants ignore Foster's suspiciously timed sale of $5 million in stock on February 15, 2023, just days before the DOJ subpoena and other negative news was disclosed, causing Charles River's stock price to crash. ¶¶46-47, 340-47.

- Defendants argue that the Complaint has not pleaded facts plausibly showing that Charles River did not comply with applicable law or knew of any activity of an illegal nature. MTD at 16. This is a straw man argument based on a mischaracterization of the Complaint. The Complaint alleges that by engaging non-preferred suppliers of Cambodian Macaques at a time when such suppliers suspiciously and rapidly increased Macaque production, Defendants increased the risk of heightened legal scrutiny of the Company and its supply chain by the DOJ and U.S. Fish and Wildlife Service ("FWS").

Defendants' arguments fail to meaningfully consider—and in several instances ignore—each alleged false and misleading statement and the context in which each was made. When viewed

in context, Defendants' misrepresentations are alleged with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b).   Defendants' arguments concerning scienter are equally unavailing.  The Complaint alleges a cogent and compelling inference of scienter based on facts that the First Circuit has stated are classic indicia of securities fraud—Foster and Smith's unusual and suspicious sales of over $67 million in Charles River stock, allegations of admissions, divergence between internal reports and external statements on the same subject, closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information, and disregard of the most current factual information before making statements. Finally, regarding loss causation, the Complaint need only allege a plain and short statement under Rule 8(a) of the Federal Rules of Civil Procedure, and Defendants do not argue otherwise.  The Complaint easily meets this standard, alleging Defendants' fraud was revealed through a series of partial disclosures that caused the stock price to decline.

## II.    FACTS

Charles River is the world's largest provider of outsourced animal or non-clinical drug research and experiments. ¶¶4, 69.  The Company both supplies Macaques to drug companies and uses them in connection with its drug safety assessment studies, its largest source of revenue.  ¶¶71-74.  The Macaque is a non-human primate ("NHP") similar to humans and is one of the most widely used animals for drug safety assessment studies. ¶¶75-80. Nearly all Macaques are imported into the U.S. and are subject to strict regulation under international law (the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES")) and U.S. law (the Endangered Species and Lacey Acts)—Cambodian Macaques must be purpose-bred and sourced from breeding farms, not trapped from the wild. ¶¶7, 84-88, 92-106.

### A.    Before the Class Period, Charles River Loses it Macaque Supply in China and Pivots to Cambodian Suppliers

Charles River is the largest user of Macaques in the U.S. and therefore a steady and timely supply of Macaques was material to its customers and to the Company's financial results.  ¶¶6, 81-82, 297-01, 367-71. Before the Class Period, Charles River obtained over 60% of its Macaques from China and owned a breeding farm to secure a steady and timely supply of Macaques.  ¶¶8, 110-16.  That changed in early 2020 when China blocked exports of Macaques in response to the COVID-19 pandemic. ¶¶9, 111, 136-38. China's COVID-19 related restrictions constrained the Macaque supply chain at the same time as demand for Macaques for research purposes increased, causing a massive 660% increase in the price per Macaque during the Class Period. ¶¶90-91.

To fill the void created by the Chinese export ban, Cambodian suppliers of Macaques suspiciously and rapidly increased production and export of Macaques between 2019 and 2020 by up to 86%, replacing China as the world's largest exporter of Macaques. ¶¶14, 114-15.  Due to the breeding patterns of Macaques, such a rapid escalation in captive-bred animals was highly unlikely and indicated that it was very likely that wild-caught (not captive-bred or specific pathogen free (SPF)) Cambodian Macaques were introduced into the Macaque supply chain, a practice forbidden by Cambodian, U.S. and international law.  ¶¶15-16, 97, 101, 117-23.  As admitted by a Charles River senior executive after the Class Period, "none of the [Macaque] farms can scale really, really quickly . . . gestation doesn't allow that. The animals have to be a certain age." ¶¶15, 121-22. Indeed, the suspicious and rapid increase in Macaques exported by Cambodian suppliers drew the attention of the DOJ and FWS, who before and during the Class Period were investigating the trafficking of Cambodian Macaques into the U.S. ¶¶232-33, 238-39, 253-54, 280, 289-96.

### B.    Defendants' Fraudulent Conduct

By the beginning of the Class Period (May 7, 2020), in order to secure a steady and timely

supply of Macaques and to meet customer demand, Defendants pivoted the Company's Macaque supply chain to Cambodia, which replaced China as Charles River's largest source of Macaques (over 60% concentration). ¶¶8-10, 114-16. During the Class Period, Charles River obtained Cambodian Macaques from non-preferred suppliers and animal brokers, such as Inotiv Inc. ("Inotiv"), Envigo Global Services, Inc. ("Envigo"), Orient BioResource Center, Inc. ("ORBC"), and Worldwide Primates, Inc. ("WW Primates"). ¶17 (chart of Charles River's suppliers). These non-preferred suppliers and brokers obtained Cambodian Macaques from Vanny Cambodia. ¶¶127-29. In addition, Charles River obtained Macaques from KHI Bioservices Ltd. ("KHI") and Nafovanny, both affiliates of Vanny Cambodia and members of the Vanny Group of companies. ¶¶17, 134-35. In addition to these non-preferred suppliers, Charles River obtained Macaques from K.F. (Cambodia) Ltd. ("KF Cambodia"). ¶¶130-32.

Unknown to investors, Defendants' shift to non-preferred Cambodian suppliers put the Company at increased risk. By purchasing from such suppliers, it is very likely that Charles River received animals trapped from the wild, which materially and substantially increased the risk: **1)** that shipments received from these non-preferred suppliers contained animals that were not purpose-bred; **2)** that the Company's conduct and its Macaque supply chain would be subject to heightened scrutiny, namely the ongoing DOJ and FWS investigation; and **3)** that the Company's supply chain of Macaques would be materially interrupted, thereby reducing the Company's revenue and margins. *E.g.* ¶¶13, 142.

However, at the start of and throughout the Class Period, Defendants falsely represented that the Company "may" source products from non-preferred vendors, when in fact, *it was already* sourcing from non-preferred suppliers of Cambodian Macaques. ¶¶145, 157, 170, 184, 213, 226, 244, 262, 276, 285, 305. Charles River obtained thousands of Cambodian Macaques from non-

preferred suppliers, which at that time were under investigation for sourcing Macaques from the wild (not purpose-bred). ¶¶17, 20, 28-29, 124-29, 133-35, 232-33, 238-39, 253-54, 280, 289-96.

In addition, during the Class Period, while knowing, or disregarding with at least a high degree of recklessness, of the Company's shift to concentrate its Macaque supply chain in Cambodia and reliance on non-preferred suppliers at a time when Cambodian suppliers had rapidly and suspiciously increased Macaque production, Foster and Smith represented: **1)** that the Company had adequate inventory or was increasing inventory to meet customer demand for Macaques, which increased revenue and margins, while mitigating supply chain risks or disruptions, when in fact, as a result of engaging non-preferred vendors concentrated in Cambodia, Defendants materially increased risks to the Company; **2)** that the Company was sourcing products from multiple countries and geographies, when in fact, its Macaque supply was overly concentrated in Cambodia; **3)** that the Company was a provider of purpose-bred, SPF Macaques, when it was very likely that Charles River's Cambodian Macaques were taken from the wild and therefore were not purpose-bred or SPF; and **4)** that the Company was in compliance in all material respects with U.S. law and the standards set by CITES and the FWS, when the Company had already engaged in conduct that substantially increased the risk that the Company would be subject to heightened scrutiny. ¶¶139-312.[2]

CEO Foster and CFO Smith were well aware of the Company's shift to concentrate the Company's supply chain in Cambodia and the attendant increased risks to the Company. Throughout the Class Period during investor conference calls, Foster and Smith regularly

---

[2] Macaque demand and inventory misrepresentations: ¶¶143, 147, 157, 168, 172, 184, 191, 213, 221, 226, 244, 248, 250, 256, 260, 274, 303. Supply chain concentration misrepresentations: ¶¶162, 176, 203, 236, 248. Purpose-bred and SPF misrepresentations: ¶¶188, 258. Legal compliance and code of conduct misrepresentations: ¶¶149, 174, 186, 195, 200, 215, 228, 246, 264, 278, 287, 307.

responded to investor and analyst questions about the state of the Company's Macaque supply chain, they indicated that they monitored key risks of new and existing suppliers, and conducted periodic and annual meetings with key suppliers and evaluated new suppliers for risks. ¶¶161, 176, 203, 236, 248, 250, 311, 391. Suspiciously, nearly all of Foster and Smith's materially false and misleading statements were followed closely in time by Foster and Smith's massive sales of Company stock. *See, e.g.,* ¶19 (chart); ¶¶151-52 ($3.6 million in sales on or around 5/7/20 misrepresentations); ¶¶163-66 ($5.4 million in sales days after 8/5/20 misrepresentations); ¶¶178-82 ($6.4 million in sales days after 10/29/20 misrepresentations); ¶¶205-11 ($12.9 million in sales days after 2/17/21 misrepresentations); ¶¶217-19 ($4.7 million in sales on or around 5/4/21 misrepresentations); ¶¶234-35 ($4.7 million in sales days after 8/4/21 misrepresentations); ¶252 ($6.3 million in sales weeks after 11/3/21 misrepresentations); ¶¶270-72 ($7.4 million in sales days after 2/16/22 misrepresentations).

### C.    The DOJ and FWS Investigate the Company's Non-Preferred Suppliers

Foster and Smith—as Charles River's most senior officers who continuously monitored supply chain risks and suppliers, knew, or at least disregarded with a high degree of recklessness, that one of the Company's non-preferred suppliers, ORBC (acquired by Inotiv in January 2022), was the subject of an ongoing DOJ and FWS investigation into the trafficking of Macaques from Southeast Asia. ¶¶21, 23, 232-33, 238-39, 391. While Defendants argue that the DOJ's investigation and the criminal conviction of an ORBC executive had nothing to do with Charles River, they miss the point. MTD at 16-17. The DOJ and FWS's conviction of an executive of a key Charles River non-preferred supplier and the existence of the ongoing investigation were publicized in the media through press releases—facts that put Defendants on notice of the ongoing investigation. ¶¶21, 232-33, 238-39. Suspiciously, days after the August 4, 2021 DOJ press release that disclosed an "ongoing investigation into the trafficking" of Macaques from Southeast Asia,

7

Foster and Smith collectively sold approximately $4.7 million in Charles River stock. ¶¶21-22, 233-35. By February 2022, Inotiv disclosed that its subsidiary, Envigo, received a grand jury subpoena in connection with the DOJ's ongoing investigation. ¶¶25, 253-54. Just days later, Foster sold $6.1 million in stock. ¶26. Then in May 2022, Inotiv disclosed that ORBC, like Envigo, was under investigation. ¶¶27, 280.

### D.    The DOJ and FWS Block Charles River's Macaque Imports

By no later than September 2022, the DOJ and FWS's ongoing investigation had zeroed in on the conduct of Charles River and its Cambodian supplier, KF Cambodia. On or around September 21, 2022, the FWS refused to clear a shipment of 360 Macaques from KF Cambodia to Charles River. ¶¶289-90. Far from a "voluntary" decision to stop imports of Cambodian Macaques, as Defendants suggest (MTD at 1, 4, 9), the FWS blocked the Company's imports to preserve evidence because there were grounds to believe federal law or regulations had been violated. ¶¶30, 289-96. Despite facing an ongoing government investigation that blocked Charles River from importing Macaques and that the Company was already under legal scrutiny, just weeks later, on November 2, 2022, Charles River and Foster falsely represented that "we are currently in compliance in all material respects with applicable national . . . laws, as well as other accepted guidance used by oversight bodies (including . . . the standards set by" CITES and the FWS. ¶307.

### E.    The Indictment of Cambodian Macaque Suppliers

On November 16, 2022, six executives of the Vanny Group of companies were charged with violations of U.S. law for participating in a scheme to smuggle Macaques into the U.S. ¶¶31-33, 314-22. The DOJ indicted several Vanny Group executives—individuals who operated and controlled Vanny Cambodia, KHI and Nafovanny—all suppliers to Charles River. ¶¶31-32, 127-29, 134-35. Moreover, the Indictment alleged two "unnamed" co-conspirators—Charles River non-preferred suppliers ORBC or Envigo, and WW Primates. ¶¶31, 125-26, 133, 316. On

November 16, 2022, Charles River shares declined over 4% on heavy volume. ¶34.

### F.    Foster's Partial Disclosures and Blatant Lies to Investors

On November 30, 2022, during an investor conference in which the Indictment was centerstage and in a report filed with the SEC, Charles River and Foster disclosed that the Company's Macaque supply was overly concentrated in Cambodia, that the supply chain from Cambodia was negatively impacted, and that "supply of Cambodia-sourced [Macaques] will be difficult to obtain" in the U.S.—disclosures that caused the Company's stock to decline by over 12%. ¶¶326-28.  However, also on November 30, 2022, Charles River and Foster represented that Charles River had no "direct contract" or "contacts" with the indicted suppliers and further represented that Charles River was still able to import Cambodian Macaques, which were materially false and misleading statements that maintained the inflation in Charles River's stock price. ¶¶37-42, 326-31. Then on January 12, 2023, contrary to Charles River and Foster's prior representations that they had no "direct" relationship with Vanny Cambodia, Jefferies published a research report that revealed that at least 24% of the Company's Macaques were supplied by Vanny Cambodia and that immediately finding new supply was unlikely, "putting at risk a high growth contributor," causing the Company's stock to decline 6%. ¶¶43-44.

### G.    Foster Suspiciously Sells Stock Days before the Stock Crashes

On December 29, 2022 and January 24, 2023, the FWS blocked additional shipments to Charles River from KF Cambodia, bringing the total of blocked shipments to 1,269 Cambodian Macaques with a market value of over $17 million. ¶¶45, 294-96.  Then, on February 15, 2023, Foster executed a suspiciously timed sale of Charles River stock, reaping over $5 million. ¶46. Just days later, on February 22, 2023, Charles River revealed that **1)** it was under DOJ and FWS investigation and had received a grand jury subpoena, **2)** that the Company was "suspending" shipments of Macaques from Cambodia, which would negatively impact its earnings for 2023 and

9

would reduce revenue growth by $80-160 million, and **3)** that, in sharp contrast to Foster's representations on November 30, 2022, the investigation was focused on the Company's conduct and that the FWS blocked the shipments of Cambodian Macaques to Charles River.  ¶¶47-48. On this news, the Company's stock declined by over 10%. ¶49.

The Class Period ends on March 15, 2023, when Foster made the stunning admission that Charles River, in fact, engaged non-preferred suppliers of Macaques who "[r]eputationally" are not "the best possible people to use" and who did not "care where the animals came from or what the background is,"—a disclosure that caused the Company's stock to decline by approximately 5%. ¶¶50-51.  Since the end of the Class Period, the SEC has been investigating both the Company's and Inotiv's disclosures to investors concerning the sourcing of Macaques from Southeast Asia.  ¶52.  Moreover, rather than demonstrate that the Company's Cambodian Macaques were captive or purpose-bred, as the FWS requires, Charles River suspiciously shifted its Macaque animal research studies outside of the U.S. to circumvent further legal scrutiny of its supply chain—a tacit admission that Macaques imported during the Class Period were not purpose-bred. ¶¶54-55.

## III.    ARGUMENT

To state a claim under Section 10(b) of the Exchange Act, Plaintiff must plead (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation and the purchase of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).  A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Constr. Indus. & Lab. Jt. Pen. Tr. v. Carbonite, Inc.*, 22 F. 4th 1, 6 (1st Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  In ruling on a motion to dismiss, the Court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in Plaintiff's

favor. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). As discussed below, the Complaint adequately alleges a plausible claim under Section 10(b).

## A.    The Complaint Adequately Alleges Falsity

Defendants' falsity arguments group the Complaint's statements into two broad categories—supply chain and compliance. MTD at 12-18. However, Defendants' sweeping arguments fail to meaningfully consider each alleged false and misleading statement, the context in which it was made, or why the Complaint alleges Defendants' representations were materially false and misleading at the time they were made. Such deficiencies are fatal to Defendants' arguments.

## 1.    Representations in Response to the Indictment

On November 30, 2022, in response to the Indictment, Charles River and Foster represented that Charles River had "no direct contracts" or "direct contacts" with Vanny Cambodia, creating the false impression that Vanny Cambodia was not a supplier to the Company. ¶¶37-42, 326-31. Foster's representation was materially misleading because he failed to disclose that Charles River had obtained Macaques indirectly from the indicted supplier, Vanny Cambodia, through Charles River's non-preferred suppliers who were co-conspirators in the Indictment. Moreover, contrary to Foster's representation, Charles River had direct contacts with Vanny Cambodia's executives and affiliate companies Nafovanny and KHI and received Macaques directly from them. ¶¶134-35. Given these representations were made two weeks after the Indictment was unsealed and that investors and analysts asked questions during the 11/30/22 conference call that sought to ascertain the Indictment's impact on Charles River, a reasonable investor would have viewed the information that Charles River and Foster omitted as important and having altered the mix of information available. *Carbonite*, 22 F.4th at 8; *Miss. Pub. Emps. Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 85 (1st Cir. 2008). Indeed, sophisticated analysts were

misled by Charles River and Foster's lies. ¶¶42, 334.

Moreover, Defendants ignore and do not address Foster's 11/30/22 misrepresentation that "one of the big suppliers from Cambodia, who's not a supplier of ours is unable to ship. So that's going to hurt some folks," which was yet another falsehood that created the misimpression that Charles River was able to import Cambodian Macaques to the U.S. and was not implicated in the conduct that led to the Indictment, which was not true. ¶¶41, 327, 331. Far from being able to import Macaques, starting in September 2022, the U.S. government had already blocked Charles River's import of Cambodian Macaques and, at the time of Defendant Foster's representation, Charles River was, in fact, "unable to ship" Cambodian Macaques to the U.S. due to the ongoing criminal investigation (a prohibition still in effect today). Defendants' failure to address these misrepresentations concedes that they are adequately alleged. *See Solta Med., Inc. v. Lumenis, Inc.*, 454 F. Supp. 3d 107, 112 (D. Mass. 2020) (Casper, J.) (finding argument raised for first time in reply is waived).

Defendants assert that, in effect, Foster's no "direct supply contracts" representation was accurate. MTD at 13. However, this argument ignores the well-settled principle that the "disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 249 n.10 (D. Mass. 2006). Having elected to comment on the Company's Macaque suppliers, Charles River and Foster were required to make full and accurate disclosures and not mislead. *See In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 327 (D. Mass. 2002).

**2.    Representations Concerning Engagement with Non-Preferred Suppliers**

Defendants represented that the Company "may" source its products from non-preferred vendors, when in truth, by the start of the Class Period the Company had already engaged non-preferred suppliers of Cambodian Macaques and exposed the Company to increased risks.

Defendants' repeated assertions that the Complaint does not "allege any facts showing that Charles River purchased [M]acaques from any 'non-preferred vendors'" (MTD at 12-15) ignore the Complaint's allegations (¶¶13-17, 31, 126-29, 133-35) and raise fact disputes that cannot be resolved on a motion to dismiss.  *See Aronson v. Ad. Cell Tech., Inc.*, 972 F. Supp. 2d 123, 132-33 (D. Mass. 2013).  Similarly meritless is Defendants' argument that on March 15, 2023, Foster did not admit that the Company engaged non-preferred suppliers during the Class Period. MTD at 12-13. Defendants again ignore the allegations that Charles River purchased Cambodian Macaques from non-preferred suppliers and, in essence, ask the Court to read Foster's admission in the light most favorable to Defendants, which is improper on a motion to dismiss. *In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131, 147 (D. Mass. 2001); *Allaire*, 224 F. Supp. 2d at 327-28 ("The appropriate place to proffer contradictory facts is on a motion for summary judgment . . ."). Read in the light most favorable to Plaintiff, Foster admitted, contrary to his prior representations, that the Company did, in fact, engage disreputable non-preferred suppliers during the Class Period.

Defendants further argue that "Plaintiff does not allege that Charles River had not taken 'steps to find alternative supply channels and lock in supply with preferred sources through multi-year and/or minimum commitment contracts to ensure steady and timely supply.'"  MTD at 12. Defendants' argument misses the point.  While Defendants may have made efforts to secure preferred sources, the Complaint alleges that they failed to disclose that to secure a "steady and timely supply" of Macaques, the Company had already engaged non-preferred suppliers of Cambodian Macaques at a time when Cambodian suppliers of Macaques had suspiciously and rapidly increased production of Macaques, making it very likely that wild-caught Macaques were introduced into the Cambodian supply chain. ¶146. By engaging and purchasing from such suppliers, it is very likely that Charles River received animals trapped from the wild, substantially

13

increasing the risks to the Company. *Id.*

Defendants assert that the risk "warning" that the Company "may" in the future engage non-preferred suppliers shields them from liability. MTD at 6-7, 15. The fundamental defect with Defendants' argument is that it relies on the assertion that the Complaint "does not allege facts showing that Charles River used any vendor that it considered a 'non-preferred vendor' during the class period," which, as noted above, is contradicted by the Complaint's allegations. ¶¶13, 17, 20, 50, 125-29, 133-35, 348.   Moreover, while Defendants assert that the increased risks to the Company as a result of engaging non-preferred Cambodian Macaque suppliers was not foreseeable "at any relevant point in time" (MTD at 15), this is not true.  For example, on August 3, 2022, and November 2, 2022, Defendants warned of the future risk that they "may" source from non-preferred suppliers. ¶¶285, 305.  By that time, Defendants knew, or disregarded with a high degree of recklessness, facts that showed that the risks concerning the Company's engagement with non-preferred suppliers had already materialized, *i.e.*, the DOJ and USWFS had been investigating the Company's non-preferred suppliers. *See Sp. Sits. Fund III, L.P. v. Am. Dental Partners, Inc.*, 775 F. Supp. 2d 227, 236–37, 243 (D. Mass. 2011) (denying motion to dismiss statements that failed to disclose heightened legal risk); *Gerneth v. Chiasma, Inc.*, 2018 WL 935418, at *4 (D. Mass. Feb. 15, 2018) (Casper, J.) ("[C]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").[3] Defendants did not warn that they were, in fact, sourcing from non-preferred suppliers and none of the risks attendant to engagement with non-preferred suppliers were disclosed.

---

[3] The Complaint alleges facts that provide the information necessary to infer that the future risk had already materialized.  In contrast, in *City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. CVS Health Corp.*, 46 F.4th 22, 33-35 (1st Cir. 2022), and *Pyramid Hold., Inc. v. Inverness Med. Innov. Inc.*, 638 F. Supp. 2d 120, 125 (D. Mass. 2009), plaintiffs failed to provide such information.  The decision in *Tutor Perini Corp. v. Banc of Am. Sec. LLC* (MTD at 15) supports Plaintiff because the First Circuit stated that questions of whether a risk disclosure failed to warn investors are questions for a jury. 842 F.3d 71, 91-92 (1st Cir. 2016).

Finally, Defendants assert that the Complaint does not allege that "any 'non-preferred' supplier ever shipped wild-caught macaques to Charles River." MTD at 15. However, the Complaint alleges that: **1)** the indicted supplier, Vanny Cambodia, was the principal supplier for Inotiv, Envigo and ORBC, **2)** Charles River purchased thousands of Macaques from non-preferred suppliers Inotiv, Envigo, ORBC and WW Primates (co-conspirators in the Indictment), **3)** Charles River obtained at least 24% of its Macaques from Inotiv, **4)** Cambodia was Charles River's primary country of origin of Macaques where breeding farms cannot scale rapidly, **5)** the FWS forced both Inotiv and Charles River to stop importing Cambodian Macaques because they could not show that they were purpose-bred, *i.e.*, not taken from the wild, and **6)** both Charles River and Inotiv are under government investigation—facts that plausibly infer that non-preferred suppliers shipped "wild-caught" Macaques to Charles River. ¶¶15, 20, 27-28, 37, 52, 54-55, 324, 326, 332, 338, 365.

### 3.     Representations Concerning Purpose-Bred and SPF Macaques

Defendants represented that the Company was a provider of "purpose bred, SPF" Macaques to the "biomedical research community," which was materially false and misleading because it was very likely that Charles River's Cambodian Macaques were taken from the wild and therefore were not purpose-bred or SPF. These representations were material because purpose-bred, SPF Macaques are the preferred research models of Charles River's customers who cannot use non-SPF Macaques in research. ¶¶109, 190.  Misrepresentations concerning the quality and nature of a Company's product are actionable. *Matrixx*, 563 U.S. at 47; *Kiken v. Lumber Liqs. Hold., Inc.*, 155 F. Supp. 3d 593, 604 (E.D. Va. 2015). Defendants ignore these allegations, and therefore, concede that they have been adequately alleged.

### 4.     Representations Concerning Supply Chain Concentration

To reassure investors that the Company had ample supply in light of supply constraints, Defendants represented that the Company was sourcing products from multiple countries, when,

in fact, its Macaque supply was overly concentrated in Cambodia (over 60%) and the Company had engaged non-preferred Cambodian suppliers which increased the risks to the Company. Defendants' argument that these representations are inactionable opinion statements cherry-picks facts, while ignoring the context in which these statements were made and why they were materially false and misleading. MTD at 13. For example, Foster represented that "we're doing very well resourcing in NHPs" in the context of representing that Charles River's supply chain was diversified in terms of geography, which was materially misleading because the Company was overly concentrated and reliant on Cambodia for over 60% of its Macaques. ¶¶176-77. Such representations when viewed in context are not opinions, but rather statements of fact that are false and misleading. *Carbonite*, 22 F.4th at 7-8.

Defendants further assert that they had no duty to disclose any risks about the purchase from non-preferred suppliers. MTD at 15 (citing ¶237). However, when Defendants reassured investors about supply, Defendants were under a duty to reveal that the Company was overly concentrated in Cambodia and faced increased risks from engaging non-preferred suppliers. *See Karth v. Keryx Biopharma., Inc.*, 2018 WL 3518497, at *4 (D. Mass. July 19, 2018) (Casper, J.) ("[i]f . . . a company chooses to reveal relevant, material information even though it had no duty to do so, it must disclose the whole truth.") (citations omitted).[4]

### 5.    Representations Concerning Macaque Demand and Inventory

Defendants represented that the Company had adequate inventory or was increasing inventory to meet customer demand while mitigating potential supply chain risks or disruptions, when in fact, to obtain inventory and meet demand, the Company engaged non-preferred vendors

---

[4] Accordingly, *Ponsa-Rabell v. Santander Sec. LLC*, 35 F.4th 26, 34-35 (1st Cir. 2022) is irrelevant because in *Ponsa* plaintiffs asserted material omissions, failed to identify an independent duty to disclose, and asserted omissions of facts that had already been disclosed. Here, Defendants' affirmative misrepresentations gave rise to a duty to disclose.

concentrated in Cambodia that materially increased risks to the Company. ¶¶143, 147, 157, 168, 172, 184, 213, 221, 226, 244, 248, 250, 260.  Defendants further represented that demand for the Company's safety assessment studies, for which Macaques were essential, increased revenue and margins—representations that Defendants' motion ignores. ¶¶191, 256, 274, 303.

Defendants assert that the Complaint does not allege that Defendants did not "'proactively engage with its suppliers beginning in January 2020 to limit any potential disruption to its supply chain.'" MTD at 12 (citing ¶143).  Defendants again miss the point and ignore the Complaint's allegations. This representation was materially misleading because Defendants failed to disclose that in order to increase its inventory of Macaques, the Company engaged non-preferred suppliers at a time when Cambodian suppliers of Macaques had suspiciously and rapidly increased production, making it very likely that Charles River received animals trapped from the wild, which materially and substantially increased risks to the Company. When Defendants represented the Company's purported success in managing Macaque supply constraints and reported increased revenue and margins, it had a duty to disclose the increased risks to the Company because reasonable investors would find that such information would significantly alter the mix of available information. *See Kiken*, 155 F. Supp. 3d at 604-05 (finding failure to disclose product imported in violation of Lacey Act created misleading impression about success of sourcing initiatives); *In re Van der Moolen Hold. N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400-01 (S.D.N.Y. 2005).

Defendants assert that Foster's representation that "we've done an exceptional job in adding, ensuring, tightening up, and expanding our supply sources" is "non-actionable puffery." MTD at 14 (citing ¶221).  However, Defendants again cherry-pick facts and ignore context. Foster's statement that Charles River did not have "any sort of external or artificial roadblocks" in the supply chain (¶¶220-21) was materially false and misleading because he failed to disclose that

17

in order to successfully avoid "roadblocks" to sourcing a sufficient number Macaques to meet demand in light of supply constraints, the Company had engaged non-preferred suppliers of animals from Cambodia and increased risks to the Company. ¶222. Far from puffery, Defendants made representations concerning specific, concrete past conduct in response to an investor question about supply chain "stresses" that was false and misleading for failure to disclose the heightened risks Defendants had already taken to avoid Macaque supply constraints. *See In re Smith & Wesson Hold. Corp. Sec. Litig.*, 604 F. Supp. 2d 332, 342 (D. Mass. 2009) (finding statements of present or historical fact are not puffery); *Carbonite*, 22 F.4th at 8.[5]

Finally, Defendants assert that these representations are "forward-looking" and protected by the PSLRA's safe harbor. MTD at 14 (citing ¶¶143, 157, 168, 184, 260). Defendants are wrong. Foster's representations referenced past or historical conduct ("we have" increased inventory and supplies, and "we proactively engaged"), and are not forward-looking.[6] *Carbonite*, 22 F.4th at *8.

### 6.    Representations Concerning Legal Compliance and Code of Conduct

Defendants assert that their representations that Charles River was in compliance with CITES and FWS standards were not false and misleading because the Complaint has not pleaded facts plausibly showing that Charles River did not comply with applicable law or knew of any activity of an illegal nature. MTD at 16. As noted above, Defendants' argument mischaracterizes the Complaint. The Complaint alleges that the Company had already engaged in conduct that substantially and materially increased the risk that the Company and its supply chain would be

---

[5] In sharp contrast, the decision in *In re Biogen Sec. Litig.*, 193 F. Supp. 3d 5, 42 (D. Mass. 2016) found optimistic statements concerning future performance were puffery. Similarly, the court *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1219 (1st Cir. 1996) deemed vague statements like the company "should show progress" to be inactionable expressions of optimism about the future.

[6] In contrast, the statements at issue in *Yan v. ReWalk Robotics Ltd.*, 973 F.3d 22, 34 (1st Cir. 2020) were forward-looking—the verb tense made "clear" that the statements concerned the company's "expectancy for the future."

subject to heightened scrutiny including criminal and civil investigations. For example, when Charles River and Foster made this representation on November 2, 2022 (¶307), far from being a "hindsight" allegation, at that time they knew, or disregarded with a high degree of recklessness, that there was an ongoing DOJ and FWS investigation of the Company's non-preferred Cambodian Macaque suppliers from whom the Company had purchased thousands of Macaques, that the Company had sourced a majority of its Macaques from Cambodia at a time when Cambodian suppliers had rapidly and suspiciously increased production, and that the FWS had already blocked Charles River's imports because there were grounds to believe that a federal law or regulation had been violated—facts that conflicted with what a reasonable investor would take from the statement, and were more than the "mere existence of an investigation." *Omnicare, Inc. v. Lab. Dist. Council Const. Indus. Pen. Fund*, 575 U.S. 175, 188-89 (2015) (finding liability if speaker expresses opinion yet proceeds with knowledge that the federal government took opposite view); *In re Bioscrip Sec. Litig.*, 95 F. Supp. 3d 711, 722, 728-31 (S.D.N.Y. 2015) (finding legal compliance representation actionable where company received notice of government investigation indicating company likely to come under legal scrutiny).[7]

Finally, relying on out-of-circuit authorities, Defendants assert that codes of conduct are as a matter of law not actionable. MTD at 18. However, Defendants ignore that in *City of Fort Lauderdale Police and Firefighters Ret. Sys. v. Pegasystems, Inc.*, 2023 WL 4706741, at *9 (D. Mass. July 24, 2023), the court rejected this argument, finding that Pegasystems' code of conduct "describes with specificity a course of conduct that Pega promised to abjure." *Id.* (citing similar

---

[7] The court in *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003) found statements of compliance with Medicare regulations were inactionable because no regulatory actions had been taken during the class period. In contrast, during the Class Period, the FWS blocked the Company's Macaque shipments. ¶¶289-96. In *Lipow v. Net1 UEPS Tech, Inc.* 131 F. Supp. 3d 144, 155 (S.D.N.Y. 2015) the DOJ investigation began after the class period.

cases). Similarly, Charles River's code of conduct represented that the Company complied with international and U.S. law, which was materially misleading because the Company had already engaged in conduct that substantially and materially increased the risk that the Company and its supply chain would be subject to heightened legal scrutiny. ¶¶195-201, 266-69.

## B.    The Complaint Adequately Alleges a Strong Inference of Scienter

The PSLRA requires a securities fraud complaint to state with particularity facts that give rise to a strong inference of scienter. *Collier v. ModusLink Glob. Sols., Inc.*, 9 F. Supp. 3d 61, 69 (D. Mass. 2014) (Casper, J.). When analyzing scienter, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310, 326 (2007) (stating scienter need be only "at least as compelling as any opposing inference of nonfraudulent intent"). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id*. at 324.  "[W]here there are equally strong inferences for and against scienter, *Tellabs* now awards the draw to the Plaintiff," and courts may consider circumstantial evidence in assessing scienter. *Collier*, 9 F. Supp. 3d at 69.  In the First Circuit, motive and opportunity allegations, together with additional factual support, "establish a strong inference of scienter." *Aldridge v. A.T. Cross Corp*., 284 F.3d 72, 82 (1st Cir. 2002); *In re Cabletron Sys., Inc*., 311 F.3d 11, 38-39 (1st Cir. 2002); *Collier*, 9 F. Supp. 3d at 73.  The Complaint alleges facts supporting a strong inference of scienter that is at least as likely as Defendants' asserted nonculpable inference that, while they admittedly sold over $67 million in stock, they were unaware of the undisclosed, material risks facing the Company by engaging Cambodian Macaque suppliers in the midst of a DOJ and FWS investigation.

The complaint alleges motive and opportunity. ¶388. Foster and Smith sold over $67 million in artificially inflated shares of Charles River common stock—sales that were suspiciously

20

timed and in unusual amounts.[8] *See, e.g., Miss. Pub. Emps.*, 523 F.3d at 92-93 (finding strong inference of scienter where sales occurred before stock crashed); *Brumbaugh*, 416 F. Supp. 2d at 247, 254 (finding sales of 50% and 20% of holdings "quite suspicious" and supported inference of scienter); *Allaire*, 224 F. Supp. 2d at 331 (findings sales of 40% of holdings support inference of scienter).[9]  Defendants assert that the Complaint fails to allege sufficient context to show Foster and Smith's massive sales were suspicious or unusual. MTD at 18-19. However, Defendants ignore the Complaint's allegations that **1)** Foster and Smith's sales were unusual in terms of dollar amounts and in percentages of shares sold, **2)** the sales occurred around the time of their misrepresentations, shortly before the stock crashed, or shortly after the DOJ investigation was publicized, and **3)** the sales violated the Company's insider trading policy.[10] Contrary to Defendants' assertion, in the First Circuit, "trading histories are not a sine qua non of an allegation of unusual insider trading. Some trades may, from the face of things, be unusual." *City of Dearborn Heights Act 345 Pol. & Fire Ret. Sys. v. Waters Corp.*, 632 F.3d 751, 761 (1st Cir. 2011); *Miss. Pub. Emps*., 523 F.3d at 92-93 (analyzing sales during class period).[11]

Foster and Smith's massive suspiciously timed stock sales considered, together with

---

[8] In addition, Defendants ignore that two senior Charles River executives who oversaw the Company's Macaque business sold stock around the same time as Foster's suspiciously timed sale on 2/15/23 (¶46)—a fact that supports an inference of scienter.  *Shaw*, 82 F.3d at 1224; *see also Waters Corp.,* 632 F.3d at 762 n.5.  Defendants concede that opportunity has been adequately alleged.

[9] Defendants assert that Foster and Smith's millions of dollars in gifts are not probative of scienter. MTD at 19. However, the Complaint alleges that Smith gifted shares to his spouse "that were later sold" for over $2.3 million, bringing his total sales to over $11.3 million.  ¶67. Even assuming, *arguendo*, the Court does not consider Foster's gifts of over $12 million, Defendants do not dispute that he sold stock for over $58 million in net proceeds. ¶65.

[10] In contrast, in *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 206-07 (1st Cir. 1999), one insider accounted for nearly all the sales after his retirement, and insiders sold after disclosures that caused the stock to decline.  In *Fire & Pol. Pen. Ass'n of Co. v. Abiomed, Inc*. 778 F.3d 228, 245-46 (1st Cir. 2015), one insider increased his holdings, and, unlike here, the complaint "was silent" on "percentage of holdings sold or circumstances surrounding the trades."

[11] Indeed, the case upon which Defendants rely, *Auto. Indus. Pen. Tr. Fund v. Textron, Inc.*, 682 F.3d 34, 40 (1st Cir. 2012), states that an analysis of pre-class period trading history with class period trading is just an example ("*e.g.*") of the context needed to infer a strong inference of scienter.

indirect and circumstantial evidence of Defendants' state of mind, support a strong inference of scienter. Plaintiff may show that Defendants either "consciously intended to defraud" or acted with "a high degree of recklessness." *Carbonite*, 22 F.4th at 8. Recklessness means "a highly unreasonable omission constituting an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers and sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id*. at 8-9.

Charles River and Foster's 11/30/22 representations—that Charles River had no direct contracts or contacts with the indicted supplier and that, unlike the indicted supplier, Charles River could ship Cambodian Macaques—sharply conflicted with the then-existing facts. The Company did, in fact, obtain Macaques from Vanny Cambodia, it had direct contacts with the indicted individuals and co-conspirators, and weeks earlier the FWS blocked Charles River's Cambodian Macaque imports and therefore it could not ship from Cambodia.  Charles River and Foster publishing statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is "classic evidence of scienter." *Aldridge*, 284 F.3d at 83.  Moreover, the fact that the FWS blocked Charles River's shipments—in stark contrast to Foster's representation—is highly probative of scienter.  *See e.g., Berson v. Applied Sig. Tech., Inc*., 527 F.3d 982, 989 (9th Cir. 2008) (finding scienter where U.S. government orders were prominent enough that it would be "absurd to suggest" management was unaware). Here, the FWS's drastic actions to block shipments of Macaques, essential supply chain products for the Company's largest revenue generating segment, sharply diverged from what Foster told investors. In the alternative, Foster was at least highly reckless in making these representations without checking the Company's contacts with its supplier or if it could still import. *Carbonite*, 22 F.4th at 9.[12]

---

[12] In contrast to *Sousa v. Sonus Networks, Inc.*, 261 F. Supp. 3d 112, 120 (D. Mass. 2017), where the complaint lacked

Considering that **1)** CEO Foster and CFO Smith frequently commented to investors about Charles River's Macaque supply chain during conference calls and responded to investors' inquiries about the Macaque supply chain in light of supply constraints and rising prices (¶¶161, 176, 203, 220-21, 248, 250, 310-11),[13] **2)** that they continuously monitored key supply chain risks from new and existing suppliers and held periodic meetings with key suppliers and that they had "close working relationships with [their suppliers]" (¶¶176, 391),[14] **3)** that the DOJ and FWS investigation of the Company's non-preferred suppliers was publicly available information,[15] and **4)** that both Foster and Smith made numerous misrepresentations concerning the Company's non-preferred suppliers,[16] it is at least as likely than not that Foster and Smith knew, or disregarded with a high degree of recklessness, that the Company's non-preferred suppliers were under investigation by the DOJ and FWS and that, by engaging such suppliers, Defendants increased the risks to the Company.[17] *Carbonite*, 22 F.4th at 9-10.

---

key details when defendants became aware of facts, the Complaint alleges specific dates when Foster and Smith knew of, or at least disregarded with a high degree of recklessness, the DOJ and FWS investigation (8/5/21, 10/7/21, 2/16/22 and 5/16/22) and when the FWS blocked Charles River's Macaque imports (9/21/22, 12/29/22, and 1/22/23). ¶¶233, 239, 253, 280, 294-95.

[13] *See Dahhan v. OvaScience, Inc.*, 321 F. Supp. 3d 247, 255 (D. Mass. 2018) (finding scienter where CEO closely tracked treatments at issue); *Brumbaugh*, 416 F. Supp. 2d at 259 (finding inference of scienter where executives held positions providing access and familiarity with business).

[14] *Kiken*, 155 F. Supp. 3d. at 608 (finding scienter of executive who worked with suppliers that imported products in violation of Lacey Act).

[15] *See Yannes v. SCWorx Corp.*, 2021 WL 2555437, at *4-5 (S.D.N.Y. June 21, 2021) (finding scienter where defendant on notice of problems with key supplier because it was publicly known that executive of supplier was convicted felon); *Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 115 (D. Mass. 2014) (finding government investigations support inference of scienter); *In re Lernout & Hauspie Sec. Litig.*, 230 F. Supp. 2d 152, 165 (D. Mass. 2002) (same).

[16] *See In re PerkinElmer, Inc. Sec. Litig.*, 286 F. Supp. 2d 46, 54-55 (D. Mass. 2003) (finding inference of scienter where CEO and CFO held positions that provided access to and familiarity with company's business and they made allegedly false statements); *Avid Tech., Inc.*, 28 F. Supp. 3d at 115 (same); *Allaire*, 224 F. Supp. 2d at 330 (finding strong inference of scienter where senior executive officers of company were informed about major product line).

[17] Contrary to Defendants' argument (MTD at 20) and authorities, these facts show that the Complaint alleges more than Foster and Smith's corporate positions alone to support a strong inference of scienter.

Moreover, the Company's over concentration of its Macaque supply chain in Cambodia and the rapid increase in production from Cambodia raised a red flag that put Foster and Smith on notice that the Macaque supply chain likely contained animals taken from the wild. Given the gestation periods and fecundity of Macaques, the rapid increase in supply originating in Cambodia was not possible without including illegally-sourced wild animals. ¶¶16, 117-23, 347, 358. Indeed, after the Class Period, a Charles River senior executive admitted that the Company knew all along that it was biologically impossible for captive-breeding farms to rapidly increase production. ¶¶15, 123; *see Sloman v. Presstek, Inc.*, 2007 WL 2740047, at \*10 (D.N.H. Sept. 18, 2007) (finding admission supports inference of scienter); *Kafenbaum v. GTECH Hold. Corp.*, 217 F. Supp. 2d 238, 247 (D.R.I. 2002) (same). Defendants' assertion that there are no facts concerning breeding patterns at specific suppliers ignores that the Complaint alleges that none of the Cambodian suppliers could have rapidly increased production, and that the Vanny Group admitted to such constraints on its website. ¶¶117-23.

Defendants' Macaque sales were critical to the Company's safety assessment studies (Charles River's largest revenue-producing unit), the Company's Macaque business generated approximately $500 million in revenue and artificially inflated the Company's operating margin, and the Company purchased thousands of Cambodian Macaques from non-preferred suppliers. These facts make it at least as likely than not that CEO Foster and CFO Smith were aware that, by engaging non-preferred suppliers, Defendants increased the risk that the Company's financial results would be materially interrupted. *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 19 (D. Mass. 2004).[18]

---

[18] Foster and Smith's scienter is imputed to the Company. *In re Bos. Sci. Corp. Sec. Litig.*, 646 F. Supp. 3d 249, 261 (D. Mass. 2022).

24

Finally, Foster's admission at the end of the Class Period that the Company had, in fact, engaged non-preferred suppliers supports an inference of scienter. *See Sloman*, 2007 WL 2740047, at *9-10; *Kafenbaum*, 217 F. Supp. 2d at 247. Defendants mischaracterize Foster's admission as showing "candor." MTD at 20. However, as discussed *supra* at 13, Defendants' argument improperly asks the Court to construe Foster's statement in the light most favorable to Defendants, and ignores that Foster's admission was a corrective disclosure that caused the Company's stock price to decline.  Defendants further assert that the risk of disruption to its Macaque supply chain in the future was disclosed, undermining an inference of scienter. MTD at 6-7, 20. However, as discussed *supra* at 14, the Complaint alleges that Defendants' purported warning of a future risk was materially false and misleading because during the Class Period the risks had already materialized and were not disclosed.[19]

### C.      The Complaint Adequately Alleges Loss Causation

Loss causation allegations are reviewed under "'ordinary'—not heightened—pleading requirements." *Sp. Sits. Fund*, 775 F. Supp. 2d at 244.[20]  A plaintiff need only allege "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharma. Inc. v. Broudo*, 544 U.S. 336, 337 (2005).  The Complaint alleges loss causation by identifying corrective disclosures (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the Company's fraud), *Bos. Sci.*, 646 F. Supp. 3d at 291, and through partial materializations of concealed risks. *In re CS-AOL Sec. Litig.*, 465 F. Supp. 2d

---

[19] This Court's decision in *Leung v. Bluebird Bio, Inc.*, 599 F. Supp. 3d 56, 63 (D. Mass. 2022), is distinguishable because during the class period the company disclosed the risk of the possibility that the FDA may require additional studies and when that risk materialized at the end of the class period, the company promptly disclosed it. *Id*. at 60-64, 68.  In sharp contrast, in the face of suspicious activity by non-preferred Cambodian suppliers and government investigations, Defendants did not disclose that the undisclosed risks had already materialized during the Class Period.

[20] *But see Mass. Ret. Sys. v. CVS Caremark, Corp.*, 716 F.3d 229, 239 n.6 (1st Cir. 2023).  The allegations here are specific enough that the outcome would be the same under either Rules 8(a)(2) or 9(b).

34, 47 n.13-14 (D. Mass. 2006); *Mass. Ret. Sys.*, 716 F.3d at 239-42.

The November 16, 2022 disclosure of the Indictment caused the Company's stock to decline over 4% and was a materialization of the undisclosed risks—that the Cambodian supply chain was likely tainted with Macaques taken from the wild, that the Cambodian supply chain faced increased scrutiny by DOJ and FWS, and that the Macaque supply chain would be materially interrupted. Defendants argue that the Indictment "in no way revealed that any prior statement by Charles River" was false or misleading. MTD at 21. However, as Defendants concede (MTD at 23), a corrective disclosure need not be a "mirror-image" disclosure—a direct admission that a previous statement is untrue—and need not completely reveal the fraud. *Mass. Ret. Sys.*, 716 F.3d at 240. The disclosure of the Indictment of Cambodian Macaque suppliers relates to the same subject matter as the undisclosed, material risks that Defendants concealed from investors, and plausibly was a partial materialization of the undisclosed risks that their representations had concealed.[21]

On November 30, 2022, Charles River and Foster disclosed that Cambodia was the "primary country of origin" of its Macaques and that, in light of the Indictment, Charles River was "operating under the expectation that for some time period supply of Cambodia-sourced Macaques" will be difficult to obtain in the U.S., which caused the Company's stock to decline over 12%. ¶¶38, 326-28. These disclosures partially materialized the risks that the Company's Macaque supply chain would be materially interrupted, thereby harming the Company's financial

---

[21] In contrast, the decision in *Coyne v. Metabolix, Inc.*, 943 F. Supp. 2d. 259, 275 (D. Mass. 2013) found loss causation had not been alleged because the alleged corrective disclosure made no mention of the alleged undisclosed risk. Defendants' reliance on analyst reports to dispute what the market understood concerning the Indictment's potential impact on Charles River raises a question of fact that cannot be resolved on a motion to dismiss. Even assuming, *arguendo*, the Court engages in fact finding, the analyst reports that Defendants cite support Plaintiff's loss causation allegations. MTD at 21 n.6 (noting in reports concerning Charles River that Indictment could lead to regulatory changes and that Cambodian Macaque supply could go "offline").

results, that the Company's Macaques were likely wild-caught, and further disclosed that the Company's supply chain was overly concentrated in Cambodia. ¶¶13, 122.

Defendants assert that these disclosures "did not correct some untruth." MTD at 8, 22. However, Defendants' argument confuses what the Complaint alleges was partially disclosed and caused the stock to decline, outlined above, with an alleged false statement that maintained the artificial inflation in the stock price (the misrepresentations that Charles River had no "direct contracts" with the indicted supplier). While Defendants acknowledge that Complaint alleges that Foster's no "direct supply contracts" representation is an alleged false statement (MTD at 10, 13), they mischaracterize the allegation as a disclosure for purposes of their loss causation argument. The Court should reject Defendants' meritless sleight of hand argument.

On January 12, 2023, Charles River's stock price declined approximately 6% in response to the publication of a Jefferies research report that began to correct the misrepresentations that the Company had no direct contracts or contacts with the indicted supplier. ¶¶43-44, 338-39. Jefferies contrasted the representation that Charles River "does not have any direct supply contracts" with Vanny Cambodia, with its analysis that showed that the Company obtained approximately 24% of its Macaques indirectly from Vanny Cambodia, revealing to investors that Foster's statements that Vanny Cambodia "was not a supplier of ours" was a blatant lie. *Compare* ¶37 with ¶¶43, 338.[22]

Defendants' argument that the February 22, 2023 disclosure does not allege loss causation is based on the faulty factual premise that "only" a government investigation was disclosed, as well as the implausible assertion that the DOJ and FWS's investigation of Charles River was

---

[22] Defendants, citing *dicta* in *Mass. Ret. Sys.*, 716 F.3d at 243 n.9, suggest that an analyst report cannot serve as a corrective disclosure. However, courts have found that corrective disclosures can come from any source from which the market can absorb and react, including analyst reports. *See Findwhat Inv. Group v. Findwhat.com*, 658 F.3d 1282, 1311–12 (11th Cir. 2011); *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 322 (5th Cir. 2014).

unrelated to the wrongful conduct that led to the Indictment.  MTD at 4, 22-23.  In addition to the disclosure of the DOJ grand jury subpoena and civil investigation of Charles River's conduct, the Company further disclosed that it was suspending shipments of Cambodian Macaques which would negatively impact its earnings for 2023 and would reduce revenue growth by $80-160 million, that in sharp contrast to Foster's representations on 11/30/22, the DOJ and FWS investigation was focused on the Company's conduct, and that the FWS blocked shipments.  ¶¶47-48, 341-45.  When more than government investigations are disclosed, such disclosures can support loss causation.  *See Brumbaugh*, 416 F. Supp. 2d at 256; *Amedisys*, 769 F.3d at 324.[23]

Defendants assert that the 3/15/23 disclosure is not sufficient to allege loss causation because, in their view, Foster did not admit that Charles River used non-preferred suppliers "during the Class Period" and that nothing disclosed shows any of Charles River's prior statements were false.  MTD at 23.  As explained above, *supra* at 13, Defendants' arguments regarding the meaning and intent of Foster's 3/15/23 admission raise fact questions. Foster's disclosure was an admission that Defendants' prior representation—that the Company may engage non-preferred suppliers— was materially false and misleading and caused Charles River's stock price to decline.[24]

## IV.    CONCLUSION

Defendants' motion to dismiss should be denied in its entirety.[25]

---

[23] The decisions in *Loos v. Immersion Corp*. 762 F.3d 880, 890 (9th Cir. 2014) and *Meyer v. Green*, 710 F.3d 1189, 1201 (11th Cir. 2013) are distinguishable because on 2/22/23 more than the DOJ and FWS investigation was disclosed.

[24] While Defendants do not dispute that Foster and Smith controlled the Company under Section 20(a), they assert that "culpable participation" is required. MTD at 24. However, culpable participation is not an element of this claim. 15 U.S.C. § 78t(a).  Because the language of the statute places the burden on Defendants to establish their good faith as an affirmative defense, which they have not done, Plaintiff need not make a prima facie showing of culpable participation.  *See In re Brooks Auto., Inc. Sec. Litig*., 2007 WL 4754051, at *14 (D. Mass. Nov. 6, 2007). Assuming, *arguendo*, culpable participation is required, the allegations discussed above demonstrate culpable participation.

[25] In the event the Court dismisses the Complaint, in whole or in part, Plaintiff requests leave under Rule 15 of the Federal Rules of Civil Procedure for an opportunity to replead. *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 56 (1st Cir. 2008) (stating PSLRA does not modify liberal amendment policy of Rule 15(a)).

Dated: March 15, 2024

Respectfully submitted,

*/s/        Frederic S. Fox*

Frederic S. Fox (admitted *pro hac vice*)
Jeffrey P. Campisi (admitted *pro hac vice*)
Brandon Fox (*pro hac vice* forthcoming)
Carihanna Morrison (*pro hac vice* forthcoming)
**Kaplan Fox & Kilsheimer LLP**
800 Third Avenue, 38th Floor
New York, NY 10022
T: (212) 687-1980
F: (212) 687-7714
ffox@kaplanfox.com
jcampisi@kaplanfox.com
bfox@kaplanfox.com
cmorrison@kaplanfox.com

*Lead Counsel for Lead Plaintiff State Teachers Retirement System of Ohio and the Proposed Class*

Edward F. Haber (BBO# 215620)
Patrick J. Vallely (BBO# 663866)
**Shapiro Haber & Urmy LLP**
One Boston Place, Suite 2600
Boston, MA 02108
T: (617) 439-3939
F: (617) 439-0134
ehaber@shulaw.com
pvallely@shulaw.com
ndill@shulaw.com

*Liaison Counsel for Lead Plaintiff State Teachers Retirement System of Ohio and the Proposed Class*

29

## <u>CERTIFICATE OF SERVICE</u>

I, Frederic S. Fox, hereby certify that, on March 15, 2024, I caused the foregoing to be served on all counsel of record by filing the same with the Court using the CM\ECF system which will send electronic notices of the filing to all counsel of record.

*/s/ Frederic S. Fox*

Frederic S. Fox
