UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


_____

STATE TEACHERS RETIREMENT SYSTEM
OF OHIO, Individually and On
Behalf of All Others Similarly
Situated,

                    Plaintiff,          Civil Action
                                        No. 23-11132-DJC
V.
                                        May 16, 2024
CHARLES RIVER LABORATORIES
INTERNATIONAL, INC., et al.,            2:00 p.m.

                    Defendants.
_____


TRANSCRIPT OF MOTION HEARING

BEFORE THE HONORABLE DENISE J. CASPER

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA  02210


DEBRA M. JOYCE, RMR, CRR, FCRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5204
Boston, MA  02210
joycedebra@gmail.com

APPEARANCES:

FOR THE PLAINTIFF:

FREDERIC S. FOX, ESQ.
JEFFREY P. CAMPISI, ESQ.
BRANDON FOX, ESQ.
CARIHANNA MORRISON, ESQ.
Kaplan Fox & Kilsheimer LLP
800 Third Avenue
38th Floor
New York, NY 10022
212-687-1980
Ffox@kaplanfox.com
Jcampisi@kaplanfox.com

EDWARD F. HABER, ESQ.
Shapiro Haber & Urmy LLP
One Boston Place
Suite 2600
Boston, MA 02108
617-439-3939
Ehaber@shulaw.com

FOR THE DEFENDANT:

CHARLES DUGGAN, ESQ.
David B. Toscano, Esq.
Davis Polk & Wardwell LLP
450 Lexington Ave.
New York, NY 10017
212-450-4000
Charles.duggan@davispolk.com
David.toscano@davispolk.com

MARA THEOPHILA, ESQ.
McDermott, Will & Emery LLP
200 Clarendon Street
Boston, MA 02116-5021
617-535-4107
Mtheophila@mwe.com

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Denise J. Casper, United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, 1 Courthouse Way, Boston, Massachusetts, on May 16, 2024.)

THE CLERK:  All rise.

(The Court entered the courtroom.)

THE CLERK:  Court is in session.  Please be seated.

Civil action 23-11132, Coleman v. Charles River Laboratories International.

Would counsel please state your name for the record.

MR. HABER:  Good afternoon, your Honor.  Edward Haber of Shapiro Haber & Urmy from Boston in plaintiffs.

I'd like to introduce Frederic Fox from the Fox Kaplan firm for plaintiffs who will be presenting.  He's admitted *pro hac*.

THE COURT:  Good afternoon.

MR. FOX:  Good afternoon, your Honor.  Frederic Fox, I'm glad Mr. Haber elevated me, it's actually Kaplan Fox.  With me are my partner Jeffrey Campisi --

MR. CAMPISI:  Good afternoon.

THE COURT:  Good afternoon.

MR. HABER:  -- as well as associates Carihanna Morrison and Brandon Fox.

THE COURT:  Good afternoon.

Counsel.

MS. THEOPHILA:  Hi, Mara Theophila from McDermott Will & Emery in Boston.  With me are attorneys from Davis Polk, Charles Duggan and David Toscano.

THE COURT:  Good afternoon, counsel.

MR. DUGGAN:  Good afternoon, your Honor.

THE COURT:  Counsel, I know we're here on the defendants' motion to dismiss.  I've had a chance to review the motion papers, opposition, and the reply brief as well.

Counsel, I'm prepared to hear argument.

MR. DUGGAN:  Thank you, your Honor.

May I address the Court from the podium, your Honor?

THE COURT:  Sure.

MR. DUGGAN:  Good afternoon, your Honor.  Again, for the record, Charles Duggan from Davis Polk & Wardwell for the defendants.

THE COURT:  Good afternoon.

MR. DUGGAN:  I appreciate the opportunity to address the Court as *pro hac vice* today.

As you know, we've moved to dismiss the complaint for failure to state a claim as it doesn't plead any of the essential elements of a securities fraud.

The basic thrust of the plaintiff's fraud theory, simply stated when one cuts through the complaint with essence,

is that Charles River told investors beginning in March 2020 that it believed it had taken effective steps to secure its supply of macaques, sometimes referred to as non-human primates or NHPs.  And plaintiffs argue that these statements mislead investors because its supply chain was significantly disrupted to the end of the class period.

That is essentially the case that the company represented, that it had confidence in its supply chain and then its supply was disrupted at the end of the class period.

What the complaint lays out is a story of developments involving suppliers of macaques from Cambodia culminating in that disruption.  What it doesn't do is state a claim of fraud.

To the contrary, we submit that a review of these alleged events negates all three elements of falsity, *scienter* and loss causation.  It demonstrates that Charles River appropriately advised investors of developments that it expected would affect its supply chain as it learned them.  Almost all of these developments until the very end of the story were related to entities other than Charles River itself.

If I may, your Honor, I'd like to walk the Court through these events with the aid of a chart that plaintiffs generated.  It appears on page 9 of the complaint.  These are their allegations, it's the plaintiff's work product, but we have magnified it to make it a little easier to read.

May I approach, your Honor?

THE COURT:  Sure.  And you've shared it with your brothers and sister on the other side?

MR. DUGGAN:  Yes.

(Pause.)

MR. DUGGAN:  So, your Honor, this chart, it begins at the start of the class period in May 2020.  And the multicolored dots that are clustered under the stock price line each represents a distinct shipment of macaques that Charles River received from its suppliers, and they're color coded to conform to particular suppliers in accordance with the key at the bottom of the page.

And what these dots demonstrate is that as of May 2020, Charles River did enjoy a reliable supply of macaques that continued for over two-and-a-half years with several different sources of supply.

It also indicates beginning in September 2022, the Fish and Wildlife Service refused to clear three shipments from Charles River supplier KF Cambodia.  This is the box at the bottom of the chart pointing to three orange circles in the lower right-hand corner of the chart.

Although, as you see from the chart, even after the refusal to clear those shipments, Charles River continued to receive shipments for several months after its September shipment was held up from its supplier Envigo, which is the dark green circle; Worldwide Primates, which is in pink; and

Orient BioResources, or OBRC, which is in light green, you can see that in early November.  Some of them are partially obscured by purple dots, but we've blown it up so you can see that these shipments were received after Fish and Wildlife took action with respect to Charles River's September shipment.

What's missing from the complaint are any specific factual allegations that at the start class period, in May 2020, Charles River had reason to think that its suppliers were not reliable and that its supply chain ran a high risk of being interrupted due to illegal practices.

There are no well-pled facts that Charles River's expression of commitment to compliance with the law and confidence as to the security of its supply chain were lies, that it did not believe that it was complying with the law --

THE COURT:  Counsel, just sticking with the chart.  If my memory is correct, and my notes from the filings are correct, are all of the dots here representing sort of non-preferred suppliers?

MR. DUGGAN:  Well, your Honor, these represent Charles River suppliers.  We don't believe that there's any basis in the complaint to characterize any of these suppliers as non-preferred.  It certainly does include KF Cambodia, which was Charles River's largest supplier, but Charles River has, as this chart indicates, a number of suppliers of macaques, both from Cambodia and from Vietnam and elsewhere.  And as Charles

River explained to investors, this was part of its strategy for supply, multiple geographies and multiple suppliers in multiple geographies.

THE COURT:  So, as I understand it, and obviously at this point I have to assume the allegations in the complaint are true, it's not that -- it's not that Charles River denies supplies from these various entities, it's focused on what, if any, knowledge Charles River had about their conduct?

MR. DUGGAN:  Correct, your Honor.  There is -- you know, we obviously are accepting the complaint as correct.  But no part of our argument puts into question that these shipments were actually received by Charles River.  And in fact, my point here is that Charles River enjoyed a steady and continuous source of supply as it has represented -- as it had represented as of the start of the class period that it felt it had achieved, and it was only as events developed over the course of the class period that it had any cause to alert investors as to a change in its level of confidence and in the likelihood that it would continue to receive shipments.

And, your Honor, I'd like to walk you through that, using these particular events --

THE COURT:  Sure.

MR. DUGGAN:  -- that are called out in the boxes on the chart.

The complaint, your Honor -- I'm sorry.

Charles River repeatedly warned investors throughout the class period of risks to its supply chain, including risks due to laws governing imports.

And it's clear under settled law that having warned about those risks we would only acquire a duty to disclose further known information about the precise extent of that risk when it, quote, had a near certainty of causing financial disaster to the company or where the warned-of risk had already begun to materialize itself.  That's from the 1st Circuit's decision in the CVS Health case was cited in our briefs.

And that's exactly what Charles River did.  When the risk began to materialize at the very end of the class period, it promptly and appropriately advised investors of those developments.

There's nothing in the complaint to suggest that any of its vendors reflected on these charts were ones it would prefer not to deal with.  To the contrary, the only relevant statement by Charles River in the complaint was that it regarded all of its sources of Cambodia supply as, quote, high quality ones.  And that's on page 95 of the complaint, paragraph 327.

Your Honor, we argue in our briefs that general aspirations, statements of confidence or optimism are also simply not actionable as a matter of law before you even evaluate whether they were false, let alone knowingly false.

But even looking past the defect of plaintiff's attempted challenge those general statements of confidence or optimism, plaintiff plead no facts indicating any difference between what Charles River told investors and what it believed.

The chart also identities several events that plaintiffs assert are corrective disclosures but are actually merely developments, public events that Charles River learned about at the same time as everyone else.

If I may, your Honor, I'll walk through them quickly.

THE COURT:  Sure.

MR. DUGGAN:  The key point about them is that they don't support plaintiff's argument that Charles River was misleading investors about its belief in the security of its supply chain or it failed to disclose information that its supply chain was at imminent risk.

So, your Honor, the first one of these events occurs more than a year after the start of the class period, and that is the guilty plea by an executive at Orient BioResource in August of 2021, and that is the -- it's called out in the bar at the top left-hand corner of the page.

OBRC is one of Charles River's suppliers, and the plea that was entered by one of its executives was for lying to federal investigators about the existence of certain reports. It was not for illegally importing macaques.  And the complaint fails to show that Charles River faced any threat at that time

of disruptions to its supply of macaques.

And the chart, in fact, demonstrates that OBRC in the period after this executive's plea of guilt for having lied to investors, that OBRC continued to be a source of reliable supply for Charles River for well over a year until everything came apart in November of 2022.  And that's the green dot that we already noted in respect to OBRC in November of '22 sort of nestled behind one of the purple dots there.

The same is true for the next developments called out by plaintiffs, which is the alleged disclosures in February and May of 2022 that OBRC and another Charles River supplier, Envigo, had received subpoenas from the Department of Justice roughly a year before in June of 2021.  Neither of these developments indicated that Charles River's supply of macaques was now somehow at imminent risk.  And again, that's illustrated by this chart by the fact that Charles River continued to receive shipments of macaques from these and other suppliers.

The next major development did amount to a materialization of risk to Charles River's supply chain, and it was promptly disclosed by Charles River, and that's the unsealing in November 2022 of the indictments of Cambodian officials and Vanny executives on charges of smuggling wild-caught macaques upon which Charles River promptly warned investors that it would be difficult to obtain Cambodian

macaques in the United States for a period of time.  A clear statement of a likely effect on Charles River's own supply chain, despite the fact that Vanny did not directly supply Charles River.  Plaintiffs call this a corrective disclosure, but that's incorrect; it's a new development, it is not a correction of any prior statement.

THE COURT:  The November statement, or the statement about the November --

MR. DUGGAN:  The statement regarding the -- excuse me, the unsealing of the indictment in November.

Your Honor, this is followed then, according to the complaint here, by Charles River's 10-K filing in February of 2023 at which time it disclosed that it had received a subpoena from the DOJ --

THE COURT:  And just to back up, counsel, for a moment.  The November 2022 statement is also the statement about no direct contract with the defendants.

MR. DUGGAN:  That's correct.  Vanny did not directly supply Charles River.  But what I wish to call to the Court's attention is that that same disclosure also made clear that Charles River would be affected, although not directly by dealings with Vanny as a counterpart, but by the implications of the situation with Vanny on the supply of macaques in the United States.  That's the entire purpose of the disclosure at that time --

THE COURT: Right.

MR. DUGGAN: -- in respect of the Vanny indictment.

THE COURT: And, counsel, what's your response to their -- to the plaintiff's argument that the statement is incomplete in regards to any indirect supply as opposed --

MR. DUGGAN: Well, your Honor, I think when the word "direct" is inserted as the characterizer of a relationship, it leaves open to the possibility -- to the implication that there are indirect considerations. And the fact that Charles River said that the U.S. supply of macaques will be affected was -- would be constrained was an acknowledgment that it was not simply limited to direct suppliers but would effect participants in the market generally.

THE COURT: Thank you.

MR. DUGGAN: At the same time, Charles River also said that it would be working to try to -- further to this point, to try to ameliorate the effects that would result from the Vanny indictment.

So, your Honor, in addition to -- in addition to disclosing in its 10-K that it had received a subpoena from the DOJ, and this is now in November -- I'm sorry, of February 2023, Charles River also disclosed that three shipments from its supplier KF in September, December and January had not been cleared by Fish and Wildlife Service and that Charles River was voluntarily suspending imports from Cambodia pending

development of a new protocol to demonstrate that macaques from Cambodia were captive bread and not wild caught.

Your Honor, these disclosures in November and then February of expected disruptions to Charles River's supply chain reflect the company's faithful reporting of material information to investors when developments began to suggest that it was facing an interruption in supply.  Prior to that time there was no such suggestion, and the allegations that there was somehow deception at any point in time are simply not borne out by the allegations in the complaint.

Your Honor, I'll just say a word about what plaintiffs, I would submit, wrongly call the final corrective disclosure.

For some reason, it is not included on plaintiff's chart, and that is statements that were made by Charles River's CEO in March of 2023 that, quote, Historically the company had sourced some macaques from, quote, brokers that he said Charles River preferred not to deal with.

Plaintiffs assert without any factual allegation in the complaint that these, quote, brokers, were OBRC, Inotiv, Envigo and others of Charles River's suppliers during the class period.  There is no support in the complaint for that assertion.

There's nothing about when Charles River dealt with the brokers that its CEO referred to, what the volume of

business was that was done with them or anything else that would support plaintiff's assertion that Charles River would have preferred not to deal with any of its suppliers during the class period.

It also fails plaintiffs for two other reasons, your Honor.

First, the fact that Charles River's CEO volunteered this information in March 2023 negates plaintiff's contention that Charles River spent the prior years concealing that it was dealing with suppliers that it would prefer not to deal with. The two thoughts just don't hang together.

Second, it can't be a corrective disclosure as to the unreliability of Charles River's supply chain because by that time the markets already knew that Charles River's supply chain had been significantly disrupted from its own announcement the month before that it was not sourcing any macaques from Cambodia.  The notion that the March statement cleared up any misconceptions about the dependability of Charles River's supply of macaques from Cambodia makes no sense.

If may, your Honor, I'd just like to very quickly address some additional points on *scienter* specifically with respect to plaintiff's argument about stock trading by Charles River's CEO and CFO during the class period.

There's several problems with this theory.

First, the complaint fails to show that this trading

was unusual or inconsistent with trading outside the class period, and I'd respectfully refer the Court to the Textron case from the 1st Circuit and other authorities in our brief on that point.

Second, even looking within the class period --

THE COURT:  All of which -- correct me if I'm wrong, all of which would be a matter of public record?

MR. DUGGAN:  The Form 4s that are the basis for generating plaintiff's allegations are also available for prior periods.

So, your Honor, secondly, even looking within the class period, so as opposed to comparing the period of time outside the period to the period of time inside the period, but even looking within the class period -- and I'd like to ask you to look at this chart again -- the trading is represented by the red dots on the stock price line.  And it shows that the trading is concentrated in the first year before the developments that plaintiffs cite, such as OBRC's executive guilty plea and the revelations about grand jury investigations.  The vast majority of the trading takes place before all of those developments.

And it can also plausibly be explained and reasonably be explained by the fact that, as you can see from the chart, Charles River's stock was rising through this period, which is noted by several cases, undermine an inference of fraud.

THE COURT:  You mean both between the first year and later.

MR. DUGGAN:  Between the start of the class period and when the stock price sort of peaks initially, where you see the real concentration of trades reflecting the common sense notion that as the price of the stock rise, selling it becomes more attractive.

But even after the mid point, your Honor, the later trades, and as I've noted, there are fewer of them, as you can see, they correspond to pops in the price of the stock relative to the preceding period, which is a much more plausible explanation, non-fraudulent explanation, than plaintiff's unsupported fraud theory.

THE COURT:  And, counsel, my memory is that there's also an allegation that their sales of stock were a high percentage of the stock that they owned at the time, right? Foster, Mr. Foster, the allegation is 40 percent, and Mr. Smith, 54 percent, I'm not sure if that's the total within the class period or not, but what, if anything, do you say to any argument about the percentage?

MR. DUGGAN:  Your Honor, I do have a response to that. And as we explain in our reply brief in Footnote 13, despite these alleged significant stock sales, Charles River's CEO and CFO closed out the class period owning more shares of stock than they had at the start.  So while they sold significant

portions of their holdings, they also acquired significant additional stock such that they actually had more at the end than when they had started.

So this simply -- this fact simply doesn't support the notion that they were liquidating out of their positions of Charles River stock.  Rather, they increased their position and holdings of stock during the class period.

And I encourage the Court to visit the 1st Circuit's case in the Abiomed decision, which explains that this acquisition of stock during the alleged class period precludes reliance on trading as a basis for inferring fraud.

THE COURT:  Thank you.

MR. DUGGAN:  Your Honor, for the remainder of our argument we'll rely on our briefs, and I'd ask that I be permitted to reserve my additional time for rebuttal.

THE COURT:  You may.

Counsel, I think there's a footnote in the plaintiff's opposition suggesting that they be allowed to amend if I were inclined to allow the motion.

Do you have a response to that?

MR. DUGGAN:  Well, your Honor, this is an amended complaint, and I think plaintiffs have already had their second best go at this.  It certainly doesn't lack for length, and our position would be that at this juncture dismissal is appropriate with prejudice.  None of the elements that need to

be adequately alleged are satisfied by the complaint and we, therefore, would submit that no purpose would be served in amendment.

THE COURT:  Thank you.

MR. DUGGAN:  Thank you.

THE COURT:  Counsel, I'll hear from the plaintiff, thank you.

MR. FOX:  Thank you, your Honor.

May I also speak from the podium?

THE COURT:  Sure, of course.

(Pause.)

MR. FOX:  Good afternoon again, your Honor.

THE COURT:  Good afternoon.

MR. FOX:  Frederic Fox representing the lead plaintiff, which is the Ohio State Teachers Retirement System your Honor appointed.  Ohio STRS represents the retirement savings of more than half a million active, inactive and retired teachers.

Your Honor, there's a lot of information in the complaint and the briefing about Charles River and its NHP business, but I would like to bring to the Court's attention several uncontested facts that are in the complaint.

First, before the class period, just slightly before the class period, China, which was Charles River's main supplier of NHPs, their exports declined to zero.  And China

had sourced 60 percent of its NHPs from China, where actually Charles River owned or was a majority owner in a breeding farm there.

THE COURT:  Charles River sourced 60 percent.

MR. FOX:  Yeah, Charles River sourced 60 percent of its NHPs through a majority owned breeding farm in China.

Because China prohibited the exports by the beginning of the class period, defendants had to completely overhaul 60 percent of Charles River's supply chain, and defendants admit they had to completely overall Charles River's supply chain, it's in the first line of Mr. Duggan's brief.

But defendants deceptively kept the nature and extent of that overhaul secret until they were actually forced by outsiders to admit what was happening.

And not to jump ahead, but I know Mr. Duggan says, Oh, Charles River should get credit for coming forward and saying, Oh, you know, we're having supply chain issues.  But even as Mr. Duggan said, that was only in reaction to the unsealed Vanny indictment.  That's when they came forward.  And quite frankly, they waited 16 days to comment on the Vanny indictment before that happened.

So they had a complete overall of their supply chain, and what was that overhaul?  So that overhaul secretly shifted Charles River's primary import of macaques from China to Cambodia.  So this shift alone, going from a majority owned

supplier in China to a number of different companies in Cambodia, that shift alone completely materially increased the risk to Charles River's business for three reasons:

First, defendants shifted 60 percent of its supply chain from a preferred supplier that, as I said, Charles River majority owned, and therefore, controlled and monitored, to numerous other non-preferred suppliers which Charles River did not own or control.  That's risk number one.

Second, the overhaul was accomplished by engaging suppliers, no doubt some of them non-preferred suppliers, who defendant Foster would later admit, quote, get their animals from anywhere, and, quote, are not the best people to use because, as defendant Foster said at the end of the class period, I just don't think they care where the animals come from or what the background is.

THE COURT:  And, counsel, as to that point, what do you say to your brother's argument, even as I'm taking all of the allegations as true, there appears to be no connection between the sort of non-preferred suppliers who were -- and I still have the chart in front of me -- and the historical sources that Mr. Foster was referencing, even taking that statement at its face value?

MR. FOX:  Well, I would find it hard to believe that Mr. Foster would characterize as preferred suppliers that don't care where they get their animals from.  And Charles River does

make statements about non-preferred -- and I will get to that -- does make statements about non-preferred suppliers at the beginning of the period.

And as for historically, you know --

THE COURT:  Well, historically meaning not during the class period, right?

MR. FOX:  Well, I think that's -- I would say historically more plausibly means during the class period, unless one were to read historically as in the past but not during the class period.  So I would say the more plausible inference of that statement as to history is that it did occur during the class period -- at least during the class period and probably before the class period as well.

THE COURT:  And, counsel, and I apologize if in reading the papers I misunderstood this -- when you say "non-preferred," are you saying non-preferred because of an allegation of noncompliance with law or non-preferred because of the source of the primates?  Why the phrase non- -- what specifically are you referring to in terms of non-preferred?

MR. FOX:  Well, I think it's both of the things that your Honor said.  When Charles River itself refers to non-preferred, it refers to them in the context of their supply chain.

So at the end of the class period, Mr. Foster says, Well, historically we deal with some of these suppliers that

don't care where they get the animals -- where they get their animals from, and he says, Which we prefer not to use, but they do, and these are these animal brokers.

So there are -- the third reason why from the beginning of the class period the risk is materially ratcheted up is because defendants had reason to believe that the company they were buying the -- Cambodia, where they were now getting their supply from, had materially increased their exports by at least 86 percent in a very, very short period of time.  And the complaint alleges that the rapid increase in the supply of macaques from Cambodia was suspicious and biologically implausible making it very unlikely that captive-breeding farms in Cambodia legally increased production during the period.

Furthermore, the complaint alleges that defendants knew or were reckless in not knowing that this rapid increase in exports from Cambodia was suspicious because the gestation period and breeding patterns of macaques do not allow for rapid escalation in the number of animals for export.  And the complaint alleges that industry analysts knew this, NHP suppliers knew this, and even a Charles River executive acknowledged that it takes many years to meaningfully increase the number of macaques for export and that none of the breeding farms can escalate export that rapidly.

Now, defendants speculate in their brief that, well, the suppliers could have had excess animals in 2018 on hand

before the pandemic shut down China, and therefore, the increase in demand for Cambodian macaques, that could be the reason, account for the increase in production.

Defendants offer no authority for this speculation, and quite frankly, the inference defendants ask the Court to draw makes no economic sense.  There's nothing to suggest that the Cambodian suppliers fed, sheltered and provided healthcare to tens of thousands of animals at a time before the pandemic increased the demand for Cambodian animals.  It just doesn't make sense.

But even assuming that these suppliers had a reserve of animals for export, that doesn't alter the fact that these were, as Foster admitted at the end of the period, disreputable suppliers that Charles River had used historically and that they didn't care where the animals came from.

And in contrast, the defendants' speculation, the facts alleged in the complaint create a very strong inference that the scaled-up production from Cambodia's suppliers reported from 2020 to 2022 in response to the Chinese export ban could not have been available for export until 2023 and that wild-caught animals were, thus, introduced into the supply chain.

THE COURT:  Counsel, what about -- in terms of Mr. Foster's statement at the end of the period, again, March of 2023, what do you say in regards to the argument that that

is not a corrective statement -- let me put that a different way.

In the plaintiff's view, what statement is that allegedly correcting?

MR. FOX:  Your Honor, maybe -- may I approach and hand up something that will indicate what the statements were?

THE COURT:  Sure.

MR. FOX:  And we have shared these with Mr. Duggan his co-counsel before the argument.

THE COURT:  Thank you.

(Pause.)

MR. FOX:  So, your Honor, what -- just in terms of you asked what statements did it correct?

So if you look, what the chart that I've handed up with the typewritten text on it on the left-hand column has the risk disclosure as it relates to supply chain from several of Charles River's 10-Qs issued during the period.

And if you look toward the bottom of the first page, in bold -- and this is at the end of talking about supply -- it says, In addition, limited global supply or regional restrictions on transportation for certain products may require us to source products from non-preferred vendors.

So there is a representation in -- in this risk warning, so-called risk warning, that they may source products from non-preferred vendors.  And the complaint alleges that, in

fact, even at the beginning of this -- the class period, this risk disclosure was in the 10-K -- I'm sorry, the 10-Q for the first quarter, which came out in May, at the beginning of the period.  There's a representation that they may require us to source products from non-preferred vendors, and the complaint alleges that they were supplying -- they were getting supplier products from non-preferred vendors throughout the class period.

So that's the connection between what Mr. Foster said at the end, that they got animals from -- they didn't particularly care where they came from, from brokers, and what was said in various 10-Qs and 10-Ks, that they may source products from non-preferred vendors.

THE COURT:  Thank you.

MR. FOX:  Yes.

THE COURT:  And what's on the right is the 10-K statement, not his later statement in March.

MR. FOX:  Correct.  I'll get to that in a minute, but, yes, that's from a later -- later risk disclosure.  But I thought in response to your Honor's questions about preferred vendors, this relates to that.

So the facts that I just went through that defendants completely overhauled the supply chain, that it came -- now it was coming from Cambodia and there was -- there was -- or should have been deep suspicion about this increase in

production in Cambodia.  So all those increase the risk to the company, complete overall, and each of those things was known to the defendants at the very beginning of the class period, that the supply was concentrated in Cambodia, over 60 percent, and that there was an overhaul of the supply chain.  All of this completely known.  And how do we know?  Well, if you look at the right side of what I've handed up, your Honor, this was the risk disclosure in the 2022 10-K which is issued on February 22, 2023.  And there you can see that, toward the bottom of the page -- top of the page it actually talks about non-human primates.  Well, the earlier so-called risk warnings don't even talk about non-human primates in the supply chain.  But it also says at the bottom of the page, where we've highlighted, Cambodia was the primary country of origin of non-human primate imports to Charles River -- and going over to the next page -- accounts for approximately 60 percent of the supply.

So those facts -- in order for them to have moved the supply chain over at the beginning of the class period, they knew to whom they moved it over at the beginning of the class period.  And they said that very late in the class period in this disclosure and they certainly knew it at the beginning of the class period and it did not disclose it in the risk warning, and instead they said that we may be required to use --

THE COURT:  So, counsel, let me see if I can ask a good question on this issue.

But looking at the initial risk disclosures on the left side --

MR. FOX:  Yes.

THE COURT:  -- I know you're pointing me to the last sentence, but obviously I have to read it in the context of the full disclosure, which makes reference to China, that a significant portion of the supply is from China, that we continue to find steps to find alternate -- alternative supply chains.  Is your picking up the sort of non-preferred language from this disclosure?

MR. FOX:  Certainly the language in this disclosure says they may use non-preferred suppliers, and the allegation is that by this time, the beginning of the class period, they did use non-preferred suppliers, that many of the suppliers they used were animal brokers and others that are later indicted.

I cannot imagine that Charles River would consider an animal broker or an indicted supplier a preferred supplier.

THE COURT:  And I guess -- I guess my question is, what would you have had Charles River say in the October 2020 risk disclosure at the beginning of the class period?

And I know you're making allegations throughout the class period, but what would you have them say in October?

MR. FOX:  Well, first of all, it's not highlighted here, but your Honor picked up on it.  It says, Second, China supplies a significant portion of certain critical large research models.  Not true.  By this point in time, China did not supply any large research models to Charles River.  That's what the complaint alleges.

What else would I have them say?  I would have them say what they said in the February -- in the -- I'm sorry, the 2022 10-K filed in February of 2023.  They should have warned the market that which they knew, which was that they had a massive overhaul in their supply chain -- that China completely shut down, they had a massive overhaul in the supply chain, and now they were getting 60 percent of their supply from Cambodia and that it was concentrated just like they said in February of 2023.

They knew that same risk -- exact same risk existed in May of 2020, and China did not supply them in May of 2020.

So I think the answer to your question is they should not have said China supplies, that indicated that China was still supplying them, which they were not; and they should have said what they clearly knew earlier on, that they overhauled their supply chain, they shifted it all -- 60 percent of it consisted of Cambodia and Vietnam, but it was primarily concentrated in Cambodia.  That creates a risk, right?  You go from a company that you majority own, you majority own, you

control, you can monitor, to an amalgamation of other companies.

Your Honor, if I may refer you to the other chart that I have handed up --

THE COURT:  Yes.

MR. FOX:  -- and this comes from the complaint.

And what this is showing is this is what Charles River's supply chain looked like at the beginning of the class period.  So it went from one company it majority owned to this.  And when you look -- when you look at this, you might -- well, one thing that -- I think I maybe should make clear is that the names of -- none of the names of these companies would you find in any Charles River filing during the class period, none of them.  So what I'm showing you here is what defendants knew what their -- what their supply chain looked like, but it was not in any Charles River filing or press release or anything like that.

And so what you have here is the new suppliers or the members of the Vanny Group of companies and they ship to WW Primates, which is a broker; Inotiv, Orient Bio Science and Envigo, which are brokers --

THE COURT:  I guess, counsel, what I'm trying to ask is, I understand the change in the percentage of the supply -- the percentage or the sources of the supply, right, from China to Cambodia, but to the extent that there was a risk of the

supply chain, wasn't that later in the class period when there are -- later in the class period where there are the subpoenas to Charles River and -- or even to move it earlier, to the unsealing of the indictment, right, that implicates Vanny Group?

I guess that's what -- I guess what I'm trying to get at is however you characterize the vendors or the suppliers, preferred or not, at the end of the day, it's about the representation of what impact there is on the supply chain. And so that's what I'm less clear on, counsel. Even if I assume all the allegations are true, which I need to.

MR. FOX:  The complaint alleges that these risks existed at the very beginning of the class period. They then -- they're there, right?  If the Cambodian supply chain going from one supplier to a whole amalgam of other suppliers, if that's a risk, that's at the beginning of the class period.

If concentration of your supply chain in a company -- in a country where you know that they've massively increased their output and you know what the gestation period is, and it's very long, it's long and then you have to wait about two years for the animals to mature, that existed from the very beginning of the class period.

So these things existed at the very beginning of the class period.  It's sort of like this was a bomb, and the bomb was there at the beginning, the defendants lit the fuse.  Those

risks were there, they lit the fuse, the bomb later exploded through information that reached the market, a lot which was not by the defendants' good grace, and when that bomb exploded, it injured my client and the other members of the class.

Now -- and, I think, you know, your Honor -- your Honor had a case in the recent past called Gerneth v. Chiasma, and I think that decision is actually instructive.  The defendants -- we cite that in our brief, the defendants don't respond to it.  But there, your Honor probably remembers it was a drug developer, they had risk disclosures, and one of the ones was that the FDA may disagree with the design of their trial.  But the plaintiffs allege none of the risk disclosures alleged that Chiasma had meetings with the FDA where the FDA raised concerns about the company's trial and the company's ability to secure approval.  And the defendants said, as I believe Mr. Duggan is saying here, that, you know, there was no duty, they didn't have to -- there was no duty requiring them to disclose what happened with the FDA, you know, it wasn't material.

Your Honor found that a reasonable investor could have been mislead by failure to include the details about the company's meetings with the FDA in a risk warning concluding that, quote, Cautionary words about future risks cannot insulate from liability the failure to disclose that the risk has transpired.

And what's really important, I think, from that decision is your Honor recognized that the disclosure that ultimately caused the loss -- in that case the FDA rejection of the drug -- that didn't transpire until the end of the class period.  However, it was the increased risk to the company that had not been disclosed to investors during the class period.  And I think that's very similar to what occurred here.

So, you know, defendants assert the increased risks to the company, they say, Oh, that wasn't foreseeable, it wasn't foreseeable at any relevant point in time.  We couldn't have known that was a problem.  And as Mr. Duggan said, as soon as we knew, you know, we --

THE COURT:  Yeah, but isn't the other case distinguishable in regards to there is a regulator, there's an investigator that is giving you some notice that may be an issue?  Isn't that what's missing here?

MR. FOX:  It is -- it is a regulator, but in that case it's an outsider.  Here I would say it's even stronger because the defendants know what their own conduct is.  They know they set up this supply chain that materially heightened the risk to the company.  So they didn't -- they didn't have to be told by a regulator, they knew what they did, and they -- actually, they didn't disclose anything until regulators started to blow the whistle, so to speak.

So, I think, if anything -- I understand your Honor's

question, but, if anything, I think it's stronger here because they know what they did and they know what they set up, and so I think it's -- it is very similar to your Honor's logic in that case.

But, you know, the defendant says we -- it wasn't foreseeable, it wasn't foreseeable, we didn't know, as soon as we knew, we were the good guys, we warned.

Well, if you look at the chart that I handed up that depicts the supply chain, when you look at those -- look at the companies in that supply chain, I respectfully submit that it is foreseeable. You know, Orient BioResource in the green square, or ORBC, and Envigo, also in the green square, they obtained the macaques from the Vanny Group. And Vanny Group is a group of related companies in Southeast Asia. Each of these companies, it is foreseeable there were issues. As I believe Mr. Duggan mentioned, ORBC and Envigo, they were the subject of a DOJ and U.S. Fish and Wildlife Service investigation into the trafficking -- into the trafficking of macaques. It wasn't just that somebody filled out paperwork wrong. It was publicly known that -- it was an investigation into trafficking of macaques from Southeast Asia, that's undisputed.

And on August 4, DOJ announced a guilty plea of a man called Tucker of ORBC, a Charles River supplier, for lying to the government in connection -- in connection with the DOJ's, quote, ongoing investigation into the trafficking, close quote,

of macaques.  The defendants don't say they were unaware of this.

October 14th, the DOJ issued a press release on Tucker's sentencing for lying to investigators in connection with the government's, quote, criminal investigation of international trafficking, close quote, of macaques into the U.S.

Defendants argue that the DOJ investigation and the criminal conviction of ORBC had nothing to do -- I heard Mr. Duggan say nothing to do with Charles River, even though ORBC was a Charles River supplier, and make the implausible argument that the DOJ investigation was not specific to Charles River non-preferred suppliers when ORBC was expressly mentioned in the DOJ press release.

They miss the point.  The DOJ conviction of a key executive of a Charles River Cambodian supplier and the existence of an ongoing criminal investigation of Cambodian supply chain were a matter of public record and confirm the heightened risk that -- and just -- I think I said this already, but, you know, Charles River knows ORBC is its supplier.  Even when this press release is issued, the public does not know that ORBC is a Charles River supplier.  Charles River does not enlighten the public in that regard.

In February 2022, Inotiv disclosed that Envigo received a grand jury subpoena issued by the DOJ related to

importation into the U.S. of, quote, live non-human primates originating from or transiting through Cambodia. Again, this was confirmation of an increased risk, makes that risk very foreseeable, and the market did not know, again, that Envigo was a supplier to Charles River.

In May of '22, going on, Inotiv disclosed that ORBC received a grand jury subpoena that related to importation into the U.S. of live non-human primates originating from or transiting through Cambodia. Yet again, the market not aware ORBC was a supplier of macaques to Charles River, and yet, again, defendants were mute despite the increasing risk to Charles River.

Again, it is plausible to say that the defendants knew of these, they don't deny they knew of these, and that it heightened the risk to Charles River materially.

In September 2022, the Fish and Wildlife Service, which nobody's denying, refused to clear a shipment of 360 macaques from KF Cambodia to Charles River. KF Cambodia, as you see on the chart, is a direct supplier to Charles River.

Defendants argue Foster could have reasonably believed that KF would continue to ship. But the argument does not square with the facts alleged -- we allege he had known or recklessly ignored.

In fact, the complaint pleads facts that show the opposite is true because under the relevant federal law, when a

shipment is refused, like KF's September 2022 shipment, the U.S. Fish and Wildlife Service sends a notice to the importer, here Charles River, that described the, quote, detained wildlife and indicates the reason for the detention and describes the general nature of the tests or inquiries to be conducted.

So there is a strong inference or Foster knew or recklessly ignored the U.S. government blocked macaque shipments from Cambodia because it had reasonable grounds to believe that KF Cambodia macaques were caught wild and Charles River was importing them.

But despite facing an ongoing investigation that blocked Charles River from importing macaques and that there was an ongoing criminal investigation of the Cambodian supply chain, just weeks later, on November 2nd -- the shipment was blocked in September -- in November, in its 10-Q, Charles River falsely represented, quote, we are currently in compliance in all material respects with applicable national laws as well as other accepted guidance used by oversight bodies, without ever mentioning that it had at least one shipment, a major shipment, blocked from a Cambodian supplier.

And as you heard Mr. Duggan argue that, Oh, well, you know, these shipments went -- the chart that he handed up shows that these shipments went on despite the fact that these investigations were going on.  Well, first of all, certainly

the shipments were blocked, as everybody here agrees with, but several of the -- several of the shipments referred to on this chart, some of them are taken -- part of our investigation is we were able to obtain through FOIA requests a lot of the documents underlying these various shipments. And several of the shipments toward the end are interstate shipments, not shipments that Fish and Wildlife cleared through customs.

So, for example, Orient BioResource and Envigo I believe are in are Texas, WW Primates is in Florida. So some of those shipments are just interstate; they weren't, quote-unquote, cleared by Fish and Wildlife.

Then, getting toward the indictment of the Vanny Group, you know, six executives on November 16th, six executives of Vanny were charged with violations of U.S. law for participating in a scheme to smuggle macaques into the U.S. And referring back to the chart of the suppliers, you'll see that Vanny both directly and indirectly supplied macaques to Charles River.

And you see indirectly through Vanny Cambodia supplied to Inotiv, WW Primates, but another of the Vanny companies, Nafovanny, supplied Charles River directly.

And the -- the DOJ indicted several Vanny Group executives, and these are individuals who operated and controlled Vanny Cambodia, KHI and Nafovanny, all Charles River suppliers.

So at this juncture, anyway, in November 16th, as it relates to 60 percent of Charles River supply of macaques to the U.S., all of these companies are either indicted, unindicted conspirators or had shipments blocked due to the government's belief that their macaques were wild caught.

So what did Charles River say in response to this indictment?  And, you know, again, I just repeat, it waited 16 days to respond to this.  It did not respond until November 30th when Charles River issued an 8K and defendant Foster participated in a conference with analysts and investors, and the indictment was center stage there.

So in the November 30th 8K and during the conference, Charles River and Foster made statements that represented two critical facts:  First, he said, and the company said that the company does not have any direct supply contracts with the indicted Cambodian supplier, and we don't have any direct contacts with Vanny Cambodia.

He also said -- he then tried to reassure the market that, contrary to what Mr. Duggan was saying, not that, you know, there would be material difficulties going forward getting macaques, he indicated -- he said Vanny Cambodia is, quote, unable to ship.  Okay.  Unable to ship.  So that's going to hurt some folks --

THE COURT:  I'm sorry, counsel, this is November of 2022.

MR. FOX:  November 30, 2022.

THE COURT:  Thank you.

MR. FOX:  Yes, thank you, your Honor.

Vanny Cambodia is unable to ship, so that's going to hurt some folks.

Remember, Vanny Cambodia is a supplier of theirs.  But that it's not directed to us.  The indictment has, quote, no real short-term impact, and that Charles River has, quote, other sources in Cambodia for macaques.

Well, we still don't know, because they don't say, but we learn later that at least 25 percent of Charles River's macaques that come from Cambodia come from Vanny.

So these representations were calculated to falsely assure investors that Charles River's supply chain and Charles River itself was not at risk because of the criminal investigation that led to the indictment.

The representations that Charles River does not have any direct supply contracts or contacts with the indicted supplier Vanny was materially false and misleading because Foster failed to disclose that Charles River had obtained macaques indirectly from Vanny, and we later learn that it's not a small amount, it's about 25 --

THE COURT:  And does the qualifier "direct" make a difference here, counsel, in my analysis?  Direct versus no qualifier?

MR. FOX:  I think that -- well, without saying a lot of other things, it doesn't help, because it still implies that they don't have a direct relationship and that they're not going to have a problem going forward, when the real truth is they buy at least 24 percent of their animals from their direct supplier who has a direct relationship with -- with Vanny -- with Vanny Cambodia.

The other problem with it is they do have a direct relationship with a Vanny company, Nafovanny, direct relationship, direct relationship.  And the same people who run Vanny Cambodia -- the same people who were indicted in the Vanny Cambodia indictment also run Nafovanny.

So I really think it's the height of obfuscation given what their real situation is, which is we get -- you know, one of our suppliers is blocked, another supplier is indicted, and they don't say that they get 24 percent of their animals from that supplier.  And you know, I don't think it does much good to say it's indirect without any other color about it.  It could mean that -- "indirect" could mean anything.  It doesn't mean we get 25 percent or 24 percent of our animals from the indicted supplier.  So that's what I would -- that's what I would say to that.

And as I mentioned, Charles River had a direct relationship with Vanny through Nafovanny, also, I didn't mention through KHI.  Where he said they have an indirect

relationship, that's false.  They have a direct relationship with these other Vanny companies that are controlled by the same people, and I understand they are not the indicted supplier, but it's pretty close.

THE COURT:  Counsel, did you want to discuss *scienter*?

MR. FOX:  Yes, I do, thank you, your Honor.

So let's discuss *scienter*.

So the *scienter* are -- well, let's start with insider selling.

The *scienter*, the red dots are the insider selling during the period.  And on the point of pre- and post-period sales, I think it's important to look what happened in the period.  Under the 1st Circuit law, not to say that pre and post period are something that can be looked at, but the Court there says it's not *sine qua non*, it's not the only way that one should look at it; and other 1st Circuit cases say that where you have a pattern within the period of defendant selling very large amounts of stock before the bad news is disclosed, that is itself indicative of a strong inference of *scienter*.

And, you know, here, I mean, just the amount -- the amount of the sales is actually stunning.  I mean, you know, $67 million in sales before any bad news was disclosed is, I believe, indicative of wanting to get out before the bad news got out.

And when you do look at -- when you look at these

sales, as Mr. Duggan said, there are a lot more on the way up than there are on the way down, and at very high prices.  There are -- once it peaked, there are very few sales, and certainly there are very few sales once -- very few sales after -- or gifts, some of these are gifts after the indictments are announced.

Now, I will say --

THE COURT:  Doesn't that -- does that not cut against your argument?

MR. FOX:  That there are few sales?

THE COURT:  Yes.

MR. FOX:  No.

THE COURT:  How so?

MR. FOX:  No, because -- no, because if -- if you want -- if you're an insider bent on selling stock while you're committing a fraud, you would do that before the bad news came out because when the bad news comes out, the value of the stock is going to decrease --

THE COURT:  No, I understand that, but if you look -- if you look at the frequency, right, which is more frequent in the first half of the period versus the second half of the period, which also has peaks, so what, if any, significance should I assign to that?

MR. FOX:  Well, I think what the complaint alleges is that they were making false statements and selling stock

literally the same day they were making the false statements.

If you look at when those sales are, they are almost always the same day or within a couple of days after a false statement is made, and in most cases the stock increases from where it was before the false statement.  So that those are more frequent when they're making more false statements I think is indicative of *scienter*, and I think it's particularly indicative that they stopped selling basically -- they basically stopped selling once the bad news started to come out because the stock was going down.

THE COURT:  Right.  But I thought one of your alleged false statements, which I don't think is on this chart, which is the one we just talked about, November 30th, for example, there's no indication that there's sales around at that time frame.

MR. FOX:  Mm-hmm, that's true.  That's true, but that is -- that is certainly a partial disclosure.  That's certainly a partial disclosure.  And so that's -- that is one of the things I'm saying here, is that as the bad news came out, there were these partial disclosures, the stock went down, they stopped selling because the stock was going down because the truth was coming out.

THE COURT:  But then -- well, I understand the argument.

And I think, counsel, I understand your answer to

this, but let me just ask it directly:  Your brother points to the fact that their stock is actually higher at the end of the period than it was at the beginning.  What do you say to that?

MR. FOX:  Thank you, your Honor, let me address that.

So my brother did say that, but I think it is -- I think -- I think the way he's representing the math is not the way it should -- is not the way it really happened.  This is why I say that.

As your Honor pointed out, the complaint alleges Foster sold 41 percent of his stock and Smith sold 54 percent. So let's use Foster as the example, okay?

So he started the class period with 337,915 shares, okay?  He added to his holdings, not by buying stock in the open market, but by exercising options, most of which, the great, great majority of which were at zero cost, okay?

So he started at 337,915.  He along the way added a lot of stock options at zero cost, that was 327,000 stock options which he exercised.  So during the period, Foster's holdings at the beginning plus the options totals up to 665,747 shares that he had during the period.

He sold 277,430 shares, or 41 percent of the 665,747.

So it is true, it is true that he started with 337,915 and ended with 351,098, but, along the way, as the stock was rising, and if you accept the complaint's allegations as true, continued to make false statements, he sold 277,000 shares of

stock for $67 million.

So the beginning and the end balance don't account for what happened in the middle.

THE COURT: Thank you.

MR. FOX: So -- and I would just like to point out that, you know, one particular sale is, you know, just I think deserves mention, and that is on --

THE COURT: February 15th.

MR. FOX: Yes, thank you, your Honor.

February 15th, there's a sale of about $5 million worth of stock, and there that is, you know -- of course, there are still shipments being blocked by KF, there were at least two additional shipments worth $20 million blocked, and that is a day -- on February 22nd, the company announces that on February 16th and 17th they were advised of the pending criminal investigation into Charles River.

So we would allege that that particular sale is -- we think all the sales are suspiciously timed, but that one, in particular, really stands out, the day before it's announced that Charles River -- or five days it's announced that Charles River is under investigation, but the company knew a day before that there was going to be a subpoena and that they were under investigation. So that particularly stands out.

It is also, I will say, you know, in violation of Charles River's code of conduct concerning insider trading,

which provides you may become aware of material information about Charles River or a supplier before it's announced to the public, you may not sell stock while you have material inside information about the company.

If I could, your Honor, I know I've been going a long time, but if I could just briefly address loss causation.

THE COURT:  Very briefly, counsel.

MR. FOX:  Okay.  I will be very brief.

The defendants basically say that each of the five disclosures were not connected and there's no loss causation. They don't deny, however, in the 1st Circuit a disclosure does not have to be a mirror image of the false statement or omission.  And just to be very brief, each of the corrective disclosures discloses some information that's the same subject matter of the misrepresentations or omissions, and that is what's required by 1st Circuit law.

With that, your Honor, I will end.

Thank you, your Honor.

THE COURT:  Thank you.

Counsel, I'll give you brief rebuttal.

MR. DUGGAN:  Thank you, your Honor.

(Pause.)

MR. DUGGAN:  Thank you, your Honor.

So just to address several of Mr. Fox's points, and I'll take them largely in the order in which they were made,

but I'm also -- would welcome direction from the Court if there were particular ones that you would ask me to address at the outset.

Simply starting with this notion that somehow there was a heightened set of risks that the company was facing in respect to its supply chain as of the start of the class period, the company had just gone through a substantial derisking exercise because 60 percent of its supplied macaques had been stripped out of its supply chain by China.

So it went from being heavily overconcentrated in a market where it was suddenly prohibited from importing macaques on which its business depended, to a different model, and this is described in length in the company's public statements, which sought to have reliance on a diversified geographic supply base and a diversified group of suppliers within those geographies, and that's exactly what you see here.

So the company is addressing a supply chain challenge predating the class period, and this is its solution to the challenge.

Is it riskless?  No, that's why there are, in fact, disclosures that are legal risks and the possibility of supply chain interruptions as a result of legal risks, including other importation problems.  That is disclosed.

And as I set forth earlier today, it's when it began to appear that those risks were materializing that the company

disclosed the information relevant to that materialization of the risk, the Vanny indictment and the subsequent disclosures that were made about its ability to continue accessing its supply chain.

I do want to say a few things about, first of all, your Honor, about Mr. Fox discussed the Chiasma case.

THE COURT:  Yes.

MR. DUGGAN:  And I think that case is actually -- has parallels to this case, but the parallels aren't the one that Mr. Fox was focused on.

When the FDA meets with a company with product in development and indicates that it has concerns that may prevent it from going forward, that is a materialization of a risk. And the analogy here is when Vanny is indicted and the Fish and Wildlife Service begins prohibiting importations of shipments from Cambodia.  And those events were disclosed.

And the question isn't whether or not risks are foreseeable, it's whether or not they are beginning to materialize.  Clearly they were foreseeable to some degree because that's why the company specifically warned that there could be supply chain interruptions.  When the threat of supply chain interruptions took form, took shape, that's when the disclosures were made, that's exactly how the law is supposed to work.

THE COURT:  I understand your position.

What do you say to your brother's argument, you know, sort of looking at plaintiff's chart of the disclosures before November 2, 2022, and then contrasting that with the 10-K, what do you say about your brother's argument about saying more in the disclosure predating November 2nd?

MR. DUGGAN:  Excuse me, your Honor, I left this here.

THE COURT:  Sure.

MR. DUGGAN:  Well, here's what was said in the disclosure prior to the February 22 10-K.

China supplies a significant portion of critical -- certain critical large research models which have been subject to geographic export restrictions.

Mr. Fox suggested that there was somehow a failure to disclose that supply of macaques from China had been constrained.  It's actually right there in black and white.  He read the first part of the sentence but not the second part.

It goes on to say, We take steps to find alternative supply channels and lock in supply with preferred sources through multiyear or minimum commitment contracts.

This is a description of how the company was addressing the problem with China, and it made quite clear that there were challenge associated with it.

What you see in the 10-K, in the right-hand column, is a description of the implications of what has happened in Cambodia by this time.  The reason that Cambodia is called out

at -- in February 22, 2023 in the 10-K is that the company has been affected as of that time by problems that have arisen with respect to the importation of macaques from Cambodia.

So what you have is timely discussion of Cambodia when Cambodia is affecting the company's ability to access supplies of macaques.

Your Honor, in reference to the constellation of companies that Mr. Fox talked about that are related to Vanny, a couple of things.

First of all, there was a securities action filed against Inotiv in connection with allegations in respect of importation of macaques by Envigo and OBRC, and those were based on the fact that there had been disclosures of the subpoenas that had been received.

What the Court says in that lawsuit -- and this is at star 29 in the electronic version -- is that a subpoena is just a subpoena, and it actually dismissed claims of fraud based on the receipt of a subpoena as lacking sufficient probative value to suggest that there was a broader problem in and of itself.

Also, with respect to Mr. Fox's chart, there was extensive discussion of Nafovanny, which is affiliated with Vanny Cambodia.  Nafovanny is a distrib -- is a supplier of macaques from Vietnam, not from Cambodia.

And, your Honor, I would again ask you to look at my favorite exhibit here, the chart, which shows that in the lower

right-hand column all of those purple dots are approved shipments from Nafovanny. And you can see that the Fish and Wildlife Service is proving shipments from Nafovanny, multiple shipments from Nafovanny in the period both after it had begun to block shipments from KF, which was Charles River's primary Cambodian supplier, but also after the indictment was unsealed that charged the Vanny related individuals of conspiracy.

By the way, the result -- one defendant was tried in that case, as you know, your Honor, and was acquitted.

THE COURT:  I saw that noted.

Counsel, otherwise -- otherwise, the supplier dots on this chart are Cambodian companies, right, companies in Cambodia, other than that one?

MR. DUGGAN:  Your Honor, I am not sure that I know where KHI sources its product from, but Worldwide Primates, Envigo, OBRC, KF, those are all Cambodian. Nafovanny is a Vietnamese supplier. And I regret I'm not conversant with KHI, which doesn't figure in this story at all.

THE COURT:  Thank you.

MR. DUGGAN:  Your Honor, a couple of things about Mr. Foster's stock positions, just very quickly, and I don't wish to repeat myself. But Mr. Fox explained that part of the reason that his position was larger at the end of the period than before despite having sold was that he acquired more stock. Well, that would necessarily have to be the case. And

as I said before, what you don't infer from this sequence of events is that Mr. Foster sought to derisk himself relative to Charles River, rather, at the end of it, he was more exposed to Charles River than he was --

THE COURT:  In terms of personal investment, basically?

MR. DUGGAN:  Correct.

There was -- the Court asked some questions about the last sale reflected on this chart, the February 2023 sale.

THE COURT:  February 15th, yes.

MR. DUGGAN:  Correct, your Honor.

Well, the sequence there, your Honor, as you know, the sale was on the 15th.  Charles River was informed about the indictment after -- I'm sorry, not the indictment, informed about receipt of the subpoena after the date of the sale.

Mr. Fox says, Well, those are very close in time, and that is true, but there is no basis offered by the complaint to suggest that Mr. Foster was aware of the receipt of the subpoena that didn't come for another two days and predated the announcement by only five days.

THE COURT:  Thank you.

MR. DUGGAN:  Your Honor, those are -- I don't want to impose on the Court's patience, those are the principal points I wanted to address, but if there's any other aspect of what Mr. Fox shared with us, I'm happy to speak to it.

THE COURT:  Thank you, thank you.

MR. FOX:  Your Honor, may I have just one minute?

THE COURT:  You may, from there, counsel, not to discourage talking about --

MR. FOX:  Thank you.  I just wanted to address one thing.

THE COURT:  Sure.

MR. FOX:  On the Envigo case, you know, that -- it's a different complaint, it's -- the allegations there are much thinner than the allegations here, and so that got dismissed for, you know, a different complaint.

I would say, you know, again, Mr. Duggan brings up the acquittal.  I think that the -- the judge in that case, we could submit this, and the witnesses in that case clearly show that Vanny was harvesting illegal macaques, and I believe the judge commented on that.

But this was a Cambodian official and they weren't able to show that he knew that the illegal monkeys were coming to the United States because those animals can go other places without a problem, it's coming to the United States that's a problem.  So the government wasn't able to show that that Cambodian official knew that.

One other thing, which is that your Honor raised the footnote in our brief about leave to amend, and I just want to -- my brother, Mr. Duggan, said that this is an amended

complaint.  That is true, it's an amended complaint.  However, it is the first complaint by my client, by the Ohio STRS.  The original complaint was filed by a completely different plaintiff.  It's a completely different complaint.  And so this is my client's first -- first complaint, and if your Honor -- of course, we don't think your Honor should, but if your Honor were to dismiss the complaint, we would request leave to amend.  And, you know, it's been six months or so since -- at least, maybe longer, since we filed the complaint, and I think we would be able to even add more detail to it.

Thank you, your Honor.

THE COURT:  Thank you.

Counsel, I appreciate the arguments on either side.  You've given me a lot to think about, and I want to take the time to do a little bit more of that.  I'll take it under advisement, and we'll go from there.

Thank you.

MR. FOX:  Thank you, your Honor.

THE CLERK:  All rise.

(Court adjourned at 3:33 p.m.)

- - - - - - - - - - - -

                         CERTIFICATION

        I certify that the foregoing is a correct transcript

of the record of proceedings in the above-entitled matter to

the best of my skill and ability.


/s/Debra M. Joyce                    May 17, 2024
Debra M. Joyce, RMR, CRR, FCRR       Date
Official Court Reporter