§UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————————

STATE TEACHERS RETIREMENT
SYSTEM OF OHIO, individually and
on behalf of all others similarly situated,

    Plaintiff,

  v.

CHARLES RIVER LABORATORIES
INTERNATIONAL, INC., JAMES C.
FOSTER and DAVID R. SMITH,

    Defendants.

———————————————————————

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

  Case No. 23-cv-11132-DJC

## MEMORANDUM AND ORDER

**CASPER, J.**          **July 1, 2024**

### I.  Introduction

  Lead plaintiff State Teachers Retirement System of Ohio ("Plaintiff") asserts this putative class action against Defendants Charles River Laboratories International, Inc. ("Charles River" or the "Company"), Charles River's Chief Executive Officer ("CEO") James C. Foster ("Foster") and Charles River's former Chief Financial Officer ("CFO") David R. Smith ("Smith") (collectively, "Defendants"), alleging securities fraud in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 ("Rule 10b-5), between May 7, 2020 and March 15, 2023 (the "Class Period"). D. 36. Defendants have moved to dismiss the amended complaint. D. 42. For the reasons stated below, the Court ALLOWS the motion to dismiss.

## II.     Factual Background

The following facts are alleged in Plaintiff's amended complaint, D. 36, and are accepted as true for the purpose of resolving the motion to dismiss.

Plaintiff is a public pension fund with total investments of $88.8 billion as of June 30, 2022, providing retirement benefits, health care benefits and other services to active, inactive and retired Ohio public educators.   D. 36 ¶ 62.   Plaintiff purchased Charles River stock during the Class Period.   Id.   Charles River is a publicly-traded drug development company (with its common stock trading on the New York Stock Exchange) that assists drug developers in the discovery and development of new products.   Id. ¶¶ 4, 63, 69.   Foster served as the Company's Chief Executive Officer at all relevant times, id. ¶ 64; Smith served as Chief Financial Officer from August 2015 to May 2022.   Id. ¶ 66.

### A.     Charles River Imports Long-Tailed Macaques for Drug Safety Assessment Studies Subject to Federal and International Law

U.S. Food and Drug Administration regulations require that a drug's safety be proven through drug safety assessment studies on animals before it can be tested in humans.   Id. ¶¶ 5, 75.   Charles River sells animals to drug developers for use in these drug safety assessment studies.   Id. ¶¶ 4, 71.   The Company also imports animals for use in its own drug assessment studies, which it conducts on behalf of some clients.   Id. ¶¶ 4, 71–72.   To test the safety of biologic drugs, such as vaccines, Charles River and other drug developers conduct safety assessment studies on "non-human primates" ("NHPs") due to their biological similarity to humans.   Id. ¶¶ 5, 76–77.   The NHP most frequently used to assess the safety of biologic drugs is the long-tailed macaque.   Id. ¶¶ 5, 83–85.   Nearly all macaques are imported into the United States.   See id. ¶¶ 6, 88.

The commercial trade and import of macaques is regulated by federal and international law.   Id. ¶¶ 7, 92.   The macaque is a protected species under the Convention on International Trade

in Endangered Species of Wild Fauna and Flora ("CITES"), to which the United States is a party. Id. ¶¶ 7, 93–94, 97.  The United States has implemented CITES through the Endangered Species Act ("ESA"), which is enforced by the U.S. Fish and Wildlife Service ("USFWS").  Id. ¶¶ 7, 104–05.  The ESA provides, in relevant part, that "[i]t is unlawful for any person . . . to engage in any trade in any specimens [of wildlife] contrary to the provisions of the [CITES], or to possess any specimens [of wildlife] traded contrary to the provisions of . . . [CITES]."  Id. ¶ 7 n.2 (alterations in original) (quoting 16 U.S.C. § 1538(c)).

Separately, the Lacey Act makes it unlawful for any person "to import, export, transport, sell, receive, acquire, or purchase any fish or wildlife or plant taken, possessed, transported, or sold in violation of any law, treaty, or regulation of the U.S."  Id. ¶¶ 7 n.2, 106 (citing 16 U.S.C. § 3372(a)(1)).  The Lacey Act defines "wildlife" as "any wild animal, whether alive or dead, including without limitations any wild mammal . . . whether or not bred, hatched, or born in captivity, and includes any part, product, egg, or offspring thereof."  Id. ¶ 106 (quoting 16 U.S.C. § 3371(a)).

During the Class Period, Charles River told investors that the Company maintained and enforced standards of conduct concerning its suppliers.  Id. ¶ 107.  For example, the Company would refer investors to its Code of Business Conduct and Ethics and Supplier Code of Conduct, which provided that Charles River's executives, officers, employees and suppliers "must comply with the international agreements and conventions, as well as the national, regional and local laws and regulations that apply to our global and international business," "[b]e truthful and accurate in all representations and certifications made to government agencies," "[w]e must always be truthful and accurate about our products and services," and "we must all be vigilant in meeting and going beyond our responsibilities to comply with relevant laws and regulations."  Id. ¶ 108.

**B.**     **China Restricts Macaque Exports in Response to the Pandemic and Charles River Sources Macaques from Other Suppliers in Southeast Asia**

Before the Class Period, Charles River obtained more than 60% of its macaques from China.  Id. ¶¶ 8, 110.  In early 2020, however, in the wake of the Covid-19 pandemic, China imposed strict restrictions on the export of macaques, reducing exports to the United States to zero. Id. ¶¶ 9, 111.  As China imposed its export controls, Cambodian suppliers increased their export of macaques to the United States—up 86% in 2020 over 2019, with similar increases in 2021 and 2022 compared to 2019.  Id. ¶¶ 14, 115.  In 2019, Cambodia exported between 10,902 and 11,351 macaques to the United States; in 2020, it exported between 24,500 to 28,295 macaques to the United States.  Id. ¶ 14.  Meanwhile, demand for Charles River's drug safety assessment services surged with the rise of Covid-19 related drug research, an increase in biologic drug development generally, and access restrictions preventing Charles River's clients from using their own research facilities.  Id. ¶¶ 9, 89–90.

In response to these industry dynamics, Foster told investors shortly before the Class Period, "we've made arrangements with other supply sources around the world," and "[s]o we won't be interrupted there to any material degree."  Id. ¶¶ 10, 137.  Throughout the Class Period, Charles River sourced macaques from various suppliers in Southeast Asia, including Orient BioResource Center, Inc. ("Orient BioResource"), Envigo Global Services, Inc. ("Envigo"), Nafovanny, K.F. (Cambodia) Ltd. ("KF Cambodia") and World Wide Primates, Inc. ("WW Primates").  Id. ¶¶ 20, 28–29, 124, 126, 132–34.  Charles River also received over 1,000 specimens or extracts derived from macaques from KHI Bioservices Ltd.

Charles River received at least 2,262 macaques from Orient BioResource and Envigo, subsidiaries of a company called Inotiv, Inc. ("Inotiv").  Id. ¶¶ 20, 125–26.  Inotiv is a publicly traded U.S. company and, as of 2021, purported to be the "largest importer of NHPs in North

America, with long-established relationships with the source breeders around the world," including from "breeding farms principally located in Cambodia, Vietnam, and Mauritius Island." Id. ¶ 125. Inotiv primarily received macaques from Cambodia. Id. ¶ 127. Inotiv's principal supplier of macaques in the country was a network of related companies doing business as the "Vanny Group," including Vanny HK, KHI Bioservices Ltd., Vanny Cambodia, Vanny Chain Technology (HK) Ltd. and Nafovanny. Id. ¶¶ 127, 129.

Charles River received more than 10,000 macaques from KF Cambodia during the Class Period, including 3,763 macaques in 2020, 3,182 macaques in 2021 and 3,096 macaques in 2022. Id. ¶ 132. The Company sourced at least 956 long-tailed macaques from WW Primates, a company based in Miami, Florida. Id. ¶ 133. Nafovanny, a member of the Vanny Group based in Vietnam, directly supplied at least 512 macaques directly to Charles River. Id. ¶ 134.

As Charles River leveraged its network of suppliers, Defendants represented to investors that the Company had a timely and steady supply of macaques to meet client demand. Id. ¶ 11. For example, Defendants stated in various SEC filings that Charles River had taken "steps to find alternative supply channels and lock in supply with preferred sources through multi-year and/or minimum commitment contracts," id. ¶¶ 11, 145, 170, 262, and that "[w]e proactively engaged with our suppliers beginning in January 2020 to limit any potential disruption to our supply chain." Id. ¶¶ 11, 143, 168. During conference calls in 2020 and 2021, Foster told analysts and investors, "we work really hard to have multiple supply sources from multiple geographies," id. ¶¶ 12, 176, "we've done an exceptional job in adding, ensuring, tightening up, expanding our supply sources so that we have multiple supply sources for multiple countries such that we can support the demand, which is quite significant," id. ¶¶ 12, 203, and "we've had to identify and validate multiple new sources of supply of multiple countries to accommodate just the increase in demand

and the pace of demand and just to ensure that the supply is there." <u>Id.</u> ¶¶ 12, 248.  On February 22, 2023, Foster stated, "in recent years, NHPs sourced from Cambodia have been responsible for approximately 60% of the NHPs supplied to the United States and to Charles River for drug research and development."  <u>Id.</u> ¶¶ 116, 342.

### C.   Constraints on the Import of Macaques Due to Their Gestation Periods

As alleged by Plaintiff, the rapid increase in the supply of macaques from Cambodia was unlikely to have been the result of captive breeding alone.  <u>Id.</u> ¶¶ 13, 15, 117.  Plaintiff asserts that the gestation period for long-tailed macaques is roughly six months, pregnancy typically results in one offspring and macaques usually are not ready for export until they are at least two years old. <u>Id.</u> ¶¶ 15, 118–19.  Thus, any uptick in macaque exports in response to the Covid-19 pandemic, according to Plaintiff, could not have occurred earlier than "at least late 2022."  <u>Id.</u> ¶ 120.

The constraints imposed by NHPs' gestation periods were acknowledged after the Class Period by Charles River's Executive Vice President and Chief Operating Officer Birgit Girshick ("Girshick"), who stated in a June 8, 2023 conference call that "none of the [NHP] farms can scale really, really quickly" and that "the gestation doesn't allow that.  The animals have to be a certain age."  <u>Id.</u> ¶¶ 15, 122, 357.  On June 13, 2023, UBS published an analyst report stating that "given the gestation periods and fecundity of primates, the rapid increase in supply originating in Cambodia simply was not possible without including (illegally-sourced) wild animals into the mix."  <u>Id.</u> ¶¶ 16, 123.

### D.   The DOJ Investigates the Import of Macaques from Cambodia

On August 4, 2021, the U.S. Department of Justice ("DOJ") issued a press release stating that Gary Tucker, an executive at Orient BioResource, had pled guilty to lying to USFWS agents about "his involvement in the procurement and importation to the United States of long-tailed

macaques—small non-human primates regularly employed in scientific research—from Southeast Asia." Id. ¶¶ 21, 233.  Agents had asked Tucker "whether he or others working for his employer, Orient BioResource Center (OBRC), prepared or submitted to OBRC any audits or reports concerning visits to supplier sites in Cambodia," the existence of which "was material to the ongoing investigation into the trafficking of the primates." Id. ¶ 233.  Two days later, on August 6, 2021, Foster sold 10,000 shares of Charles River for over $4 million and gifted 2,500 shares with a value of over $1 million; on August 9, 2021, Smith sold 1,750 shares of Charles River common stock for proceeds of approximately $712,954. Id. ¶¶ 22, 234–35.  On September 14, 2021, when asked about Charles River's supply chain, Foster stated, "we've been doing a really good job in supply chain . . . . [W]e found ourselves in very good shape as supply chain tightened or was hampered by COVID and have continued to work through that with pretty much no disruptions at all that I'm aware of." Id. ¶ 236.  Foster referenced the Company's "complex framework of suppliers" and added that "what we've done there is meaningfully expanded our supply sources." Id.

The government filed its sentencing memorandum in Tucker's criminal case on October 7, 2021, asserting that the government "has been investigating whether foreign exporters and, potentially, U.S. importers are improperly importing wild-caught non-human primates into the United States despite the animals being labeled as captive bred in regulatory and related documents." Id. ¶ 239.  A week later, the DOJ issued another press release, stating that Tucker had been sentenced as part of "a criminal investigation of international trafficking of primates into the United States." Id. ¶¶ 23, 238.  On October 26, 2021, Foster gifted 14,813 shares to his children with a value of $6,367,072 based on the closing price per share of $429.83 per share. Id. ¶¶ 24, 240.

On February 16, 2022, Inotiv disclosed in an SEC filing that, on June 15, 2021, Envigo had been served with a grand jury subpoena by the DOJ "requiring the production of documents related to the importation into the United States of live non-human primates originating from or transiting through China, Cambodia and/or Vietnam." Id. ¶¶ 25, 253. As of this disclosure, Charles River allegedly had acquired at least 1,918 macaques from either Inotiv or its subsidiaries, Orient BioResource and Envigo. Id. ¶ 254. As alleged, Orient BioResource and Envigo supplied more than 814 macaques to Charles River, accounting for approximately 5% of macaques used by Charles River in 2021. Id.

Also on February 16, 2022, Charles River's 2021 Form 10-K stated that "[w]e continuously engage with our suppliers to limit any potential disruption to our supply chain," id. ¶ 260, that "[l]imited global supply or regional restrictions on transportation for certain products may require us to source products from non-preferred vendors, which may not be successful," id. ¶ 262, and that "we are currently in compliance in all material respects with applicable national, regional and local laws, as well as other accepted guidance used by oversight bodies." Id. ¶ 264. On February 22 and 23, 2022, Foster exercised 37,732 options to acquire shares of Charles River common stock and sold 100% of them for net proceeds of over $6.1 million. Id. ¶¶ 26, 270–71. On March 3, 2022, Smith exercised 8,965 options to acquire shares of Charles River common stock and sold 100% of them for net proceeds of $1,308,326. Id. ¶ 272.

On May 16, 2022, Inotiv disclosed that Orient BioResource had received a grand jury subpoena from the DOJ in June 2021, similar to the one previously served upon Envigo. Id. ¶¶ 27, 280. As of May 2022, Envigo and Orient BioResource had supplied Charles River with at least 1,990 macaques since the start of the Class Period, at least 1,247 of which were identified as Cambodia macaques. Id. ¶ 27. Envigo and Orient BioResource had sourced about 60% of their

Cambodia macaques from the Vanny Group.  Id. ¶ 28.  On June 6, 2022, Foster gifted 2,000 of Charles River common stock, with a value of $490,040, based on the closing price of $245.02 per share.  Id. ¶ 281.

Several months later, on or around September 21, 2022, the USFWS refused to clear a shipment of 360 macaques from KF Cambodia to Charles River, the first time the agency had done so.  Id. ¶¶ 30, 289, 291.  The USFWS blocked additional shipments from KF Cambodia to Charles River on or around December 29, 2022 and January 22, 2023.  Id. ¶¶ 294–95.  By the end of the Class Period, the USFWS had blocked the Company's import of 1,269 macaques from KF Cambodia.  Id. ¶ 296.

### E.    The DOJ Charges Six Vanny Group Executives

On November 16, 2022, the DOJ unsealed an indictment of two Cambodian government officials responsible for the implementation and oversight of CITES and six executives of the Vanny Group, including executives at Vanny HK and Vanny Cambodia, charged with taking part in a scheme to smuggle macaques into the United States.  Id. ¶¶ 31, 314.  The indictment also referenced "unnamed" co-conspirators, which Plaintiff alleges to be Inotiv (or its subsidiaries Orien BioResource and Envigo) and WW Primates.  Id. ¶¶ 31, 315–16.  The Vanny Group executives were charged for allegedly conspiring to introduce wild macaques into the supply chain of customers in the United States, in violation of the ESA and the Lacey Act.  Id. ¶¶ 32–33, 317–18.  On the same day, November 16, 2022, Charles River's shares declined to $239.39 per share, a decline of $10.68 per share or about 4.3% from the closing price per share on the prior day.  Id. ¶¶ 34, 323.  On November 17, 2022, Inotiv filed a Form 8-K with the SEC, stating that it had previously disclosed the grand jury subpoenas issued to Orient BioResource and Envigo in June

2021 and acknowledging that Vanny Cambodia was Inotiv's "principal supplier of non-human primates." Id. ¶¶ 35, 324.

About two weeks later, on November 30, 2022, Charles River made the following statements in a Form 8-K:

> Charles River was not named or referenced in the DOJ proceedings, and the Company does not have any direct supply contracts with the indicted Cambodian supplier. [ ] Charles River has global supply sources, including other sources in Cambodia, which is the primary country of origin of NHP imports to the United States and to Charles River. However, in light of the indictment, and subsequent statements made by the Cambodia government, Charles River is operating under the expectation that for some time period supply of Cambodia-sourced NHPs will be difficult to obtain in the United States.

Id. ¶¶ 37, 326. Foster reiterated during an investor conference on the same day, "there were also a couple of Cambodian officials that were named in this indictment, and we don't have any direct contacts with that supplier either," and added that "we're working really hard to mitigate any potential adverse impact with other supply sources with our current supplier in Cambodia." Id. ¶¶ 37, 327. Foster also stated that the situation was complex because "one of the big suppliers from Cambodia, who's not a supplier of ours is unable to ship. So that's going to hurt some folks" and that "[the] [f]acility that we work with in Cambodia is extremely high quality one [sic], all the ones that we work with are high quality ones." Id. Charles River's shares declined from $239.50 per share the previous day to close at $228.57 per share on November 30, 2022, a decline of $10.93 per share or 4.6%. Id. ¶¶ 38, 328.

On January 12, 2023, there was the publication of a research report about Charles River, in which it stated that "[t]he indictment of Vanny and other Cambodian officials alters" the viewpoint that Charles River's import of NHPs "was in a privileged position" because "~24% of CRL's U.S. NHP usage relies on Vanny supply (likely through an indirect relationship), a perspective underappreciated by investors." Id. ¶¶ 43, 338. The Company's stock then declined

from a close on January 11, 2023 of $246.94 per share to a close at $232.25 per share on January 12, 2023, a decline of $14.69 per share or about 6%.  Id. ¶¶ 44, 339.  On February 15, 2023, Foster sold over $5 million worth of Charles River stock.  Id. ¶¶ 46, 340.

### F.       Charles River Discloses Receipt of a DOJ Subpoena

On February 22, 2023, before the market opened, Charles River announced on February 17, 2023, it had received a DOJ subpoena related to the USFWS investigation into the Company's import of NHPs from Cambodia.  Id. ¶¶ 47, 341.  Charles River also filed its 2022 Form 10-K, stating that "we have voluntarily suspended future shipments of [NHPs] from Cambodia until such time that we and USFWS can agree upon and implement additional procedures to reasonably ensure that [NHPs] imported to the United States from Cambodia are purpose-based."  Id. ¶¶ 47, 345.  Charles River's stock price declined from a close on February 21, 2023 of $243.60 per share to a close on February 22, 2023 of $219.09 per share, a decline of $24.51 per share or over 10%. Id. ¶¶ 49, 346.

On March 15, 2023, the last day of the Class Period, Foster stated in a conference call with analysts and investors that Charles River had used non-preferred suppliers of macaques from Cambodia.  Id. ¶¶ 50, 348.  In relevant part, Foster said:

> So there are no U.S. breeding sources.  There are a couple of companies that sort of brokers[,] that get animals from wherever.  We have used those folks to some extent historically.  I'm trying to be careful picking my words here.  We prefer not to use them.  Reputationally, I just don't think they're the best possible people to use.  And I don't actually think they care where the animals come from or what the background is and they've been kind of inappropriate with pricing . . . . There are probably animals in country brought in from the outside, including it could be from Cambodia.  It could be from the source that DOJ is looking at.  I don't know that. We're just not using them, number one.  Number two, I don't think it's large numbers of the [animals].  Number three, I don't know how sustainable that is.

Id. (second alteration in original).  The same day, Charles River's stock declined from a closing price on March 14, 2023 of $205.02 per share to close at $194.90 per share, a decline of $10.12 per share or approximately 5%.  Id. ¶¶ 51, 349.

Approximately two months later, on May 11, 2023, Foster stated, "we're quite confident from what we know that our supplier—he has [been] purpose bre[e]ding these animals according to all of our expectations, and we can demonstrate that . . . we're confident that we can prove it and demonstrate it scientifically without a shadow of a doubt."  Id. ¶¶ 54, 354.  On August 9, 2023, Charles River disclosed in its Form 10-Q that, on May 16, 2023, the Company had received an inquiry from the SEC, requesting information related to the Company's sourcing of NHPs in Asia. Id. ¶ 356.  As of November 13, 2023, the Company's stock price had not recovered, closing at $170.03 per share.  Id. ¶¶ 55–56.

## III.    Procedural History

This class action was initiated on May 19, 2023.  D. 1.  The Court allowed a motion appointing Plaintiff as lead plaintiff.  D. 25.  Plaintiff filed the amended complaint on November 14, 2023.  D. 36.  Defendants have now moved to dismiss.  D. 42.  The Court heard the parties on the pending motion and took the matter under advisement.  D. 52, 53.

## IV.    Standard of Review

As with any Rule 12(b)(6) motion, the Court must "accept well-pleaded factual allegations in the complaint as true and view all reasonable inferences in the plaintiffs' favor."  ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 58 (1st Cir. 2008) (citations omitted).

In addition, "[a]s with all allegations of fraud, a plaintiff must plead the circumstances of the fraud with particularity, pursuant to Rule 9(b)."  Hill v. Gozani, 638 F.3d 40, 55 (1st Cir. 2011) (citing ACA Fin., 512 F.3d at 58).  Allegations of securities fraud under Sections 10(b) and 20(a)

of the Exchange Act must satisfy the "specific pleading requirements" of the Private Securities Litigation Reform Act ("PSLRA"). Id. The PSLRA requires that a pleading (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading" and (2) "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." Id. (quoting 15 U.S.C. § 78u–4(b)(1)); see In re Cabletron Sys., Inc., 311 F.3d 11, 27 (1st Cir. 2002).

With respect to the element of scienter, the PSLRA requires that the pleading "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Hill, 638 F.3d at 55 (quoting 15 U.S.C. § 78u–4(b)(2)(A)). "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." Tellabs v. Makor Issues & Rts., Ltd., 551 U.S. 308, 323 (2007). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324. The plaintiff is not required to "plead evidence," ACA Fin., 512 F.3d at 63, however, and the Court must consider "all of the facts alleged, taken collectively." Tellabs, 551 U.S. at 323 (emphasis in original).

## V.    Discussion

### A.    Section 10(b) and Rule 10b-5 (Count I)

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead the following "six elements": "(1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. CVS Health Corp., 46 F.4th 22, 30 (1st Cir. 2022) (quoting Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc., 22 F.4th 1, 6 (1st

Cir. 2021)).  Defendants argue that Plaintiff has failed to plead a material misrepresentation or omission, scienter and loss causation.  D. 43 at 17–28.

1.    *Actionable Misrepresentations or Omissions*

"To establish a material misrepresentation or omission, [Plaintiff] must show 'that defendants made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading.'"  Ganem v. InVivo Therapeutics Holdings Corp., 845 F.3d 447, 454 (1st Cir. 2017) (quoting Geffon v. Micrion Corp., 249 F.3d 29, 34 (1st Cir. 2001)).

With respect to affirmative statements, the truth or falsity of same is a relatively straightforward analysis, see In re Cytyc Corp. Sec. Litig., No. 02-cv-12399-NMG, 2005 WL 3801468, at *14 (D. Mass. Mar. 2, 2005), report and recommendation adopted by No. Civ.A. 02-12399-NMG (D. Mass. Mar. 22, 2005), but whether a statement is misleading "depends on the perspective of a reasonable investor."  Karth v. Keryx Biopharmaceuticals, Inc., 6 F.4th 123, 135 (1st Cir. 2021) (quoting Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 575 U.S. 175, 186 (2015)).

With respect to omissions, Section 10(b) "do[es] not create an affirmative duty to disclose any and all material information."  In re Bos. Sci. Corp. Sec. Litig., 686 F.3d 21, 27 (1st Cir. 2012) (alteration in original) (quoting Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011)). "Even where the omitted 'information is material, there is no liability . . . unless there was a duty to disclose it."  Pizzuto v. Homology Meds., Inc., No. 1:23-CV-10858-AK, 2024 WL 1436025, at *8 (D. Mass. Mar. 31, 2024) (quoting Roeder v. Alpha Indus., Inc., 814 F.2d 22, 26 (1st Cir. 1987)); see Sec. & Exch. Comm'n v. Johnston, 986 F.3d 63, 72 (1st Cir. 2021) (noting that "[i]t is well-settled that the 'mere possession of . . . nonpublic information does not create a duty to

disclose it'") (quoting In re Smith & Wesson Holding Corp. Sec. Litig., 669 F.3d 68, 74 (1st Cir. 2012)).  Moreover, the duty to disclose "extends only where affirmative states are made and the speaker fails to 'reveal those facts that are needed so that what was revealed would not be so incomplete as to mislead.'" Bos. Sci. Corp., 686 F.3d at 27 (quoting Hill, 638 F.3d at 57).

"Information is material if a reasonable investor would have viewed it as 'having significantly altered the total mix of information made available.'" Ponsa-Rabell v. Santander Sec. LLC, 35 F.4th 26, 33 (1st Cir. 2022) (quoting Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp., 523 F.3d 75, 85 (1st Cir. 2008)).  The Court considers "the entirety of the relevant facts available at the time of the allegedly misleading statement, not simply the words of the statement itself." Id. Although "[m]ateriality is usually a matter for the trier of fact," ACA Fin., 512 F.3d at 65, "courts have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1217 (1st Cir. 1996).

Plaintiff alleges numerous, materially false or misleading statements in the amended complaint.  D. 36 ¶¶ 141, 143, 145, 147, 149, 157, 159, 161, 168, 170, 172, 174, 176, 184, 186, 188, 191, 194–95, 200, 203, 213, 215, 221, 224, 226, 228, 230, 236, 242, 244, 246, 248, 250, 256, 258, 260, 262, 264, 267–68, 274, 276, 278, 283, 285, 287, 303, 305, 307, 311, 326–27, 336. Plaintiff groups these alleged misrepresentations into the following six categories: (1) representations in response to the November 2022 indictment, D. 46 at 17–18; (2) representations concerning engagement with non-preferred suppliers, id. at 18–21;

15

(3) representations concerning "purpose-bred, SPF" macaques, id. at 21; (4) representations concerning supply chain concentration, id. at 21–22; (5) representations concerning macaque demand and inventory, id. at 22–24; and (6) representations concerning legal compliance and codes of conduct. Id. at 24–26.

a)      Representations in Response to the November 2022 Indictment

Plaintiff alleges that, on November 30, 2022, Charles River and Foster made materially false or misleading statements in response to the November 2022 indictment of two Cambodian government officials and six executives of Vanny Group member companies, including Vanny HK and Vanny Cambodia.[1]  D. 36 ¶¶ 314, 317, 326–27; see id. at 135, 138–39.  Specifically, Plaintiff points to Charles River's statements in the Form 8-K and Foster's statements during an investor conference.  Id. ¶¶ 326–27.  In the Form 8-K, Charles River stated that the "the Company does not have any direct supply contracts with the indicted Cambodian supplier" and that "Charles River has global supply sources, including other sources in Cambodia."  Id. ¶ 326.  During the investor conference, Foster reiterated that "we don't have any direct contacts with that [indicted] supplier" and stated that "we're working really hard to mitigate any potential adverse impact with other supply sources with our current supplier in Cambodia."  Id. ¶ 327.  Foster added, "So really complex [ ] situation at the moment, more complex by the fact that one of the big suppliers from Cambodia, who's not a supplier of ours is unable to ship.  So that's going to hurt some folks."  Id. He further assured investors that the "[f]acility that we work with in Cambodia is [an] extremely high quality one, all the ones that we work with are high quality ones," that "we have a really good

---

[1] As alleged, Smith served as CFO of Charles River from August 2015 to May 2022, D. 36 ¶ 66; accordingly, the allegations in the amended complaint do not appear to link him to any of the November 30, 2022 statements.

supplier over there and a good relationship and a big supply contract," and that the supplier implicated in the indictment is "not a supplier of ours.  It's not directed to us . . . ."  Id.

Plaintiff alleges that Charles River and Foster's representations regarding the Company's lack of "direct" supply contracts or contacts with the indicted supplier were materially false and misleading because they failed to disclose that the Company had received macaques from the Vanny Group network, through unnamed co-conspirators referenced in the indictment (which Plaintiff alleges to be Worldwide Primates, Envigo and Orient BioResource).  Id. ¶¶ 39, 331.  Plaintiff also alleges that Foster's representations were false and misleading because they suggested that the Company had no direct supply contracts with Vanny Cambodia when it had a direct relationship with some Vanny Group companies, namely Nafovanny and KHI Bioservices Ltd.  Id. ¶¶ 40, 331.  The amended complaint further alleges that Foster's statements were misleading because, as of September 2022, the USFWS had refused or rejected Charles River's import of at least 360 macaques from KF Cambodia in connection with its investigation of the Vanny Group.  Id. ¶¶ 41, 331.

Charles River's statements on the Form 8-K and Foster's remarks at the investor conference on November 30, 2022 were not false or misleading.  The indictment named executives of Vanny HK and Vanny Cambodia, id. at 138–39, neither of which are alleged to have been Charles River's direct suppliers.  See id. ¶¶ 126, 132–35 (alleging that Orient BioResource, Envigo, KF Cambodia, WW Primates, Nafovanny and KHI Bioservices Ltd. were Charles River's direct suppliers of macaques or macaque specimens/extracts).  Accordingly, Charles River's statements on the Form 8-K emphasizing that the Company does not have any "direct" supply contracts with the "indicted Cambodian supplier," and Foster's remarks indicating the same, were true.  See Cytyc Corp., 2005 WL 3801468, at *14.  These statements also would not have been so

incomplete as to mislead the reasonable investor, given that, in the context of same, the Company cautioned that "Cambodia-sourced NHPs will be difficult to obtain in the United States" for "some time period."  D. 36 ¶ 326; see In re Bos. Tech., Inc. Sec. Litig., 8 F. Supp. 2d 43, 55 (D. Mass. 1998) (noting that, in 10b-5 cases, statements are read in their "immediate context," i.e., "the balance of what was said on the particular occasion, and the immediate circumstances in which the particular statement was made").  Foster also had no duty to disclose the USFWS' independent refusal to clear shipments from KF Cambodia, an entity which does not appear to be mentioned in the indictment and which, even as alleged, is not affiliated with either Vanny HK or Vanny Cambodia.  See Bos. Sci. Corp., 686 F.3d at 27.

> b)  Representations Concerning Engagement with Non-Preferred Suppliers

Plaintiff also alleges that Defendants made false or misleading statements throughout the Class Period by stating in SEC filings that "regional restrictions on transportation for certain products may require us to source products from non-preferred vendors."  See, e.g., D. 36 ¶¶ 145, 170, 262.  Subsequent SEC filings incorporated this risk factor by reference.  See, e.g., id. ¶¶ 157, 285, 305.  According to Plaintiff, this risk factor was materially false and misleading because Defendants did not disclose that the Company had already engaged "non-preferred vendors," such as "Orient BioResource and Envigo."  Id. ¶ 146; see D. 46 at 18–21.

The truth or falsity of the Defendants' statements, however, depends on the meaning of "non-preferred," a term not clearly defined in the amended complaint.  At oral argument, Plaintiff's counsel contended that a supplier is "non-preferred" if it either faces an allegation of noncompliance with the law or sources macaques from the wild.  D. 53 at 22.  Plaintiff's counsel also pointed to Foster's statement at the end of the Class Period that Charles River had

"historically" used suppliers "that get animals from wherever" and that the Company "prefer[red] not to use them."  Id. at 22–23; see D. 36 ¶ 17.

"For allegedly false statements to support a claim of securities fraud, they must be false when made."  CVS Health Corp., 46 F.4th at 30 (internal quotation marks and citation omitted). Thus, even by Plaintiff's own definition of "non-preferred," any statement by Defendants that the Company "may" engage non-preferred suppliers of macaques would not have been false or misleading until at least one of its suppliers either faced an allegation of noncompliance with the law or sourced macaques from the wild.  See D. 53 at 22.  To that end, in the amended complaint, Plaintiff singles out Orient BioResource and Envigo.  See, e.g., D. 36 ¶ 146 (identifying "Orient BioResource and Envigo" as "non-preferred suppliers" of macaques); see also id. ¶¶ 171, 263, 306 (adopting the reasoning set forth in paragraph 146 of the amended complaint).  The amended complaint does not allege, however, that Orient BioResource and Envigo were in violation of the law or that they themselves were sourcing macaques from the wild when Defendants stated, "regional restrictions on transportation for certain products may require us to source products from non-preferred vendors."

Plaintiff points to the Company's statements on August 3, 2022 and November 2, 2022, see D. 46 at 20 (citing D. 36 ¶¶ 285, 305)—at which point Inotiv had disclosed that DOJ had issued subpoenas to Orient BioResource and Envigo, D. 36 ¶¶ 25, 27, 253, 280—but the mere existence of investigations does not establish that, at the time Defendants' statements were made, Orient BioResource and Envigo were, even by Plaintiff's definition, "non-preferred."[2]  As one other court

---

[2] Although Plaintiff alleges that that an Orient BioResource executive, Gary Tucker, pled guilty in August 2021 to an offense in connection with the DOJ's investigation into potential illegal trafficking of wildlife, see D. 36 ¶ 21, Defendants have proffered the DOJ press release upon which Plaintiff's allegations are based.  See D. 43-2 at 2–3.  The Court may consider same on a motion to dismiss as a "document[ ] sufficiently referred to in the complaint."  See Watterson v. Page, 987

has noted, "[t]he fact that Envigo and OBRC received subpoenas is just that—they received subpoenas."  In re Inotiv, Inc. Sec. Litig., No. 4:22-CV-045-PPS-JEM, 2024 WL 1344784, at *29 (N.D. Ind. Mar. 29, 2024); see Lipow v. Net1 UEPS Techs., Inc., 131 F. Supp. 3d 144, 167 (S.D.N.Y. 2015) (noting that "government investigations are just that, investigations").

Plaintiff also cannot rely upon Foster's statement at the end of the Class Period to salvage its theory of falsity.  On March 15, 2023, Foster stated in a conference call:

> So there are no U.S. breeding sources.  There are a couple of companies that sort of brokers[,] that get animals from wherever.  We have used those folks to some extent historically.  I'm trying to be careful picking my words here.  We prefer not to use them.  Reputationally, I just don't think they're the best possible people to use . . . .  There are probably animals in country brought in from the outside, including it could be from Cambodia.  It could be from the source that DOJ is looking at.  I don't know that.  We're just not using them, number one.  Number two, I don't think it's large numbers of the [animals].  Number three, I don't know how sustainable that is . . . .

D. 36 ¶ 348 (second alteration in original).  Plaintiff construes this statement as an admission that Charles River had used non-preferred suppliers of macaques from Cambodia throughout the Class Period and, presumably, at the same time as when Defendants stated that the Company "may" engage non-preferred vendors.  See id.; D. 46 at 19.  Assuming arguendo that the companies that Charles River "prefer[red] not to use" (as noted by Foster on March 15, 2023) meet the same criteria as "non-preferred vendors" (as noted in the Company's risk factor), Foster's statement is too vague to meet the Rule 9(b) standard applied by the First Circuit in securities fraud actions.  See Greebel v. FTP Software, Inc., 194 F.3d 185, 193 (1st Cir. 1999) (explaining that the First Circuit "has been notably strict and rigorous in applying the Rule 9(b) standard in securities fraud

F.2d 1, 3 (1st Cir. 1993).  According to the press release, Tucker pled guilty "to knowingly and willfully making a materially false, fictious, and fraudulent statement and representation" to the government as part of an ongoing investigation, D. 43-2 at 2; this offense, without more, does not show that Orient BioResource's import and supply of macaques was illegal or that the company itself was engaged in obtaining macaques from the wild.

actions"). For instance, Foster's statement does not specify "who" these non-preferred vendors were, "when" the Company's engagement with same occurred (aside from a vague mention of "historically"), or "where" these relationships were brokered. See Wassan v. LogMeIn, Inc., 496 F. Supp. 3d 612, 626 (D. Mass. 2020) (explaining that a complaint asserting securities fraud under Section 10(b) "must include the who, what, when, where, and how of the alleged fraud") (internal quotation marks and citation omitted). Accordingly, Plaintiff has not sufficiently alleged that Defendants' statements regarding possible engagement with non-preferred suppliers were materially false and misleading.[3]

### c)   Representations Concerning "Purpose Bred, SPF" Macaques

Plaintiff also alleges that Defendants made materially false or misleading statements by indicating in SEC filings that Charles River was a "premier provider of high quality, purpose bred, SPF" macaques to the "biomedical research community." D. 36 ¶¶ 188, 258. These statements were included in the Company's 2020 10-K and 2021 10-K, which were, respectively, filed on February 17, 2021 and February 16, 2022. Id. ¶¶ 183, 188, 255, 258. Plaintiff asserts that Defendants' statements were materially false and misleading at the time they were made and that Defendants failed to disclose that, because the Company had engaged non-preferred vendors, Charles River likely received wild-caught macaques from Cambodia that were neither "purpose bred" nor "SPF," i.e., "specific pathogen free." D. 46 at 21; D. 36 ¶¶ 189–90.

---

[3] Plaintiff's theory that Defendants' engaged non-preferred suppliers during the Class Period serves as the basis for at least some of Plaintiffs' other allegations of false and misleading statements. See, e.g., D. 36 ¶ 188–89 (alleging that Foster and Smith's statements that Charles River was a "premier provider of high quality, purpose bred, SPF large research models" were materially false and misleading because "the Company had engaged non-preferred suppliers of animals from Cambodia"). These allegations similarly fail for lack of specificity and so, to avoid redundancy, the Court focuses on Plaintiffs' remaining theories of falsity to the extent they are not premised upon Plaintiff's assertions of engagement with non-preferred vendors.

Defendants' description of Charles River was not materially false or misleading.  The amended complaint itself notes that Charles River supplied macaques to drug developers, see D. 36 ¶¶ 4, 69, 71, 92, 110, and the Plaintiff's allegations plainly do not go so far as to assert that most or all of these macaques were not "purpose bred" or "SPF."  Plaintiff also does not seem to argue that Charles River actually provided customers with wild-caught macaques, only that there existed a substantial risk that the Company received wild-caught macaques during the Class Period.  See D. 46 at 19–20 (arguing that "[b]y engaging and purchasing from [non-preferred] suppliers, it is very likely that Charles River received animals trapped from the wild, substantially increasing the risks to the Company").  To the extent Plaintiff challenges Defendants' use of the phrase "high quality" to describe its macaques, such corporate puffery is not actionable.  See In re Biogen Inc. Sec. Litig., 193 F. Supp. 3d 5, 42 (D. Mass. 2016) (holding that a company's statement that it had a "terrific product" was not actionable).

For reasons the Court has already discussed, namely the lack of specificity regarding the allegations of Charles River's engagement with "non-preferred" suppliers, Plaintiff's argument that Defendants were required to disclose the same when describing the Company as a provider of high-quality macaques is unavailing.  Accordingly, the Court concludes Defendants' statements as alleged were not materially false or misleading.

d)    Representations Concerning Supply Chain Concentration

Plaintiff further asserts that Defendants made materially false and misleading statements concerning Charles River's supply chain concentration.  D. 46 at 21–22.  Specifically, Plaintiff points to Foster's remarks during a conference call on October 29, 2020, toward the beginning of the Class Period.  Id. at 22 (citing D. 36 ¶¶ 176–77).  Foster stated, "we work really hard to have multiple supply sources from multiple geographies and multiple suppliers within those

geographies and have close working relationships with them to ensure exceptional veterinary oversight and supply numbers that are consistent and preferably and hopefully always in advance of when we need this animals because it's an important resource." D. 36 ¶ 176. He added, "we're doing very well resourcing in [N]HPs." Id. (alteration in original).

These statements were not false or misleading. Even as alleged, it is true that Charles River sourced its macaques from multiple geographies. See, e.g., id. ¶ 29 (alleging that Charles River received macaques from Vietnam); see also id. ¶ 19 (indicating that Defendants imported macaques from Vietnam-based supplier Nafovanny). Allegations that Charles River received roughly 60% of its supply of macaques from Cambodia also necessarily confirm that the balance of the Company's macaques were sourced from other geographies. See id. ¶ 14. In addition, to the extent Plaintiff challenges Foster's statement that Charles River was "doing very well" with resourcing NHPs, this statement is nonactionable puffery. See Cytyc Corp., 2005 WL 3801468, at *22 (ruling that statements about "momentum" and consistent "growth" non-actionable); Orton v. Parametric Tech. Corp., 344 F. Supp. 2d 290, 301 (D. Mass. 2004) (concluding that statements "we are pleased with . . . [the] results" and "[the company is] position[ed] . . . for long-term growth" were "classic example[s] of non-actionable corporate puffery"). Thus, Foster's statements on the October 29, 2020 conference call about its supply chain were not false or misleading.[4]

---

[4] Plaintiff again attempts to rely upon Foster's statement toward the end of the Class Period to plead that Charles River used suppliers that "get animals from wherever" to allege that, during the October 29, 2020 conference call, Foster had a duty to disclose the Company's exposure to the risk of engagement with non-preferred suppliers. In the Company's Q3 2020 10-Q filed on October 29, 2020, D. 36 ¶ 167, however, Defendants stated that "limited global supply or regional restrictions on transportation for certain products may require us to source products from non-preferred vendors." Id. ¶ 170.

e)      <u>Representations Concerning Macaque Inventory and Demand</u>

In addition, Plaintiff asserts that Defendants made materially false or misleading statements that Charles River had adequate inventory or was increasing inventory to meet customer demand, while mitigating potential supply chain risks or disruptions.  <u>See</u> D. 46 at 21–22 (citing D. 36 ¶¶ 143, 147, 157, 172, 184, 213, 221, 226, 244, 248, 250, 260).  For example, on May 7, 2020, Defendants stated the following on Form 10-Q for the quarter ended March 28, 2020 ("Q1 2020 10-Q"):

> We are focused on ensuring that we have adequate inventory and supplies on hand given the potential disruption of the COVID-19 pandemic to our suppliers and their supply chain.  Accordingly, we have and expect to continue to increase inventory and supplies through the second quarter of 2020 and beyond as deemed appropriate.  We proactively engaged with our suppliers beginning in January 2020 to limit any potential disruption to our supply chain.  However, notwithstanding generally successful efforts to maintain supply chain continuity, we have experienced and expect to experience increased costs and potential delays throughout our supply chain during the pandemic.

D. 36 ¶ 143.  Plaintiff contends that this statement was materially false and misleading because Defendants failed to disclose that, to increase its inventory of macaques, Charles River had engaged non-preferred suppliers.  D. 46 at 22.  For reasons the Court has already discussed, however, such as the lack of specificity concerning the Company's alleged engagement with "non-preferred suppliers," Plaintiff's omission theory of falsity fails.[5]

---

[5] Plaintiff also alleges that Defendants made materially false or misleading statements that demand for the Company's safety assessment studies had increased revenue and margins.  D. 46 at 23 (citing D. 36 ¶¶ 191, 256, 274, 303).  For example, Defendants stated on the Form 10-K, filed on February 17, 2021, D. 36 ¶ 183, that the Company's "Robust Safety Assessment" division had experienced "revenue growth in fiscal 2020 [that] was primarily driven by increased demand and pricing."  <u>Id.</u> ¶ 191.  Plaintiff argues that this statement was materially false and misleading because Defendants did not disclose that this demand "caused" Charles River to engage non-preferred suppliers, <u>id.</u> ¶ 192, but this argument fails for the same reason that Plaintiff's omission theory fails with respect to Defendants' statements about inventory.

Many of Defendants' statements about inventory also are not actionable on other grounds. For instance, Defendants' statement that Charles River "expect[s] to continue to increase inventory and supplies through the second quarter of 2020 and beyond as deemed appropriate" is forward-looking and accompanied by ample cautionary language regarding the potential adverse impacts of the Covid-19 pandemic to fall within the PSLRA's "safe harbor."  See Yan v. ReWalk Robotics Ltd., 973 F.3d 22, 34 (1st Cir. 2020) (explaining that "a statement is not actionable if it is 'a forward-looking statement, and [it] is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement'") (alteration in original) (quoting 15 U.S.C. § 78u–5(c)(1)(A)(i)). Other statements, such as those emphasizing the Company's "proactive[ ]" and "successful" engagement with suppliers, are nonactionable expressions of corporate optimism.  See Suna v. Bailey Corp., 107 F.3d 64, 72 (1st Cir. 1997) (noting that "[a]nalysts and arbitrageurs rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen") (internal citation omitted).

f)    Representations Concerning Legal Compliance and Codes of Conduct

Plaintiff alleges that Defendants made materially false or misleading statements concerning Charles River's compliance with the law.  See, e.g., D. 36 ¶ 149.  For example, on the Q1 2020 10-Q, id. ¶ 149, Defendants stated, "we believe we are currently in compliance in all material respects with applicable national, regional and local laws, as well as other accepted guidance used by oversight bodies [ ]including . . . the standards set by . . . the [CITES] [and] U.S. Fish and Wildlife Service." Id.  Defendants added that "failure to comply could subject us to denial of the right to conduct business, fines, criminal penalties and other enforcement actions." Id.  Defendants made similar statements throughout the Class Period, see id. ¶¶ 159, 174, 186, 215, 228, 246, 264,

278, 287, with the latest iteration of this statement having been made on the Company's Q3 2022 10-Q, filed on November 2, 2022.  Id. ¶ 307.

These statements were not materially false or misleading.  Plaintiff does not allege that, when Defendants were asserting their belief in the Company's compliance with the law, Charles River was actually violating the CITES, the ESA or other applicable laws.  Plaintiff alleges only that the Company had engaged in conduct that "substantially and materially increased the risk to the Company." See, e.g., id. ¶ 150.  Moreover, even assuming investigations could establish illegal conduct, allegations that investigations were ongoing at the supplier level would not necessarily undercut the truth of Defendants' opinion or belief that Charles River itself was in compliance with the law; Charles River, thus, was not required to disclose any further information when it asserted a genuine belief.  See Miller Inv. Tr. v. Morgan Stanley & Co., 308 F. Supp. 3d 411, 428 (D. Mass. 2018) (noting that statements of opinion may be actionable where the speaker does not actually hold the stated belief and where embedded statements of fact are untrue); see also Kushner v. Beverly Enters., Inc., 317 F.3d 820, 831 (8th Cir. 2003) (holding that "[a]bsent a clear allegation that the defendants knew of [illegal conduct] and its illegal nature at the time they stated the belief that the company was in compliance with the law, there is nothing further to disclose").

The Court also notes that the DOJ investigation into Charles River's conduct allegedly began on February 17, 2023, when the Company received a DOJ subpoena related to its investigation of the Cambodian NHP supply chain.  D. 36 ¶ 341.  Charles River disclosed this information to the market five days later, on February 22, 2023.  See id. ¶¶ 341–45.  Given that Charles River's latest disclosure related to its compliance was on November 2, 2022, months

26

before this investigation, Plaintiff has not shown that Defendants' statements were false or misleading when they were made.[6]  See CVS Health Corp., 46 F.4th at 30.

Separately, Plaintiff argues that Charles River's codes of conduct, which allegedly applied to suppliers, contained materially false and misleading statements.  D. 46 at 25–26; see D. 36 ¶¶ 194-95; 199-200.  As other courts have recognized, codes of conduct are "inherently aspirational"; they reflect a company's "opinions as to what actions are preferable, as opposed to implying that all staff, directors, and officers always adhere to its aspirations."  See Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund Hewlett-Packard Co., 845 F.3d 1268, 1276 (9th Cir. 2017); see also Singh v. Cigna Corp., 918 F.3d 57, 61, 63 (2d Cir. 2019) (holding that a code of ethics requiring employees "to act with integrity in all we do, including any and all dealings with government officials" was nonactionable puffery).  Where, however, a code of conduct "describes with specificity a course of conduct that [the defendant] promised to abjure," such statements may be deemed actionable.  See City of Fort Lauderdale Police & Firefighters' Ret. Sys. v. Pegasystems Inc., 683 F. Supp. 3d  120, 133–34 & n.6 (D. Mass. July 24, 2023) (holding that a code of conduct was actionable where it "adopted" a code of conduct that stated the Company would "[n]ever use illegal or questionable means to acquire a competitor's trade secrets or other confidential information, such as . . . seeking confidential information from a new employee who recently worked for a competitor, or misrepresenting your identity in hopes of obtaining confidential information").

---

[6] Plaintiff argues that the allegations related to the USFWS blocking shipments, which occurred before the November 2, 2022 statement, are sufficient to show that Charles River's statements were materially false or misleading.  D. 46 at 25.  That suppliers abroad were blocked from sending shipments, however, does not establish that Charles River itself was in noncompliance with the law.

Although some of portions of Defendants' codes of conduct appear to prescribe a specific course of conduct, see, e.g., D. 36 ¶ 195 ("make sure that all information furnished to any customs officials or anyone we engage to facilitate our imports and exports is accurate and truthful"), the overwhelming majority of alleged misrepresentations are either appeals to ethical norms or generic references to compliance.  See, e.g., id. ("[w]e must comply with the international agreements and conventions"); id. ("we must all be vigilant in meeting and going beyond our responsibilities to comply with relevant laws and regulations"); id. ¶ 199 ("[s]uppliers are expected to conduct business in accordance with the highest ethical standards and act with integrity").  Moreover, as alleged, Defendants represented to investors that the codes of conduct merely reflected the Company's "expectations"; given that a company has only so much control over its suppliers, a reasonable investor would not mistake same for a certification that all of its suppliers were in compliance with the law.  Cf. Pegasystems, 683 F. Supp. 3d at 133 n.6 (concluding that a code of conduct was actionable where the defendant "assured investors that it had 'adopted a written code of conduct that applies to our Board of Directors and employees, including our principal executive officer, principal financial officer, principal accounting officer, and persons performing similar functions'" and where same did not apply to suppliers).  Accordingly, the Court concludes that Defendants' codes of conduct are not actionable statements under Section 10(b).

　　　2.　　Scienter

"Scienter is defined as either the 'intentional or willful conduct designed to deceive or defraud investors' or 'a high degree of recklessness.'"  Metzler Asset Mgmt. GmbH v. Kingsley, 928 F.3d 151, 158 (1st Cir. 2019) (quoting In re Biogen Inc. Sec. Litig., 857 F.3d 34, 41 (1st Cir. 2017)).  Recklessness in this context refers to "a highly unreasonable omission" involving "an extreme departure from the standards of ordinary care, and which presents a danger of misleading

buyers and sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Brennan v. Zafgen, Inc., 853 F.3d 606, 613 (1st Cir. 2017) (internal quotation marks and citation omitted). This "definition of recklessness does not encompass ordinary negligence and is closer to a lesser form of intent." Greebel, 194 F.3d at 199. Defendants must have had the requisite scienter at the time of the allegedly fraudulent statements. See In re Ariad Pharms., Inc. Sec. Litig., 842 F.3d 744, 751–52 (1st Cir. 2016).

As noted above, the PSLRA's requirement to plead facts giving rise to a "strong inference" of scienter means that "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324. Thus, in evaluating securities class action complaints, courts "must take into account plausible opposing inferences." Id. at 323–24 (instructing courts to "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff"). This is necessarily a fact-specific inquiry, Aldridge v. A.T. Cross Corp., 284 F.3d 72, 82 (1st Cir. 2002), which may rely upon indirect evidence of scienter. Greebel, 194 F.3d at 195, 202. Courts conducting such an inquiry must determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, 551 U.S. at 322–23 (emphasis omitted).

Plaintiff argues that the amended complaint alleges a strong inference of scienter on the theory that Foster and Smith "sold over $67 million in artificially inflated shares of Charles River common stock—sales that were suspiciously times and in unusual amounts." D. 46 at 26–28. Plaintiff also contends that the following circumstances support scienter: (1) Charles River and Foster's November 30, 2022 statements given the USWFS and the DOJ's investigations into the

import of macaques from Cambodia, id. at 28; (2) Foster and Smith's conferences with investors, monitoring of the supply chain and the public nature of the investigations, id. at 29; (3) the Company's over concentration in Cambodia and the rapid rise in macaque exports from the country, id. at 30; (4) the centrality of safety assessment studies to Charles River's business, id.; and (5) Foster's March 15, 2023 statement at the end of the Class Period indicating that the Company had historically used "non-preferred suppliers."  Id. at 31.

a)    Foster and Smith's Sale of Charles River Stock

Plaintiff asserts that Foster and Smith's sale of over $67 million during the Class Period supports a strong inference of scienter.  D. 46 at 26–28.  Plaintiff maintains that these sales were "unusual in terms of dollar amounts and in percentages of shares sold" and occurred "around the time of their misrepresentations, shortly before the stock crashed, or shortly after the DOJ investigation was publicized."  D. 46 at 27.

"[M]ere pleading of insider trading, without regard to either the context or the strength of the inferences to be drawn, is not enough.  At a minimum, the trading must be in a context where defendants have incentives to withhold material, non-public information, and it must be unusual, well beyond the normal patterns of trading by those defendants."  Greebel, 194 F.3d at 198; see Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc., 778 F.3d 228, 245–46 (1st Cir. 1999) (holding that insider trading that was "neither unusual nor suspicious" did not support scienter).  Although Plaintiff alleges that Foster and Smith's sales were suspicious, the amended complaint includes no allegations about Foster and Smith's trading activity "before and after the class period."  See Lemartz v. Am. Superconductor Corp., 879 F. Supp. 2d 167, 186 (D. Mass. 2012).  Accordingly, the Court cannot conclude that Foster and Smith's trading activity was "well beyond the normal patterns of trading by those defendants."  See Greebel, 194 F.3d at 198.

There are also more compelling, nonculpable explanations for Foster and Smith's trading activity. Although Plaintiff insists that Foster and Smith sold or gifted stock "around the time of their misrepresentations" and "shortly before stock crashed," D. 46 at 27, the amended complaint makes plain that Foster and Smith frequently sold or gifted their shares, on at least thirty-two occasions throughout the Class Period. See D. 36 ¶ 19; see In re Wayfair, Inc. Sec. Litig., 471 F. Supp. 3d 332, 347 (D. Mass. 2019) (emphasizing that "[g]iven the frequency of Defendants' trades, it is essentially meaningless to say their sales were made 'within a few days' of a given date"). Courts have noted that the sale of stock as the Company's stock price is rising, as the amended complaint alleges here, is "hardly surprising" and "further undermines an inference of scienter." See Quinones v. Frequency Therapeutics, Inc., 665 F. Supp. 3d 156, 175 (D. Mass. 2023); see also Loc. No. 8 IBEW Ret. Plan v. Vertex Pharms. Inc., 140 F. Supp. 3d 120, 136 (D. Mass. 2015) (explaining that "there is nothing unusual, or necessarily suspicious, about insider sales during periods of rapid stock price increases").

It is also significant that Foster and Smith's holdings in Charles River stock increased during the Class Period; thus, his financial exposure to drops in the Company's stock price increased over the Class Period, weakening the inference that Defendants sought to defraud investors by selling off stock before the disclosure of adverse information. D. 36 ¶ 65 (alleging that Foster's class-period holdings increased from 337,915 to 350,198 shares); id ¶ 67 (alleging that Smith's class-period holdings increased 20,475 to 27,725 shares); see Fire & Police Pension Ass'n of Colo., 778 F.3d at 246 (noting that a 9.2% increase in insider's stock holdings during the class period negated an inference of "motive to artificially inflate" stock prices).

Because the allegations in the amended complaint provide more support for nonculpable explanations for Foster and Smith's trading activity than culpable ones, Plaintiff has not carried its

burden of pleading facts and circumstances behind Foster and Smith's trading activity so as to support a strong inference of scienter.  See Leavitt v. Alnylam Pharms., Inc., 451 F. Supp. 3d 176, 188 (D. Mass. 2020) (noting that plaintiff bears the burden of asserting facts regarding scienter).

b) <u>Plaintiff's Other Theories of Scienter</u>

"'[C]lear allegations of admissions, internal records or witnessed discussions suggesting that at the time they made the statements claimed to be misleading, the defendant officers were aware that they were withholding vital information or at least were warned by others that this was so' are often necessary to meet the PSLRA's scienter requirement." In re Bos. Sci. Corp. Sec. Litig., 646 F. Supp. 3d 249, 284 (D. Mass. 2022) (quoting Bos. Sci. Corp., 686 F.3d at 31).  The amended complaint is devoid of such allegations.  Nonetheless, Plaintiff argues that the following circumstances support a cogent inference of scienter:  (1) Charles River and Foster's November 30, 2022 statements given the USWFS and the DOJ's investigations into the import of macaques from Cambodia, D. 46 at 28; (2) Foster and Smith's conferences with investors, monitoring of the supply chain and the public nature of the investigations, id. at 29; (3) the Company's over concentration in Cambodia and the rapid rise in macaque exports from the country, id. at 30; (4) the centrality of safety assessment studies to Charles River's business, id.; and (5) Foster's March 15, 2023 statement at the end of the Class Period indicating that the Company had historically used "non-preferred suppliers."  Id. at 31.

First, Plaintiff argues Charles River and Foster's November 30, 2022 statements in response to the indictment of executives at Vanny HK and Vanny Cambodia support scienter because they "sharply conflicted with the then-existing facts."  Id. at 28.  As discussed above, however, Charles River and Foster's statements were not materially false or misleading.  In the context of analyzing scienter, a company, however, is not required to disclose every interaction

with a government agency.  See Corban v. Sarepta Therapeutics, Inc., 868 F.3d 31, 40 (1st Cir. 2017) (emphasizing that "[t]he defendants had no legal obligation to loop the public into each detail of every communication with the FDA"); Fire & Police Pension Ass'n of Colo., 778 F.3d at 244 (noting that "[t]here must be some room for give and take between a regulated entity and its regulator"); see also Washtenaw Cnty. Emps.' Ret. Sys. v. Avid Tech., Inc., 28 F. Supp. 3d 93, 114 (D. Mass. 2014) (explaining that a government investigation is "insufficient in and of itself" to support a strong inference of scienter).

Second, Plaintiff argue that scienter is met by a series of circumstances, including Foster and Smith's frequent remarks to investors during conferences, their monitoring of supply chain risks, publicly available information about the DOJ and USFWS investigations and their "numerous misrepresentations concerning the Company's non-preferred suppliers."  D. 46 at 29. Because the Court has already discussed the latter two of these circumstances at some length, the Court focuses on Plaintiff's claims regarding Foster and Smith.  To that end, Plaintiff cannot show scienter merely by emphasizing responsibilities that are inherent to Foster and Smith's positions as CEO and CFO, respectively.  Such an argument is tantamount to the "scienter by status" theory, which has been "uniformly rejected" and which cannot sustain a showing of scienter here.  See Pegasystems, 683 F. Supp. 3d at 132; Lirette v. Shiva Corp., 27 F. Supp. 2d 268, 283 (D. Mass. 1998) (inferences that defendants by virtue of their position within a company "must have known" about problems are "inadequate").

Third, Plaintiff points to the Company's alleged over concentration of its macaque supply chain in Cambodia and the rapid increase in production from Cambodia.  D. 46 at 30.  Plaintiff argues that the combination of these two factors amounted to a "red flag" that Foster and Smith either knew about or recklessly disregarded given the gestation period of macaques.  Id.  In support

of this theory, Plaintiff points to a remark by Charles River's Executive Vice President and Chief Operating Officer Birgit Girshick, made after the Class Period, stating "none of the [NHP] farms can scale really, really quickly . . . . the gestation doesn't allow that. The animals have to be a certain age." D. 36 ¶ 15. Where Plaintiff has not made "clear allegations of admissions, internal records or witnessed discussions" or the like involving Foster or Smith, this lone allegation falls short of what is required to show scienter. See Bos. Sci. Corp., 646 F. Supp. 3d at 284. Moreover, that this alleged remark was made after the end of the Class Period further weakens any inference of scienter. See Ezra Charitable Tr. v. Tyco Int'l, Ltd., 466 F.3d 1, 6 (1st Cir. 2006) (holding that "pleading by hindsight, essentially making general allegations that defendants knew earlier what later turned out badly, is not sufficient") (internal quotation marks and citation omitted).

Fourth, Plaintiff points to the centrality of the safety assessment studies to Charles River's business model. D. 46 at 30. Allegations of scienter that rest on a company's core business without "other significant evidence of a defendant's intent or recklessness," however, do not offer a strong basis to infer scienter. See Biogen, 193 F. Supp. 3d at 51.

Finally, Plaintiff argues that Foster's "admission" on March 15, 2023, at the end of the Class Period, that the Company had engaged non-preferred suppliers establishes scienter. D. 46 at 31. As the Court noted above, however, Foster's statement is so devoid of specifics that it cannot properly be characterized as an admission of knowledge. In addition, as with Girshick's remark about the gestation period of macaques, Plaintiff's argument represents an attempt to plead scienter by hindsight, which the First Circuit has noted is not sufficient. See Ezra Charitable Tr., 466 F.3d at 6. Accordingly, Plaintiff has not alleged facts supporting a strong inference of scienter

and, thus, has failed to state a claim under Section 10(b) and Rule 10b-5 on this alternative basis.[7]

### B.      Section 20(a) Claim (Count II)

Plaintiff claims that Foster and Smith are individually liable under Section 20(a) of the Exchange Act based upon their positions of control and authority within the Company.  D. 36 ¶¶ 403–07.  Section 20(a) imposes joint and several liability on "[e]very person who, directly or indirectly, controls any person liable" for a securities fraud violation.  15 U.S.C. § 78t(a).  Thus, to state a claim under Section 20(a), a plaintiff must allege a primary violation of the Exchange Act.  ACA Fin., 512 F.3d at 67 (stating that "[t]he plain terms of [S]ection 20(a) indicate that it only creates liability derivative of an underlying securities violation").  Because Plaintiff fails to a plead a primary securities law violation, Plaintiff's claim under Section 20(a) against Foster and Smith also fails.

### C.      Leave to Amend

A party may amend a complaint with the court's leave, which the court "should freely give" when "justice so requires."  Fed. R. Civ. P. Rule 15(a)(2).  Leave to amend may be "denied for several reasons, including undue delay, bad faith, dilatory motive of the requesting party, repeated failure to cure deficiencies, and futility of amendment."  Hagerty ex rel. United States v. Cyberonics, Inc., 844 F.3d 26, 34 (1st Cir. 2016) (internal quotation marks and citation omitted).

Here, Plaintiff has not formally requested leave to amend the amended complaint.  Plaintiff instead asserts in a footnote on one of the final pages of its opposition that "[i]n the event the Court dismisses the Complaint, in whole or in part, Plaintiff requests leave under Rule 15 of the Federal Rules of Civil Procedure for an opportunity to replead."  D. 46 at 34 n.25.  Other courts in similar

---

[7] In light of the Court's conclusion that Plaintiff has failed to allege falsity and scienter, the Court does not reach Defendants' challenge to Plaintiff's allegations regarding loss causation. D. 43 at 26–28; D. 46 at 31–34.

circumstances have refused to allow such "informal request[s]." <u>See, e.g.</u>, <u>Biogen</u>, 193 F. Supp. 3d at 55 (denying "plaintiffs' informal request for leave to amend" in a securities fraud class action where, instead of "formally request[ing] leave to amend the amended complaint," plaintiffs requested same "on the final page of their thirty-page opposition to defendants' motion to dismiss"); <u>see</u> <u>Fire & Police Pension Ass'n of Colo.</u>, 778 F.3d at 247 ("wish[ing] to discourage this practice of seeking leave to amend after the case has been dismissed"); <u>see also</u> <u>ACA Fin.</u>, 512 F.3d at 57 (rejecting plaintiffs' argument that district court erred in denying leave to amend because "[p]laintiffs took no action to add new allegations" in response to defendants' motion to dismiss "even though they knew what they would add if they amended," and noting that allowing such a practice would "lead to delays, inefficiencies, and wasted work"). Accordingly, the Court will not grant Plaintiff's informal request for leave to amend.

## VI. Conclusion

For the aforementioned reasons, the Court ALLOWS Defendants' motion to dismiss. D. 42.

**So Ordered.**

/s Denise J. Casper
United States District Judge