# United States Court of Appeals
## For the First Circuit

No. 24-1705

STATE TEACHERS RETIREMENT SYSTEM OF OHIO, individually and on behalf of all others similarly situated,

Plaintiff, Appellant,

SHARAN COLEMAN, individually and on behalf of all others similarly situated,

Plaintiff,

v.

CHARLES RIVER LABORATORIES INTERNATIONAL, INC.; JAMES C. FOSTER; DAVID R. SMITH,

Defendants, Appellees,

FLAVIA PEASE,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Montecalvo, Lynch, and Kayatta,
Circuit Judges.

Matthew W.H. Wessler, with whom Thomas Scott-Railton, Gabriel E. Chess, Alisa C. Philo, Gupta Wessler LLP, Frederic S. Fox, Donald R. Hall, Jeffrey P. Campisi, Pamela A. Mayer, Brandon Fox, Carihanna Morrison, Kaplan Fox & Kilsheimer LLP, Edward F. Haber,

Patrick J. Vallely, and Shapiro Haber & Urmy LLP were on brief, for appellant.

Charles S. Duggan, with whom David B. Toscano, Luca Marzorati, Oliver Kaufman, Davis Polk & Wardwell LLP, Mara Theophila, and McDermott Will & Emery LLP were on brief, for appellees.

———————

August 15, 2025

———————

**KAYATTA, <u>Circuit Judge</u>**.    Lead plaintiff State Teachers Retirement System of Ohio ("State Teachers") and other investors of defendant Charles River Laboratories International, Inc. ("Charles River") brought this securities-fraud class action alleging that Charles River and two of its officers misled investors as to the integrity of the overseas supply chain undergirding its supply of long-tailed macaques -- a central part of the company's business.   Charles River moved to dismiss the complaint for failure to state a claim.   The district court agreed that State Teachers had failed to allege false or misleading statements as well as scienter; thus, without reaching any further issues, the district court dismissed the action.   State Teachers timely appealed.

For the following reasons, we agree with State Teachers that it plausibly alleged that Charles River knowingly or recklessly misled investors as to problems lurking in its supply chain.   We therefore reverse the district court's dismissal of the complaint as to one set of misleading statements.   And we remand for the district court to consider in the first instance whether State Teachers plausibly alleged that any of its losses were caused by Charles River's misdirection.

**I.**

**A.**

"As this case comes to us on a motion to dismiss, we accept the factual allegations set forth in the amended complaint," Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc., 22 F.4th 1, 4 (1st Cir. 2021), and "disregard any conclusory allegations," Ponsa-Rabell v. Santander Sec. LLC, 35 F.4th 26, 30 n.2 (1st Cir. 2022).  We also consider "documents incorporated into the complaint by reference."  Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007).

Charles River is a global drug-development company that is "the largest provider of outsourced drug discovery, non-clinical development, and regulated safety testing services worldwide."  The company derives over 80% of its revenue from two business segments: providing animals for drug-development research and safety testing, and conducting that research itself.  Per U.S. Food and Drug Administration (FDA) regulations, biologic drug development typically requires safety testing on live monkeys ("non-human primates," as they are known in the industry).  Charles River is "the largest commercial user of [non-human primates] in the [United States]."

One of the most commonly used monkeys for these purposes is the long-tailed macaque, the international trade of which was valued at nearly $1.26 billion between 2010 and 2019.  Before

- 4 -

spring 2020, Charles River relied on Chinese exports for over 60% of its long-tailed macaque supply.  But when the COVID-19 pandemic hit, China halted exports of many species of wildlife, and its "exports of long-tailed macaques to the U.S. declined to zero." At the same time, also as a result of the pandemic, demand for Charles River's safety-testing services increased.  To maintain its profitability, therefore, Charles River needed to overhaul its supply chain.

Toward that end, Charles River rapidly increased exports from Cambodia.  Charles River obtained at least 2,262 long-tailed macaques from Envigo Global Services, Inc. ("Envigo") and Orient BioResource Center, Inc. ("Orient BioResource"), which were acquired by Inotiv, Inc. ("Inotiv"), a publicly traded U.S. company, on November 5, 2021, and January 27, 2022, respectively. Envigo and Orient BioResource "obtained approximately 60% of [their] Cambodia[n] long-tailed macaques from the Vanny Group," a Hong Kong-based network led by CEO James Lau which bred macaques in Cambodia and Vietnam for export.  Inotiv's "principal supplier" of long-tailed macaques was the Vanny Group.

Charles River also directly obtained at least 512 macaques from a Vietnam-based company that was also part of the Vanny Group, Nafovanny, a joint venture between another Vanny Group

subsidiary and the government of Vietnam;[1] over 1,000 live macaques or macaque-based extracts from another Vanny Group subsidiary, KHI Bioservices Ltd. ("KHI"); at least 956 long-tailed macaques in 2022 from Florida-based broker WorldWide Primates, Inc. ("WW Primates"); and over 10,000 macaques between 2020 and 2022 from K.F. (Cambodia) Ltd. ("KF Cambodia"), a Cambodian company that managed a macaque breeding farm.

Between May 7, 2020 and November 2, 2022, Charles River repeatedly disclosed in filings with the U.S. Securities and Exchange Commission (SEC) that "limited global supply or regional restrictions on transportation for certain products may require us to source products from non-preferred vendors." Nevertheless, Charles River's safety-testing business "boomed," with stock prices increasing from $156.56 per share in May 2020 to a high of $460.21 per share in September 2021.

Meanwhile, Cambodia's macaque export boom -- up to an 86% increase in exports to the United States from 2019 to 2020 -- was beginning to ring alarm bells at the U.S. Department of Justice (DOJ) and the U.S. Fish and Wildlife Service (the "Service"). This is because, put simply, breeding long-tailed macaques in captivity takes time, thus raising doubts that any short-term increase in supply was entirely of captive-bred

---

[1]  Lau, the Vanny Group CEO, founded Nafovanny.

macaques.  Their gestation period is a full six months; successful pregnancies typically produce only one baby.  And infant macaques must stay with their mothers until they are at least two years old before they are deemed sufficiently mature by medical researchers.

Supplementing the captive-bred population with wild-caught macaques, however, is ill-advised:  Wild populations frequently have pathogens that make them unsuitable for medical research.  And, most importantly for federal investigators, Cambodia outlaws the capture and export of wild macaques due to the species' vulnerability to extinction.  Accordingly, it is illegal under international and U.S. law to attempt to import Cambodian long-tailed macaques caught in the wild. See Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES) art. IV(2)(b), opened for signature Mar. 3, 1973, 87 Stat. 893, 993 U.N.T.S. 244 (requiring that an exported "specimen . . . not [be] obtained in contravention of the laws of th[e] [country of export] for the protection of fauna and flora"); 16 U.S.C. § 1538(c) (making it "unlawful for any person . . . to engage in any trade in any specimens [of wildlife] contrary to the provisions of the [CITES], or to possess any specimens traded contrary to the provisions of the [CITES]"); 16 U.S.C. § 3372(a), (a)(1) (making it "unlawful for any person . . . to import, export, transport, sell, receive, acquire, or purchase any fish or wildlife or plant taken, possessed, transported, or sold

in violation of any law, treaty, or regulation of the United States").

In 2021 and early 2022, signs of an ongoing federal investigation became public.  On August 4, 2021, the DOJ issued a press release disclosing that an Orient BioResource executive had pled guilty for lying to the Service about "whether he . . . prepared or submitted . . . any audits or reports concerning visits to supplier sites in Cambodia," during what the press release called an ongoing "criminal investigation into international trafficking of primates into the United States." Next, in early 2022, Inotiv disclosed in separate filings with the SEC that its subsidiaries, Envigo and Orient BioResource, had both received grand jury subpoenas from the DOJ related to the importation of non-human primates.  At the time, "investors were unaware that Inotiv was a material supplier . . . to Charles River."

By the fall of 2022, unbeknownst to investors, Charles River began experiencing supply interruptions.  On September 21, 2022, the Service seized a KF Cambodia shipment of 360 long-tailed macaques headed to Charles River.  See 50 C.F.R. § 14.53(b), (b)(1) (2025) (authorizing any Service officer to "refuse clearance of imported or exported wildlife . . . when there are responsible grounds to believe that," among other things, "[a] [f]ederal law or regulation has been violated").  The shipment had a reported

- 8 -

value of $3.24 million.  It was the first such seizure of a KF Cambodia shipment of macaques by the Service.[2]  Unaware of the seizure, analysts still understood Charles River to be in a strong position; the prevailing understanding was that, as a September 29, 2022 report from investment services company Jefferies put it, increased demand for macaques had put Charles River in a "positive" scenario.

On November 16, 2022, the DOJ unsealed an indictment alleging the existence of a conspiracy to smuggle long-tailed macaques into the United States for financial gain, including by capturing wild macaques, falsifying their export permits, and exporting them to the United States.  The indictment named Lau as a defendant, identifying him as the CEO and owner of Vanny HK.  It also named five other executives and employees of Vanny HK and what the indictment identified as Vanny HK's subsidiary, Vanny Cambodia.  The indictment also charged several Cambodian government officials and two unnamed U.S.-based companies as co-conspirators, which State Teachers alleges to be Inotiv (or its subsidiaries) and WW Primates.  The unsealed indictment was accompanied by a DOJ press release stating that "[m]embers of an international primate smuggling ring have been charged with multiple felonies for their role in bringing wild long-tailed

---

[2]  The shipment has since cleared customs, and the related investigations have been closed.

macaques into the United States." The press release also identified at least two of the defendants as employees of the Vanny Group, rather than by the specific subsidiaries that were their employers. Several analyst reports discussing the indicted suppliers also referred broadly to "Vanny" rather than specific subsidiaries.

The day after the indictment was unsealed, Inotiv disclosed in an SEC filing that its "principal supplier" of macaques was a target of the indictment. But at the time, "investors were [still] unaware that Inotiv was a material supplier . . . of Charles River." Nor were investors otherwise aware that Charles River was possibly buying macaques that came from the suppliers targeted by the DOJ indictment.

On November 30, 2022, Charles River filed a disclosure with the SEC, stating that

> Charles River was not named or referenced in the DOJ proceedings, and the Company does not have any direct supply contracts with the indicted Cambodian supplier. . . . However, in light of the indictment, and subsequent statements made by the Cambodia[n] government, Charles River is operating under the expectation that for some time period supply of Cambodia-sourced [macaques] will be difficult to obtain in the United States.

On the same day, an analyst interviewed Charles River CEO James C. Foster at an investor conference. During the interview, Foster emphasized that Charles River procured most of

its macaques from Cambodia and noted the potential for the indictment to impact supply:

> [W]e have a little bit of a dialogue from government officials who were displeased with the action taken by the DOJ with regard to one of the Cambodian suppliers. They were, I think, defensive . . . about the U.S. government saying that things aren't being done well [so] we're concerned about some pushback by the government. . . . [I]n light of this indictment and subsequent statements made by the Cambodian government, we anticipate that for some period of time, there's going to be some disruption and difficulty in getting [macaques] into the [United States].

However, Foster went on to assure investors that the supply challenges Charles River faced did not include one of its suppliers being indicted, repeating the assurance from Charles River's SEC disclosure that "we don't have any direct contacts with th[e] [indicted] supplier." He also elaborated:

> [W]e work really hard with our supplier due diligence in terms of their management practices, veterinary practices, shipping practices, husbandry practices to ensure the quality of the supplier relationships and to ensure that what we do is fully compliant with U.S. and international regulations. . . . [The f]acility that we work with in Cambodia is [an] extremely high quality one, all the ones that we work with are high quality ones. . . . So if we don't have undue government -- Cambodian government intrusion and preventing that from happening, it's possible we'll be fine. . . . [The indicted supplier is] not a supplier of ours. It's not directed to us. . . . So [it] has no real short-term impact.

Foster emphasized that although "some folks" would be "hurt" by "the fact that one of the big suppliers from Cambodia . . . is unable to ship," that supplier was "not a supplier of [Charles River's]."

Despite these assurances, the problems with Charles River's supply chain continued to accelerate. In December 2022 and January 2023, four additional KF Cambodia shipments headed to Charles River were seized at the border; in total, and together with the September 2022 shipment, the Service refused entry to the United States of over $17.4 million of macaques headed to Charles River -- nearly 8% of Charles River's total 2022 supply of non-human primates.

On January 12, 2023, Jefferies published a research report that drew on a combination of "public data sources," "channel checks," "industry conversations," and a tweet from a Cambodian official. The report stated, in relevant part,

> Our previous [macaque] supply chain work concluded [Charles River]'s [macaque] business was in a privileged position and controlled its own destiny. The indictment of Vanny and other Cambodian officials alters that viewpoint as we estimate ~24% of [Charles River's macaque] usage relies on Vanny supply (likely through an indirect relationship), a perspective underappreciated by investors. . . . After further investigation we believe [Charles River] received 20%+ of its [macaque] supply from Vanny in '21 and '22, through an indirect relationship.

At the close of trading that day, after unusually heavy trading volume, Charles River's stock declined from $246.94 to $232.25 per share, a decline of approximately 6%.

On February 22, 2023, Charles River issued a press release disclosing that it had received a grand jury subpoena in an "investigation relat[ing] specifically to several shipments of [macaques] received by Charles River from its Cambodia supplier" and that it was "voluntarily suspend[ing] [macaque] shipments from Cambodia at this time."  On the same day, Charles River filed a disclosure form with the SEC, stating that it had been "informed by the [DOJ] that . . . it had commenced an investigation into [Charles River's] conduct regarding several shipments of [macaques] from Cambodia."  At the close of trading that day, after unusually heavy trading volume, Charles River's stock price declined from $243.60 to $219.09 per share: a decline of over 10%.

On March 15, 2023, Foster told investors on a conference call that Charles River had "historically" used suppliers "that get animals from wherever," though they "prefer[red] not to use them."  At the close of trading that day, after unusually heavy trading volume, Charles River's stock price declined from $205.02 per share to $194.90 per share: a decline of approximately 5%.

**B.**

On May 19, 2023, an individual investor filed a class action against Charles River, Foster, and David. R. Smith, CFO of

- 13 -

Charles River from August 2015 to May 2022.  On November 14 of that year, State Teachers, as lead plaintiff, filed an amended complaint, seeking relief on behalf of a class of all "persons and entities that purchased or otherwise acquired Charles River securities during the period May 7, 2020 and March 15, 2023, inclusive" (the "class period").[3]  The complaint seeks recovery under the Securities Exchange Act of 1934 (the "Act"), codified at 15 U.S.C. § 78j(b), as implemented by SEC Rule 10b-5, codified at 17 C.F.R. § 10b-5 (2025) (together, the "§ 10b claim").  Plaintiffs also sought to hold Foster and Smith derivatively liable under § 20(a) of the Act, codified at 15 U.S.C. § 78t(a) (the "§ 20(a) claim").

Defendants moved to dismiss the action under Federal Rule of Civil Procedure 12(b)(6).  On July 1, 2024, the district court granted their motion.  It first found that, in context, none of Charles River's statements or disclosures alleged in the complaint were false or misleading.  It next found that the complaint did not adequately allege scienter on the part of Charles River.  The district court did not reach the question of loss causation.  And because it found that the complaint did not

---

[3]  On May 7, 2020, Charles River disclosed its financial results for the quarter ending March 28, 2020, and issued a press release stating that it "implemented measures that are focused on maintaining . . . the continuity of our operations [and] sustaining our solid financial position" in the face of the COVID-19 pandemic.

adequately plead a § 10(b) violation, it therefore found that the complaint also did not adequately state a claim for derivative liability under § 20(a).  State Teachers timely appealed.

**II.**

Section 10(b) of the Act makes it "unlawful for any person . . . [t]o use or employ . . . any manipulative or deceptive device" in, among other things, the sale of registered securities.  15 U.S.C. § 78j(b).  Accompanying regulations "implement[] that prohibition," Carbonite, 22 F.4th at 7, making it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," 17 C.F.R. § 240.10b-5(b) (2025). A § 10(b) claim must allege "(1) a material misrepresentation or omission by the defendant[s]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  Karth v. Keryx Biopharmaceuticals, Inc., 6 F.4th 123, 135 (1st Cir. 2021) (alteration in original) (quoting Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 460–61 (2013)).

To survive a Rule 12(b)(6) motion to dismiss, a § 10(b) complaint must not only "state a claim to relief that is plausible on its face," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007),

- 15 -

but also "state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b).  In addition, the Private Securities Litigation Reform Act (PSLRA) mandates that the complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).  The PSLRA further requires that a securities-fraud complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  Id. § 78u-4(b)(2)(A).

"We review de novo the district court's dismissal of a securities fraud complaint for failure to state a claim under Rule 12(b)(6)."  Mehta v. Ocular Therapeutix, Inc., 955 F.3d 194, 205 (1st Cir. 2020).  "In so doing, we accept well-pleaded factual allegations in the complaint as true and, while cognizant of the requirements for pleading scienter, we view all reasonable inferences in the plaintiff's favor."  Carbonite, 22 F.4th at 6.

### III.

On appeal, State Teachers contends that its complaint adequately alleges that Charles River's statements to investors were false and misleading and that those statements were made knowingly or recklessly as to their misleading nature.  We address each of these arguments in turn.

- 16 -

**A.**

To successfully plead that defendants made false or misleading statements, plaintiffs must allege statements that "were false or misleading at the time they were made." City of Mia. Fire Fighters' and Police Officers' Ret. Tr. v. CVS Health Corp., 46 F.4th 22, 35 (1st Cir. 2022) (citation omitted). "[W]hether a statement is misleading depends on the perspective of a reasonable investor." Karth, 6 F.4th at 135 (alteration in original) (quoting Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 575 U.S. 175, 186 (2015)). And "[w]e consider the entirety of the relevant facts available at the time of the allegedly misleading statement," focusing on the "total mix of information" available to investors at the time. Id. at 135-36.

State Teachers first argues that Charles River's disclosures and Foster's statements to investors on November 30, 2022, were false and misleading because they conveyed that Charles River was in a privileged position, with its supply chain not impacted by the federal indictment of a raft of Vanny Group officials -- when in fact key sources of Charles River's macaques were targeted by the indictment. Second, State Teachers argues that Charles River's repeated statements in SEC disclosures over the class period that it "may" be required to source macaques from "non-preferred vendors" were false and misleading because Charles

River was already relying on suppliers subject to law-enforcement scrutiny.  As explained further below, we agree with State Teachers on the first theory but not the second.

**1.**

To start, we think Foster's November 2022 comments to investors clearly conveyed to any reasonable investor that Charles River's supply chain was untouched by the federal investigation and indictment.  Foster point-blank told investors the indictment would "ha[ve] no real short-term impact."  He repeatedly assured them that the "[indicted] supplier" was "not a supplier of" Charles River's.  True, Foster averred, the fact that employees of a major supplier were indicted was "going to hurt some folks."  But, according to Foster, "all" the "facilit[ies]" Charles River worked with in Cambodia were "extremely high quality one[s],"[4] clearly messaging that Charles River was not "some folks."

These statements, taken together and in context as part of an interview with an analyst, would leave a reasonable investor with the impression that Charles River's supply chain did not include suppliers mentioned in or implicated by the DOJ indictment.

---

[4] Contrary to Charles River's suggestion, we view this statement, in context, as clearly comparative and therefore specific enough to be actionable.  See Clorox Co. P.R. v. Proctor & Gamble Com. Co., 228 F.3d 24, 39 (1st Cir. 2009) (holding that a company's statement that "Whiter is not possible" was specific enough to be actionable, because, in context, it "invite[d] consumers to compare" the company's product with products containing bleach).

See Zhou v. Desktop Metal, Inc., 120 F.4th 278, 293 (1st Cir. 2024) ("We evaluate the immediate context of each statement -- namely, the balance of what was said on the particular occasion, and the immediate circumstances in which the particular statement was made." (cleaned up)).

Contrary to what Foster conveyed to investors, though, one of Charles River's suppliers Inotiv had already publicly declared that its own "principal supplier" was a target of the indictment, meaning Charles River was almost certainly importing macaques from that supplier, albeit through an intermediary, despite assuring investors it was not. This single, well-pled allegation directly undermines Foster's representations about Charles River's supply chain. Adding fuel to the fire, a shipment of macaques headed to Charles River from a different supplier had been seized two months prior.[5] And finally, Charles River had direct supply relationships with two Vanny Group

---

[5] In its briefing, Charles River argues that the complaint lacks allegations linking this seizure to the indictment that became public in November 2022. And in a Rule 28(j) letter, Charles River brings to our attention that, as it later turned out, its seized shipments were ultimately cleared, and any related investigations were closed. But Foster's comments were misleading regardless: Reasonable investors would understand Charles River's supply to be much more at risk than Foster's comments indicated if they knew that, in the context of a federal indictment of companies from which Charles River was likely obtaining macaques, a shipment from another one of Charles River's suppliers had been seized at the border.

subsidiaries -- companies in the same network of suppliers as those named in the indictment.

As Charles River notes, "the mere possession of material, nonpublic information does not create a duty to disclose it." Hill v. Gozani, 638 F.3d 40, 57 (1st Cir. 2011) (cleaned up). But we have held that a defendant will be liable for "half-truths [that] paint[] a materially false picture in what they say because of what they omit." SEC v. Johnston, 986 F.3d 63, 72 (1st Cir. 2021). Thus, where Foster chose to address the impact of the indictment head-on, he could not do so in a manner that omitted key information about Charles River's supply chain that would have cast its risk of disruption from the federal investigation in an entirely different light. See Meyer v. Jinkosolar Holdings Co., 761 F.3d 245, 250 (2d Cir. 2014) ("Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth.").

Charles River suggests that its assurances concerning its "supplier" should be read as referring only to its "direct" suppliers because of its reference elsewhere to its "direct" supply contracts. For several reasons, we doubt that a reasonable investor would infer such a qualification of Charles River's assurances. First, referring specifically to direct supply contracts in one part of a statement, while referring to suppliers without limitation in another, implies that the latter use of the

- 20 -

term "supplier" is unlimited.  Additionally, context and relevance are important here.  The issue that Foster's comments addressed and that was relevant to investors was Charles River's supply chain, including both direct and indirect suppliers.  And as to that obvious subject of the day, Foster's remarks read less like a truthful disclosure and much more like a way to convey a false message with partial disclosures and too-clever wordsmithing.[6]

Charles River's final rejoinder is that any misleading omissions were cured by Foster's statement that he "anticipate[d] that for some period of time, there[ was] going to be some disruption and difficulty in getting [macaques] into the [United States]," and a similar warning in Charles River's disclosures that same day, that "for some time period supply . . . [would] be difficult to obtain in the United States."  But these statements simply acknowledged that the industry -- including Charles River -- faced challenges such as "pushback" by the Cambodian government as well as general supply disruption.  Excluded from these disclosures was any suggestion that Charles River faced an

---

[6]  We are not, however, convinced by plaintiffs' argument that the indictment of employees of two Vanny Group subsidiaries with which Charles River did not have direct supply contracts would be understood by any reasonable investor to also indict Vanny Group subsidiaries with which Charles River did have direct contracts. As a result, we leave intact the district court's finding that Foster and Charles River's statements about its "direct" suppliers were, by themselves, literally true, as far as they went.

additional and more direct challenge: the federal government indicting a source of its macaques.

In sum, we conclude that State Teachers adequately alleged that Charles River's and Foster's November 2022 statements misled investors into thinking Charles River's supply chain was not implicated in the federal scrutiny of the Vanny Group. State Teachers has therefore plausibly alleged specific misleading statements on the part of defendants and "the reason or reasons why the[y] [were] misleading," as required to sustain its § 10(b) claim. 15 U.S.C. § 78u-4(b)(1)(B).

**2.**

State Teachers also argues that Charles River's repeated disclosures from 2020 to 2022 that it "may" have to rely on "non-preferred vendors" were misleading because, when Charles River made those statements, it was already reliant on vendors that faced "law enforcement scrutiny." However, we find insufficient allegations in the complaint to establish that the term "non-preferred vendors" meant, and would have been understood to mean, vendors that faced "law enforcement scrutiny," as State Teachers claims. As a result, we leave intact the district court's rejection of this theory as an independent and sufficient basis for a claim. Whether and to what extent evidence of such statements may be independently relevant to the adjudication of the remaining claim, we leave to the district court.

**B.**

State Teachers also challenges the district court's determination that Charles River lacked scienter, "a mental state embracing intent to deceive, manipulate, or defraud." Tellabs, 551 U.S. at 319 (citation omitted). To establish scienter, plaintiffs must "show either that the defendants consciously intended to defraud, or that they acted with a high degree of recklessness." Mehta, 955 F.3d at 206 (citation omitted). And to meet the requirements of the PSLRA, the pleaded facts must give rise to a "strong" inference of scienter. 15 U.S.C. § 78u-4(b)(2). "Strong" need not be "irrefutable," the Supreme Court has emphasized, but must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324. "The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. at 322-23.

As this case now stands, and assuming the allegations of the complaint are true, scienter flows inexorably from our conclusions that Charles River told its investors that its suppliers were not implicated in the federal proceeding when it

knew that its supply was coming from the entities subject to investigation, seizure, and indictment.[7]

None of Charles River's arguments to the contrary are convincing. First, Charles River argues that it reasonably thought that the September 2022 seizure of one of its macaque shipments did not mean that future shipments were at risk of seizure. But such a view -- even apart from its implausibility -- does not excuse sending the message to investors that the suppliers affected by the indictment were "not . . . supplier[s] of [Charles River's]." Second, Charles River prefers to focus on its and Foster's statements that "we don't have any direct contacts with that supplier." But we think the addition of the word "direct" in some statements only strengthens the inference of scienter: Such careful phrasing smacks of a "cleverly crafted" way of leading investors astray. Johnston, 986 F.3d at 74. Finally, as for Foster's and Charles River's statements warning investors that Charles River expected supply to "be difficult to obtain" -- referring in context to possible pushback from the Cambodian government -- we do not think telling investors of a possible risk faced by the industry gave Charles River a free pass

---

[7] We need not address State Teachers' scienter arguments as to Charles River's disclosures about potential use of "non-preferred vendors," since we do not find merit in State Teacher's arguments that those statements were themselves false or misleading.

to deceive investors about a specific risk faced by Charles River itself.

For the foregoing reasons, we agree with State Teachers that its complaint "state[s] with particularity facts giving rise to a strong inference that [Charles River] acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).[8]

### c.

On appeal, Charles River asks us to reach the issue of loss causation and affirm the district court on that ground, which the district court did not reach despite briefing on the issue below.  However, the issue of whether plaintiffs in this case have adequately alleged "a corrective disclosure . . . associated with a drop in share price" is complex.  Mass. Ret. Sys. v. CVS Caremark Corp., 716 F.3d 229, 238 (1st Cir. 2013).  We therefore decline to exercise our discretion to reach this issue, see Downing v. Globe Direct LLC, 682 F.3d 18, 22 (1st Cir. 2012) (noting that "because the parties fully briefed the issue before the district court, we have discretion to" decide it), and instead leave it to the district court to consider in the first instance.

---

[8]  We leave it to the district court to consider in the first instance whether -- given this opinion -- it should revive plaintiffs' derivative § 20(a) claim.

- 25 -

**IV.**

We conclude that State Teachers plausibly alleged that Charles River knowingly misled investors based on its November 2022 statements.  We therefore <u>reverse</u> the district court's decision in that regard.  And we otherwise <u>vacate</u> and <u>remand</u> for further proceedings consistent with this opinion.  Each party shall bear its own costs on appeal.