**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

CHARLES RIVER LABORATORIES INTERNATIONAL, INC., and JAMES C. FOSTER,

Defendants.

Case No.: 1:23-cv-11132-DJC

**JURY TRIAL DEMANDED**

**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page(s)**

I. NATURE OF THE ACTION AND OVERVIEW ..... 2

II. JURISDICTION AND VENUE ..... 19

III. PARTIES ..... 19

A. Lead Plaintiff ..... 19

B. Defendants ..... 20

IV. BACKGROUND ..... 21

A. Charles River is a Provider of Animal Research Models and Contract Drug Research Services ..... 21

B. Charles River's Research Models Are Used in Nonclinical or Animal Studies Required for Approval of New Drug or Biologic Products ..... 22

C. The Steady and Timely Supply and Sale of NHPs Is Critical to Charles River's Business ..... 24

D. Long-Tailed Macaques Are a Protected Species under International and U.S. Law ..... 26

E. The Endangered Species Act Implements the CITES Convention ..... 30

F. Charles River Assured Investors That It Monitored Its Supply Chain for Legal Compliance ..... 31

G. Charles River Loses Access to its Principal Supply of Long-Tailed Macaques Due to China's Export Ban and Charles River Pivots to Cambodia ..... 32

H. Cambodia Replaces China as Charles River's Primary Source of Long-Tailed Macaques ..... 33

I. The Rapid Increase in Supply of Long-Tailed Macaques Was Implausible Based on Captive Breeding Alone ..... 33

J. Charles River's Suppliers of Long-Tailed Macaques from Southeast Asia ..... 35

K. Defendant Foster Assured Investors That Charles River Had Alternative Supplies for Long-Tailed Macaques ..... 37

L. An Executive of a Charles River NHP Supplier is Indicted in Connection with a U.S. Government Investigation of the NHP Supply Chain........................ 40

M. Charles River Supplier Envigo Receives DOJ Grand Jury Subpoena.................. 41

N. Charles River Supplier Orient BioResource Receives DOJ Grand Jury Subpoena........................................................................................................ 42

O. USFWS Refuses to Clear Shipment of over 1,000 Long-Tailed Macaques Sourced from KF Cambodia to Charles River..................................................... 42

P. September 28-29, 2022 Bloomberg and Jefferies Reports .................................. 44

Q. The DOJ Indictment of Charles River's Suppliers .............................................. 46

V. DEFENDANTS CHARLES RIVER'S AND FOSTER'S MATERIALLY FALSE AND MISLEADING STATEMENTS.............................................................. 50

VI. THE TRUTH IS REVEALED.......................................................................... 54

VII. THE END OF THE CLASS PERIOD.............................................................. 62

VIII. CLASS ACTION ALLEGATIONS ................................................................ 64

IX. UNDISCLOSED ADVERSE FACTS.............................................................. 65

X. LOSS CAUSATION.......................................................................................... 66

XI. ADDITIONAL SCIENTER ALLEGATIONS................................................ 68

XII. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ........................................................................... 70

XIII. NO SAFE HARBOR ..................................................................................... 72

XIV. CLAIMS FOR RELIEF ................................................................................ 73

XV. PRAYER FOR RELIEF ................................................................................ 75

XVI. JURY TRIAL DEMANDED.......................................................................... 76

Lead Plaintiff Oklahoma Firefighters Pension and Retirement System ("Plaintiff" or "Oklahoma Firefighters"), individually and on behalf of all others similarly situated, by and through its attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Charles River Laboratories International, Inc. ("Charles River" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued and disseminated by or about Charles River; (c) review and analysis of analyst reports concerning Charles River, and Charles River investors conferences and conference calls with analysts and investors; (d) consultation with experts in economic loss, damages, non-human primates, and U.S. Fish and Wildlife Service policies and procedures; (e) information concerning the U.S. Department of Justice and U.S. Fish and Wildlife Service's criminal investigation concerning the trafficking of non-human primates into the U.S., including court filings in the criminal actions captioned *U.S. v. Omaliss Keo, et al.*, 22-cr-20340 (S.D. Fl.), and *U.S. v. Tucker*, 21-cr-20263 (S.D. Fl.); (f) documents obtained from the U.S. Fish and Wildlife Service or the U.S. Centers for Disease Control and Prevention through Freedom of Information Act requests, and documents that have been obtained from various state regulators and the U.S. Department of Agriculture concerning the interstate shipment of non-human primates; (g) the decision of the U.S. Court of Appeals for the First Circuit in *State Tchrs. Ret. Sys. of Ohio v. Charles River Lab'ys Int'l, Inc.*, 152 F.4th 1 (1st Cir. 2025); and (h) review of other publicly available information concerning Charles River.

Nothing in this Second Amended Complaint is intended to alter, amend, diminish, or

otherwise be construed as inconsistent with the First Circuit's holding that Defendants' November 30, 2022 statements and omissions concerning Charles River's supply chain were materially false and misleading, actionable under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, and adequately pleaded as a basis for liability. Pursuant to the First Circuit's remand order and consistent with ECF Nos. 82-83, this Second Amended Complaint adds Oklahoma Firefighters as a named plaintiff, removes allegations and purportedly actionable statements that the Court and the First Circuit determined were not materially false or misleading, and amends certain allegations concerning loss causation. These amendments are made solely to conform the pleadings to the First Circuit's opinion and the issue remaining for adjudication on remand.

## I. NATURE OF THE ACTION AND OVERVIEW

1. This class action (the "Action") is brought under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b), and 78t(a), Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

2. Plaintiff brings claims on behalf of persons and entities that purchased or otherwise acquired Charles River securities during the period November 30, 2022 and March 15, 2023, inclusive (the "Class Period").

3. The Defendants are Charles River and James C. Foster, who was the Company's Chief Executive Officer ("CEO"), President and Chair of the Company's board of directors during the Class Period ("Foster"), (collectively, the "Defendants").

4. Charles River is a non-clinical (animal or preclinical), global drug development company that assists drug developers in the discovery and development of new products, and purports to be the largest provider of outsourced drug discovery, non-clinical development, and regulated safety testing services worldwide. Among other services, Charles River sells small and

large animals (animal models) to drug developers for use in animal safety studies. Separately, Charles River uses these animals in its drug safety assessment studies that its customers outsource to Charles River. Charles River's "Safety Assessment" business is part of the Company's Discovery and Safety Assessment segment ("DSA"), reportedly its biggest source of revenue.

5. Under U.S. Food and Drug Administration ("FDA") regulations, safety assessment studies on animals are required to demonstrate safety before a drug can be tested in humans. Key animal models used in the Company's Safety Assessment studies are non-human primates ("NHPs"), a group of animals, like monkeys or apes, that are biologically similar to humans. For biologic drugs, like monoclonal antibodies, NHPs are the only animals approved for preclinical safety studies. Indeed, as Defendant Foster stated after the Class Period, "biologic drugs cannot be approved for commercial use without NHPs" and "you don't do work in large molecule drug development without nonhuman primates. End of sentence, full stop." A particular species of NHP, the long-tailed macaque, is the NHP used most frequently used in preclinical safety studies for biologic drugs.

6. There are no domestic breeding sources for long-tailed macaques and nearly all are imported into the U.S. A single Safety Assessment study could employ the use of dozens of long-tailed macaques. Charles River does not breed NHPs and the Company relies on external suppliers to obtain NHPs. According to U.S. Department of Agriculture ("USDA") reports, Charles River was the largest commercial user of NHPs in the U.S. Accordingly, before and during the Class Period, a steady and timely supply of long-tailed macaques was material to Charles River's Safety Assessment business and the Company's revenue and operating margin.

7. The long-tailed macaque is a protected species under the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES" or "CITES

Convention"), which is enforced in the U.S. under the Endangered Species Act ("ESA"). The U.S. Fish and Wildlife Service ("USFWS"), an agency within the U.S. Department of the Interior, is designated by Congress under the ESA as the CITES enforcement authority within the U.S. In addition, the Lacey Act combats trafficking of illegally taken wildlife.[1] Because of the legal protections accorded to long-tailed macaques under CITES and the fact that nearly all long-tailed macaques are imported into the U.S., Charles River and its suppliers of long-tailed macaques were subject to U.S. and international law governing the commercial trade of long-tailed macaques.

8. Before the Class Period, Charles River imported over 60% of its long-tailed macaques from China. Indeed, in 2019, the Company acquired a majority equity interest in a breeding farm in China to ensure a timely and steady supply of long-tailed macaques for the Company's Safety Assessment business.

9. That changed as a result of the COVID-19 pandemic. In early 2020, China imposed export restrictions applicable to many animal species including long-tailed macaques, and Chinese exports of long-tailed macaques to the U.S. declined to zero. At or around the same time, the demand for the Company's Safety Assessment services and long-tailed macaques increased due to an increase in COVID-19 related drug research, an increase in the number of biologic drugs in development generally, and because many of Charles River's customers were unable to access or use their facilities due to COVID-19 related restrictions.

10. To continue to meet its customers' demand for Safety Assessment services and in light of the loss of China as a supply source of long-tailed macaques to the U.S., Defendant Foster

---

[1] The ESA provides "[i]t is unlawful for any person ... to engage in any trade in any specimens [of wildlife] contrary to the provisions of . . . [CITES] or to possess any specimens [of wildlife] traded contrary to the provisions of ... [CITES]." 16 U.S.C. § 1538(c). The Lacey Act makes it unlawful for any person to import, export, transport, sell, receive, acquire, or purchase any wildlife taken, possessed, transported, or sold in violation of any law, treaty, or regulation of the U.S. 16 U.S.C. § 3372(a)(l).

reassured investors that the Company had alternative suppliers of long-tailed macaques, stating before the start of the Class Period that "we've made arrangements with other supply sources around the world. So we won't be interrupted there to any material degree."

11. Before the Class Period, Defendants represented that the Company had a timely and steady supply of long-tailed macaques to meet client demand and that the Company and its suppliers complied with the requirements of CITES and U.S. law. For example, Defendants represented that to avoid disruption to the supply of "large research models," which include long-tailed macaques, the Company took "steps to find alternative supply channels and lock in supply with preferred sources through multi-year and/or minimum commitment contracts to ensure a steady and timely supply" and that "[w]e proactively engaged with our suppliers beginning in January 2020 to limit any potential disruption to our supply chain."

12. And when asked during Charles River's conference calls with analysts and investors about the Company's supply of long-tailed macaques in light of the increased demand for the Company's Safety Assessment services, COVID-related disruptions to the Company's supply chain, and a scarcity of long-tailed macaques and increased prices, Defendant Foster represented, for example:

- "we work really hard to have multiple supply sources from multiple geographies and multiple suppliers within those geographies and have close working relationships with them to ensure exceptional veterinary oversight and supply numbers . . . [a]nd we feel really good about our supply situation . . . we're doing very well resourcing in [N]HPs." (Oct. 29, 2020 conference call);

- "we've done an exceptional job in adding, ensuring, tightening up, expanding our supply sources so that we have multiple supply sources for multiple countries such that we can support the demand, which is quite significant. . . ." (Feb. 17, 2021 conference call); and

- "we work really hard at making sure we have sufficient supply of all of our animal models, particularly some of the larger models. And we've had to

> identify and validate multiple new sources of supply of multiple countries to accommodate just the increase in demand and the pace of demand and just to ensure that the supply is there. It's an ongoing complex challenge, one that I think we're managing well." (Nov. 3, 2021 conference call).

13. Unknown to investors, while Defendants represented that Charles River took steps "to find alternative supply channels" and was "doing very well resourcing NHPs" to meet customer demand for its Safety Assessment services and to secure a timely and steady supply of long-tailed macaques, Charles River engaged suppliers of animals from Cambodia at a time when Cambodian suppliers of long-tailed macaques, had suspiciously and rapidly increased production and export of long-tailed macaques and it was very likely that wild-caught long-tailed macaques were introduced into the Cambodian supply chain. By engaging and purchasing from such suppliers, it was very likely that Charles River received animals trapped from the wild, which materially and substantially increased the risk: 1) that shipments received from these suppliers contained animals that were not purpose-bred; 2) that the Company's conduct and its supply chain would be subject to heightened scrutiny including criminal and civil investigations; and 3) that the Company's supply chain of long-tailed macaques would be materially interrupted, thereby reducing the Company's revenue and operating margin from its Safety Assessment studies.

14. With Chinese suppliers out of the international market, in 2020 Cambodian suppliers increased exports of long-tailed macaques to the U.S. by up to 86% over 2019, with similar increases in 2021 and 2022 compared to 2019, causing Cambodian-sourced animals to replace China as a source for over 60% of Charles River's supply of long-tailed macaques in less than one year. In 2019, Cambodia reportedly produced for export 13,922 (CITES data) to 14,931 (UN Comtrade data) long-tailed macaques, with 10,902 to 11,351 exported to the U.S. In 2020, Cambodia reportedly produced for export between 24,500 (CITES data) to 28,295 (UN Comtrade data) long-tailed macaques, with 19,035 to 20,277 exported to the U.S.

15. However, the rapid increase in production and export of long-tailed macaques from Cambodia could not have been achieved through captive, legal breeding alone. The gestation period for long-tailed macaques is roughly six months, and provided a pregnancy results in a live birth, a long-tailed macaque pregnancy typically results in one offspring. Long-tailed macaques are not usually exported for medical research until they are at least two years old. Thus, a minimum period of 30 months from the onset of pregnancy to the animals being ready for shipment is needed to produce an offspring ready for export. Accordingly, Cambodia's scaled up production and export of long-tailed macaques could not have been available for export until at least late 2022 at the earliest. Indeed, after the Class Period, Charles River's former Executive Vice President and Chief Operating Officer Birgit Girshick, and current CEO ("Girshick") confirmed that "none of the nonhuman primate farms can scale really, really quickly. So that - as you said, the gestation doesn't allow that. The animals have to be a certain age."

16. As one analyst framed the issue: "Cambodia increased from ~11.4k US imports in 2019 to 18.6k US imports in 2021 . . . How did Cambodia ramp to that? . . . the answer may be . . . illegally." (Jefferies Feb. 23, 2023 research report). According to another report, from a supply chain due diligence perspective, the rapid increase in Cambodian supply was a red flag: "given the gestation periods and fecundity of primates, the rapid increase in supply originating in Cambodia simply was not possible without including (illegally-sourced) wild animals into the mix." (June 13, 2023 UBS research analyst report).

17. Before the start of the Class Period, Charles River engaged suppliers that were under criminal investigation for sourcing long-tailed macaques from the wild (not captive or purpose-bred) in Southeast Asia, specifically Cambodia. Charles River's suppliers included companies that Defendant Foster described after the Class Period as brokers that Charles River

had "historically" used "that get animals from wherever . . . We prefer not to use them. Reputationally, I just don't think they're the best possible people to use. And I don't actually think they care where the animals come from or what the background is . . . ."

Charles Rivers Suppliers of Long-Tailed Macaques from Southeast Asia




18. With a steady and timely supply of long-tailed macaques from Charles Rivers' suppliers, the Company's Safety Assessment business boomed and the Company reported increased revenue and operating margin in its DSA segment. As a result, Charles River's stock price increased from $156.56 per share in May 2020 to $460.21 per share on September 24, 2021.

19. One such Charles River supplier of Cambodia long-tailed macaques before the Class Period was a Company called Inotiv, Inc. ("Inotiv"), which supplied Charles River with Cambodian long-tailed macaques through Inotiv's subsidiaries Orient BioResource Center, Inc. ("Orient BioResource") and Envigo Global Services, Inc. ("Envigo"). After Charles River, Inotiv is the second largest importer of long-tailed macaques into the U.S.

20. Before the Class Period, facts emerged that put Defendants on notice that both Envigo and Orient BioResource were under criminal investigation for supplying illegally sourced long-tailed macaques. On August 4, 2021, the U.S. Department of Justice ("DOJ") disclosed

through a press release that an executive of Orient BioResource (Gary Tucker) pled guilty to lying to USFWS agents about his involvement in the procurement and importation to the U.S. of long-tailed macaques in connection with what was described publicly by the DOJ as the USFWS's ongoing "criminal investigation into international trafficking of primates into the United States."

21. On October 14, 2021, the DOJ issued a press release concerning the sentencing of Mr. Tucker in connection with "a criminal investigation of international trafficking of primates into the United States."

22. On February 16, 2022, Inotiv disclosed that Envigo received a grand jury subpoena in June 2021 issued by the DOJ related to the importation into the U.S. "of live non-human primates originating from or transiting through China, Cambodia and/or Vietnam . . . ."

23. On May 16, 2022, Inotiv disclosed that in addition to Envigo, Orient BioResource received a grand jury subpoena in June 2021 issued by the DOJ related to the importation into the U.S. "of live non-human primates originating from or transiting through China, Cambodia and/or Vietnam . . . ." By May 2022, Envigo and Orient BioResource had supplied Charles River with at least 1,990 long-tailed macaques since May 2020, including at least 1,247 expressly identified as Cambodia long-tailed macaques according to government records obtained through freedom of information requests.

24. Inotiv's subsidiaries had obtained approximately 60% of their Cambodia long-tailed macaques from the Vanny Group, a network of related companies based in Hong Kong, China, Cambodia and Vietnam, which include Vanny Bio-Research Center ("Vanny HK"), KHI Bioservices Ltd. ("KHI"), Vanny Bio-Research (Cambodia) Corp. Ltd. ("Vanny Cambodia"), and Nafovanny (based in Vietnam). Another broker which supplied Charles River with Cambodian long-tailed macaques was Worldwide Primates, Inc. based in Miami ("WW Primates"). WW

Primates supplied Charles River with at least 956 long-tailed macaques in 2022.

25. Furthermore, Charles River obtained long-tailed macaques directly from suppliers in Southeast Asia. A Company called K.F. (Cambodia) Ltd. ("KF Cambodia"), directly supplied Cambodian long-tailed macaques to Charles River. Another direct supplier of long-tailed macaques to Charles River was Nafovanny, which, as noted above, was part of the Vanny Group. Nafovanny directly supplied Charles River with live animals, extracts and specimens sourced from Vietnam.

26. By no later than September 2022, the USFWS's ongoing investigation, which had focused on at least Inotiv's subsidiaries and the Vanny Group, had turned its focus on the conduct of Charles River and its direct supplier, KF Cambodia. On or around September 21, 2022, the USFWS refused to clear a shipment of 360 long-tailed macaques with a reported value of $3.24 million from KF Cambodia to Charles River at Dulles International Airport in Virginia in connection with the USFWS's criminal ongoing investigation. By the end of the Class Period, the USFWS blocked Charles River's import of 1,269 Cambodian long-tailed macaques with a value of at least $17-20 million directly from KF Cambodia.

27. Then, on November 16, 2022, a DOJ Indictment was unsealed in which two Cambodian government officials responsible for implementation and oversight of CITES, and six executives of the Vanny Group, including executives at Vanny HK and Vanny Cambodia, were charged with taking part in a scheme to smuggle long-tailed macaques into the U.S. (the "Indictment"). The Indictment identified two "unnamed" co-conspirators, which were Inotiv or its subsidiaries Orient BioResource and Envigo, in Alice, Texas, and WW Primates in Miami, Florida—both suppliers to Charles River. The Indictment is attached as Exhibit A.

28. According to a DOJ press release, dated November 16, 2022:

> Members of an international primate smuggling ring have been charged with multiple felonies for their role in bringing wild long-tailed macaques into the United States.
>
> The eight-count indictment charges two officials of the Cambodian Forestry Administration, Ministry of Agriculture, Forestry and Fisheries; the owner/founder of a major primate supply organization and its general manager; and four of its employees with smuggling and conspiracy to violate the Lacey Act and the Endangered Species Act. . . .
>
> "Wild populations of long-tailed macaques, as well as the health and well-being of the American public, are put at risk when these animals are removed from their natural habitat and illegally sold in the United States and elsewhere," said Edward Grace, U.S. Fish and Wildlife Service Assistant Director, Office of Law Enforcement. "The Service spearheaded this complex, multi-year investigation that exposes the large-scale illegal laundering of wild long-tailed macaques for use in biomedical and pharmaceutical research. We led multiple U.S. federal agencies to provide a one-government approach to end the wholesale poaching of long tailed macaques from the wild and shut down this criminal organization."

29. The Indictment alleged, in part, the following:

- The defendants and their unindicted co-conspirators **engaged with customers in the United States** and elsewhere and entered into contractual agreements to sell and export purportedly captive-bred macaques from Cambodia to the United States.

- The defendants and their unindicted co-conspirators **established a logistics system to allow buyers to inspect macaques prior to sale, including through the use of veterinarians,** to test the monkeys for disqualifying conditions, quarantine shipments prior to export, and arrange the necessary ground and air transportation to facilitate the transactions.

- The defendants and their unindicted co-conspirators arranged to illegally purchase additional long-tailed macaques from black market suppliers in Cambodia and Thailand **to make up for the lack of supply of suitable monkeys at their purported breeding operations**. . . .

- The defendants and their unindicted co-conspirators delivered and caused the delivery of wild-caught long-tailed macaques to various international airports in the United States, accompanied by Cambodian CITES Permits and FWS Form 3-177s falsely identifying the monkeys as captive bred.

(Emphasis added).

30. On November 17, 2022, Inotiv filed a report with the SEC on Form 8-K that stated that it had previously disclosed that grand jury subpoenas were issued to Envigo and Orient BioResource in June 2021, and that further confirmed Vanny Cambodia was Inotiv's principal supplier of long-tailed macaques:

> On November 16, 2022, Inotiv, Inc. (the "Company") became aware that the U.S. Attorney's Office for the Southern District of Florida ("USAO-SDFL") has criminally charged employees of the Company's principal supplier of non-human primates ("NHPs"), along with two Cambodian officials, with conspiring to illegally import NHPs into the United States from December 2017 through January 2022 and in connection with seven specific imports between July 2018 and December 2021.

31. Despite obtaining a material number of long-tailed macaques from Inotiv or its subsidiaries Envigo or Orient BioResource, WW Primates, and Vanny Group companies Nafovanny and KHI before the start of the Class Period, Charles River waited two weeks to publicly comment on the Indictment.

## DEFENDANTS' MATERIAL MISREPRESENTATIONS AND OMISSIONS

32. Then, on November 30, 2022, the start of the Class Period, despite knowing, or disregarding with a high degree of recklessness: 1) that Charles River's suppliers of long-tailed macaques included Inotiv subsidiaries Envigo and Orient BioResource, and WW Primates, the unnamed conspirators in the Indictment; 2) that starting in September 2022, the USFWS had blocked the Company's importation of Cambodian long-tailed macaques directly from KF Cambodia; and 3) that Charles River had directly obtained live long-tailed macaques and animal extracts and specimens from Nafovanny and KHI, both Vanny Group companies, the Company and Defendant Foster made the following materially false and misleading statements in a report filed with the SEC on Form 8-K and during a Charles River investor conference:

> a. Charles River was not named or referenced in the DOJ proceedings, and **the Company does not have any direct supply contracts with the**

> **indicted Cambodian supplier**.
>
> b. **Charles River has global supply sources, including other sources in Cambodia,** which is the primary country of origin of NHP imports to the United States and to Charles River. However, in light of the indictment, and subsequent statements made by the Cambodia government, Charles River is operating under the expectation that for some time period supply of Cambodia-sourced NHPs will be difficult to obtain in the United States . . . .
>
> ***
>
> [Defendant Foster:] there were also a couple of Cambodian officials that were named in this indictment, and **we don't have any direct contacts with that supplier either**. . . .
>
> we're **working really hard to mitigate any potential adverse impact with other supply sources with our current supplier in Cambodia** . . . .
>
> So really complex [] situation at the moment, more complex by the fact that **one of the big suppliers from Cambodia, who's not a supplier of ours is unable to ship. So that's going to hurt some folks**. . . .
>
> [the] **[f]acility that we work with in Cambodia is extremely high quality one, all the ones that we work with are high quality ones**. . . .
>
> **we have a really good supplier over there and a good relationship and a big supply contract** . . .
>
> the sort of allegations on the supplier in Cambodia was sort of dramatic. **It's not a supplier of ours. It's not directed to us**. . . . So [the Indictment] has **no real short-term impact.**

33. Defendants Charles River and Foster's representations that Charles River did not have any "direct supply contracts" or "contacts" with the indicted supplier, Vanny Cambodia, and that the facility "we work with in Cambodia is extremely high quality one, all the ones that we work with are high quality ones" were materially false and misleading because Charles River and Foster failed to disclose that Charles River had obtained long-tailed macaques indirectly from Vanny Cambodia through the unnamed co-conspirators in the Indictment, Envigo or Orient BioResource, and WW Primates.

34. Moreover, Defendant Foster's representations that "one of the big suppliers from

Cambodia, who's not a supplier of ours is unable to ship. So that's going to hurt some folks" created the false impression that Charles River's supplier, KF Cambodia, with which the Company purportedly had a "big supply contract," was able to ship animals to the U.S. and was not implicated in the DOJ and USFWS investigation that led to the Indictment. However, Defendant Foster failed to disclose that, starting in September 2022, the USFWS had already refused or rejected Charles River's import of at least 360 live long-tailed macaques from KF Cambodia, and that KF Cambodia, like Vanny, was "unable to ship" to the U.S. due to the ongoing criminal investigation.

35. Indeed, Defendant Foster's statements that "It's not a supplier of ours. It's not directed to us," and that Vanny Cambodia's inability to ship is "going to hurt some folks," created the false impression among investors and analysts that Charles River's conduct and its direct supplier KF Cambodia were not implicated in the ongoing criminal investigation that led to the Indictment. For example, on December 15, 2022, UBS published a research report concerning Charles River that stated "[w]e think CRL would be in a positive position relative to peers in case of a[n] export ban from Cambodia, due to its alternatives sources and could potentially leverage further price increases due to the shortages."

## **THE TRUTH IS REVEALED**

36. Through a series of partial disclosures, the truth that Defendants' materially false and misleading representations concealed was ultimately revealed.

37. On January 12, 2023, Jefferies published a research report concerning Charles River that began to reveal that, in contrast to Defendants' representations on November 30, 2022 that the indicted supplier, Vanny, was "not a supplier of ours," approximately 24% of the Company's Cambodian NHP's supply relied on Vanny supply likely through an indirect

relationship:

> Our previous NHP supply chain work concluded CRL's NHP tox business was in a privileged position and controlled its own destiny. **The indictment of Vanny and other Cambodian officials alters that viewpoint** as we estimate **~24% of CRL's U.S. NHP usage relies on Vanny supply (likely through an indirect relationship)**, a perspective underappreciated by investors. Immediately finding new supply in an undersupplied market seems unlikely, putting at risk a high growth contributor. . . .

(Emphasis added).

38. On January 12, 2023, in response to this news, Charles River's stock declined from a close on January 11, 2023 of $246.94 per share to close at $232.25 per share, a decline of $14.69 per share, or approximately 6% on heavier than usual trading volume.

39. Analysts connected the revelations in the January 12, 2023 Jefferies report to a decline in Charles River's stock price. For example, on January 12, 2023, Bloomberg published an article titled "Charles River Falls as Jefferies Cuts on Primate Supply Risk" that reported that Charles River stock declined as much as 6.8% after Jefferies downgraded the stock due to "heightened uncertainty" around NHP supplies, and that Charles River's common stock was the worst performing stock in the S&P index on January 12, 2023.

40. On January 24, 2023, the USFWS blocked additional shipments to Charles River from KF Cambodia, and by this date the USFWS had refused or rejected Charles River's importation of 1,269 long-tailed macaques with a value of approximately $17-20 million directly from KF Cambodia.

41. On February 15, 2023, Defendant Foster, while knowing or at least recklessly disregarding material, nonpublic negative information concerning the Company, executed a suspiciously timed sale of Charles River stock, reaping over $5 million just days before the Company's stock price crashed. On February 16, 2023, Ms. Girshick, the Company's Chief Operating Officer who oversaw the Company Research Models and Services segment, which

acquired long-tailed macaques, and Shannon M. Parisotto ("Parisotto"), Executive VP Discovery and Safety Assessment, who oversaw the Company's Safety Assessment studies for which long-tailed macaques were essential, sold Charles River stock for net proceeds of $464,875 and $661,247, respectively.

42. Then on February 22, 2023, before the market opened, Charles River revealed that, contrary to Foster's representations on November 30, 2022 that "one of the big suppliers from Cambodia, who's not a supplier of ours is unable to ship. So that's going to hurt some folks" and that "[the] [f]acility that we work with in Cambodia is extremely high quality one, all the ones that we work with are high quality ones," it was voluntarily suspending all shipments of NHPs from Cambodia—which accounted for over 60% of the Company's NHP supply—and that such suspension would negatively impact earnings for 2023 and reduce revenue growth by approximately $80-160 million for the Company's Safety Assessment business. The Company further disclosed that procedures it employed to ensure that its importation of NHP's was compliant with U.S. law were inadequate, and that new "additional procedures" were needed to ensure that NHPs imported by Charles River into the U.S. from Cambodia were purpose-bred. In addition, the Company revealed that the DOJ and USFWS were investigating Charles River's conduct and its direct supplier (KF Cambodia) regarding shipments of NHPs from Cambodia that were seized at the U.S. border before the start of and during the Class Period.

43. In its annual report for the quarter and year ended December 31, 2022 filed with the SEC on Form 10-K on February 22, 2023 ("2022 10-K"), Charles River disclosed that:

> On February 16, 2023, we were informed by the U.S. Department of Justice (DOJ) that in conjunction with the U.S. Fish and Wildlife Service (USFWS), it had commenced an investigation **into our conduct** regarding several shipments of non-human primates from Cambodia. On February 17, 2023 we received a grand jury subpoena requesting certain documents related to such investigation. We are aware of a parallel civil investigation being undertaken by the DOJ and USFWS. . . .

> **we have voluntarily suspended future shipments of non-human primates from Cambodia until such time that we and USFWS can agree upon and implement additional procedures to reasonably ensure that non-human primates imported to the United States from Cambodia are purpose-bred**.

(Emphasis added).

44. The Company further disclosed information concerning the shipments of 1,269 long-tailed macaques from KF Cambodia that the USFWS blocked starting in September 2022:

> While these discussions with USFWS are ongoing, we have also agreed to continue to care for the Cambodia-sourced non-human primates from certain recent shipments that are now in the United States. The carrying value of the inventory related to these shipments is approximately $20 million. . . .

45. On this news, Charles River's stock price declined from a close on February 21, 2023 of $243.60 per share to close at $219.09 per share on February 22, 2023, a decline of $24.51 per share, or over 10% on unusually heavy trading volume.

46. The Class Period ends on March 15, 2023, when it was revealed that, in contrast to Foster's representation on November 30, 2022 that the indictment would "ha[ve] no real short-term impact," the Company in fact faced revenue and earnings headwinds from NHP issues into 2024, and Foster came clean and admitted for the first time that, in contrast to his false representations that concealed the fact that Charles River had obtained NHPs indirectly from Vanny Cambodia through the unnamed co-conspirators in the Indictment, and that all the Company's NHP suppliers were "high quality," Charles River had, in fact, sourced NHPs from animal brokers like Envigo or Orient BioResource and WW Primates that do not "care where the animals come from or what the background is."

47. On March 15, 2023, Charles River's stock declined from a closing price on March 14, 2023 of $205.02 per share to close at $194.90 per share, a decline of $10.12 per share or approximately 5% from the March 14, 2023 closing price on heavier than usual trading volume.

48. On May 16, 2023, the Company received an inquiry from the Enforcement Division

of the SEC requesting it provide information "primarily related to the sourcing of non-human primates in Asia." Relatedly, on May 23, 2023, Inotiv received a request from the SEC seeking documents and information regarding Inotiv, Envigo, and Orient BioResource's "importation of NHPs from Asia, including information relating to whether their importation practices complied with the U.S. Foreign Corrupt Practices Act."

49. In connection with the meeting of CITES's Animal Committee on June 19-23, 2023, the U.S. government indicated that there was new information concerning Cambodian long-tailed macaques and indicated that "urgent action may be needed concerning problems relating to the implementation of provisions under the Convention for captive production of specimens."

50. Shortly after the disclosure of the heightened scrutiny including criminal and civil investigations into Charles Rivers and its suppliers' conduct, Defendant Foster stated "we're quite confident from what we know that our supplier—he has [been] purpose breeding these animals according to all of our expectations, and we can demonstrate that . . . . we're confident that **we can prove it and demonstrate it scientifically without a shadow of a doubt** . . . ."

51. However, rather than demonstrate Charles River's long-tailed macaques imported to the U.S. from Cambodia were captive or purpose-bred, Charles River shifted Safety Assessment studies to its facilities outside of the U.S. to circumvent further U.S. government scrutiny of its long-tailed macaque supply chain.

52. Throughout the Class Period, Defendants made materially false statements and failed to disclose material facts necessary in order to make their statements, in the light of the circumstances under which they were made, not misleading. Furthermore, Defendants employed a scheme and engaged in acts, practices and a course of business which operated as a fraud upon members of the proposed Class.

53. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

54. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

55. Venue is proper in this Judicial District under 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and misleading information occurred, in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this Judicial District.

56. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

### A. Lead Plaintiff

57. Oklahoma Firefighters, as set forth in the certification previously filed with the Court (ECF No. 70-1), purchased Charles River securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and misleading statements and material omissions alleged herein. Oklahoma Firefighters oversees more than $3.6 billion in assets on behalf of over 26,000 active and retired firefighters and beneficiaries.

### B. Defendants

58. Defendant Charles River is incorporated under the laws of Delaware with its principal executive offices located at 251 Ballardvale Street, in Wilmington, Massachusetts 01887. Charles River's common stock trades on the New York Stock Exchange (the "NYSE") under the symbol "CRL."

59. Defendant Foster was the Company's CEO at all relevant times. Foster joined the Company in 1976 as General Counsel. During his tenure, Foster held various staff and managerial positions, and was named CEO and President in 1992 and Chairman of the board of directors in 2000. Defendant Foster signed Charles River's quarterly and annual reports filed with the SEC, and made representations to investors during Charles River's conference calls with analysts and investors.

60. Defendant Foster, because of his position with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. He was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his position and access to material non-public information available to him, Defendant Foster knew, or at least acted with a high degree of recklessness, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading. Defendant Foster is liable for the false statements pleaded herein.

## IV. BACKGROUND

### A. Charles River is a Provider of Animal Research Models and Contract Drug Research Services

61. Charles River is a non-clinical (animal or preclinical), global drug development company that assists drug developers in the discovery and development of new products. According to its 2022 10-K, for over 75 years, Charles River has been "in the business of providing the research models required in the research and development of new drugs, devices and therapies," and it purported to be the "largest provider of outsourced drug discovery, non-clinical development and regulated safety testing services worldwide." In 2022, Charles River reported revenue of over $4 billion.

62. The Company has three reporting segments: Research Models and Services ("RMS"), Discovery and Safety Assessment ("DSA"), and Manufacturing Solutions.

63. The RMS segment supplies animals, referred to as research or animal models, to the drug development industry, and internally to the Company's DSA segment for use in the Company's Safety Assessment studies. In 2022, RMS reportedly accounted for 18.6% of the Company's revenues. Research Models includes the commercial production and sale of small research models, like rats and mice, as well as the supply of large research models, including NHPs.

64. The DSA segment reportedly accounted for approximately 61.6% of the Company's total revenue in 2022. DSA provides services that enables Charles River's customers to outsource their drug discovery research, their related nonclinical drug development activities, and regulatory-required safety testing of potential new drugs, vaccines, industrial and agricultural chemicals, consumer products, veterinary medicines and medical devices. Charles River's DSA services support the research, development, and regulatory-required safety testing of potential new

drugs before they can be tested in human trials.

65. According to its annual report filed on Form 10-K for the quarter and year ended December 25, 2021 filed with the SEC on February 16, 2022 ("2021 10-K"), Charles River purports to be "a premier provider of high quality, purpose bred, SPF [specific-pathogen-free] large research models to the biomedical research community." Unlike rodents, Charles River does not breed NHPs. Rather, the Company procures NHPs from external suppliers for sale in the RMS segment or for use in connection with Safety Assessment studies within the Company's DSA segment.

66. During a Charles River conference call with investors and analysts on February 11, 2020, Defendant Foster explained that the Company's DSA segment is the largest customer of the Company's RMS segment. In other words, the research animals used in Charles River's Safety Assessment studies for its customers in the DSA segment are, in material part, obtained intercompany through the RMS segment:

> Research models remain an essential regulatory required scientific tool for early-stage research and toxicology and a vital component of our portfolio to support our clients and our own DSA segment, which remains the largest client of our research models business [RMS].

**B. Charles River's Research Models Are Used in Nonclinical or Animal Studies Required for Approval of New Drug or Biologic Products**

67. In the U.S., applicants of new drug and biologic products are required to provide to the FDA, among other information and data, pharmacology and toxicology information based on non-clinical or animal studies from which they have concluded that it is reasonably safe to conduct clinical or human trials and ultimately to support marketing. 21 C.F.R. § 312.23 (Investigational New Drug Application content and format); 21 C.F.R. § 314.5 (Content and format of a New Drug Application); 21 C.F.R. § 601.2 (Applications for biologics licenses; procedures for filing).

68. According to Charles River's 2023 Proxy Statement filed with the SEC on Schedule

14A on March 30, 2023 ("2023 Proxy"), before a "drug can be evaluated in the clinic on humans, in the absence of a validated alternative, the FDA requires testing in two animal species, including one non-rodent species, to ensure patient safety. Because of their close genetic, physiological, and behavioral similarity to humans, [NHPs] are often the only scientifically relevant animal models for critical translational research and the required safety testing of biologic drugs." NHPs are useful because their similarities to humans with respect to genetic makeup, anatomy, physiology, and behavior make it possible to approximate the human condition.[2]

69. According to the FDA, in contrast to most prescription drugs, which are chemically synthesized, "biologics" or biological products are derived from natural sources, including living entities, and include products such as vaccines, blood and blood components, and other therapies.[3]

70. The drug development pipeline has been shifting toward biologics for which NHPs are critical.




71. In connection with preclinical development of biologic drugs, substitutes for NHPs

---

[2] Nonhuman Primate Models in Biomedical Research: State of the Science and Future Needs (2023), at 1.

[3] https://www.fda.gov/about-fda/center-biologics-evaluation-and-research-cber/what-are-biologics-questions-and-answers

are limited to non-existent. Indeed, according to Defendant Foster, "biologic drugs cannot be approved for commercial use without NHPs" (May 11, 2023 Charles River conference call), and "So you don't do work in large molecule drug development without nonhuman primates. End of sentence, full stop." (March 15, 2023 Barclays investor conference).

72. Because immune system response is the primary safety concern for biologics and the NHP immune system most closely matches humans for testing purposes, NHPs are the model of choice for preclinical studies for biologics.

### C. The Steady and Timely Supply and Sale of NHPs Is Critical to Charles River's Business

73. A timely and steady supply of NHPs is important to Charles River's business, financial results and results of operations.

74. According to the USDA, Charles River is the largest user of NHPs in the U.S. Of the 65,674 NHPs reportedly used in the U.S. in 2021 for teaching, research, experiments or tests, Charles River accounted for 17,105 NHPs used, or approximately 26%. According to the USDA, Charles River use of NHPs in its business since 2018 was as follows:

2018—13,022 NHPs
2019—14,899 NHPs
2020—15,769 NHPs
2021—17,105 NHPs
2022—16,460 NHPs

75. A species of NHP called *macaca fascicularis*, also known as the long-tailed macaque, the crab-eating macaque, or the cynomolgus monkey ("long-tailed macaque"), is a species of NHP used for drug and biological efficacy and safety studies.

76. The long-tailed macaque and rhesus macaque are the predominant NHP species used in biomedical research, however, rhesus macaques are available domestically whereas long-

tailed macaques are not and are sourced internationally.[4] The long-tailed macaque is reportedly the most heavily internationally traded NHP species.[5]

77. According to the CDC, during the period 2019-22, the vast majority of NHPs imported into the U.S. were long-tailed macaques (referred to in the chart below as cynomolgus macaques), accounting for a yearly average of 95% of all NHP imports in 2019-22:

| | Number of Nonhuman Primates Imported | | | |
|---|---|---|---|---|
| Nonhuman Primate Species | FY2019 | FY2020 | FY2021 | FY2022 |
| Cynomolgus macaque | 32,273 | 24,879 | 30,649 | 31,617 |
| Rhesus macaque | 964 | 724 | 80 | 0 |
| African green monkey | 328 | 720 | 711 | 808 |
| Common marmoset | 195 | 326 | 284 | 172 |
| Squirrel monkey | 30 | 34 | 68 | 60 |
| Capuchin | 15 | 0 | 40 | 86 |
| Other* | 13 | 45 | 12 | 68 |
| Total | 33,818 | 26,728 | 31,844 | 32,811 |

78. The total value of the long-tailed macaque trade from 2010 to 2019 has been estimated to be valued at nearly $1.26 billion.[6]

79. The international trade in long-tailed macaque involves both live animals as well as specimens and extracts, such as blood and tissue.

80. During a Charles River earnings conference call with investors and analysts on October 29, 2020, Defendant Foster stated that the Company's supply of NHPs were nearly all imported: "Supply sources are pretty much external. They're coming from places like China and

---

[4] Weinbauer, Gerhard & Mecklenburg, Lars. (2022). Does Geographical Origin of Long-Tailed Macaques (Macaca fascicularis) Matter in Drug Safety Assessment?: A Literature Review and Proposed Conclusion. Toxicologic pathology. 50. 1926233221095443. 10.1177/01926233221095443.

[5]https://onlinelibrary.wiley.com/doi/epdf/10.1002/ajp.23547; https://cites.org/sites/default/files/eng/com/ac/28/Inf/E-AC28-Inf-32.pdf (stating "M. fascicularis is the most heavily-traded species of live mammal listed on the CITES Appendices.")

[6]https://www.researchgate.net/publication/358580560_Monetary_Value_of_Live_Trade_in_a_Commonly_Traded_Primate_the_Long-Tailed_Macaque_Based_on_Global_Trade_Statistics

Mauritius and Cambodia and Vietnam."

81. Charles River's business benefitted from the COVID-19 pandemic in large part due to shut downs that hindered drug development companies' ability to conduct research internally and therefore sought Charles River's services to outsource their preclinical studies. According to Defendant Foster during a Charles River conference call at the Robert W. Baird Global Healthcare Conference on September 14, 2021: "[p]robably the biggest benefit that we had, which is probably impossible to calculate, is we had an accelerant—sort of accelerating impact from COVID from the inability of clients to do work in a whole host of businesses . . . because they have had to close down their own sites or our competitors couldn't support them and they pivoted more quickly to Charles River than perhaps they would have otherwise and/or tried us when they wanted to do the work internally . . . ."

82. Due to an increased demand for the Company's Safety Assessment services, principally due to new biologics drug products, demand for long-tailed macaques for use in Charles River's Safety Assessment substantially increased before the Class Period.

83. The increased demand for long-tailed macaques caused the value of long-tailed macaques to significantly increase. According to data from the USFWS, the declared value per macaque was stable during the period 2017-19, with a long-tailed macaque being declared to have a value of around $2,400. According to USFWS data, Charles River reported the value per long-tailed macaque increased from an average value per animal of $2,300 in May 2020, to an average value of $15-17,500 per animal near the end of the Class Period, an increase in value per animal of over 660%.

### D. Long-Tailed Macaques Are a Protected Species under International and U.S. Law

84. Owing to the fact that Charles River's supply of long-tailed macaques were

imported into the U.S., Charles River and its suppliers were subject to international and U.S. legal regulations applicable to the trade of long-tailed macaques.

85. In order to protect certain species against over-exploitation, in 1975 the U.S. became a signatory to an international treaty known as the Convention on International Trade in Endangered Species of Wild Fauna and Flora, or the CITES Convention. Depending on the required level of protection needed by a species, CITES uses a system of appendices to classify protected wildlife and plants, and monitor and regulate their usage.

86. Long-tailed macaques are protected under Appendix II of CITES. Appendix II includes all species which, although not necessarily now threatened with extinction, may become so unless trade in specimens of such species is subject to strict regulation in order to avoid utilization incompatible with their survival. CITES, Art. II, ¶2; 50 C.F.R. § 23.4.

87. In a March 7, 2022 assessment, the International Union for Conservation of Nature and Natural Resources ("IUCN") reassessed the long-tailed macaque's classification as vulnerable and added it to its "Red List of Threatened Species," which is used as a guide for the appendices to CITES Convention.[7] The IUCN found:

> Reports throughout Southeast Asia indicate a continued and even increased persecution of M. fascicularis [long-tailed macaques] throughout large expanses of its current range. Hunting and trapping have been occurring and are now happening at unprecedented levels . . . most ominously, to fuel both the legitimate and illicit trade for research and other usages (Lee 2011, Hamada et al. 2011, Hansen et al. 2021). Both price and demand for M. fascicularis as a trade commodity has skyrocketed during the Covid-19 pandemic, relative to the already regular and heavy pre-pandemic capture and trade (Hansen et al. 2021, 2022). . . . the demand for non-human primates in research is threatening the species. As such, the research industry needs to become accountable for the effects of their actions on wild non-human primate populations. . . . Therefore, we assess the species as Endangered . .

[7] https://www.iucnredlist.org/about/uses

. .[8]

88. On or around July 21, 2022, the ICUN's reassessment was widely publicized and disseminated in news media.

89. The U.S. along with over 180 other countries are parties to the CITES Convention, and bound to abide by its provisions and restrictions. Both Cambodia and Vietnam are signatories to the CITES convention.[9]

90. Parties to the CITES convention regulate trade in specimens of various species and their parts, products, and derivatives through a system of permits ("CITES Permits"). CITES Permits enable the Convention parties to monitor the effects of the volume and type of trade to ensure trade is legal and not detrimental to the survival of the species included in the various Appendices.

91. Before importing a long-tailed macaque under Appendix II of CITES into the U.S., a valid CITES export permit must be obtained from the competent authority of the country of export or re-export. A separate original or a true copy of a CITES Permit must be issued before import occurs and the document must accompany each shipment and be presented to USFWS upon importation into the U.S. *See* CITES, Art. IV §§ 1 and 2; 50 C.F.R. § 23.20(c), 23.26(b).

92. CITES Permits for live long-tailed macaques or specimens are individually numbered and include information such as the importer of record, exporter, a description of the specimens, the CITES Appendix number, a source code, the quantity, and the date of issuance. The source codes indicate the particulars of the specimen(s) listed on the CITES Permit: among

---

[8] https://www.iucnredlist.org/species/12551/221666136#assessment-information (stating date of assessment Mar. 7, 2022).

[9] https://cites.org/eng/disc/parties/chronolo.php (stating Viet Nam joined in 1994 and Cambodia joined in 1997).

others, the code "W" denotes a specimen taken from the wild; "R" denotes a ranched specimen, taken as an egg or juvenile from the wild and reared in a controlled environment; "C" denotes animals bred in captivity; all subject to certain other terms and provisions on the Convention.

93. Since 2010, Cambodia has outlawed the use of wild-caught long-tailed macaques in breeding farms and for export, which is monitored through CITES Permits.[10]

94. Under the CITES Convention, source code "C" indicates an animal has been bred in captivity, which is defined to mean that the animal's parents mated in a controlled environment and the breeding stock is maintained without the introduction of specimens from the wild, except under limited circumstances.[11]

95. Under U.S. law, all imports of wildlife, including long-tailed macaques, must be declared to the USFWS on a completed, signed, and certified Declaration for Importation or Exportation of Fish and Wildlife (Form 3-177) and made available for inspection. 50 C.F.R. §§ 14.61, 14.63. Form 3-177 requires importers or their agents to provide, among other information, the source of the wildlife they are importing, specifically whether the wildlife was captive-bred, farm-raised, or wild-caught. Importers or their agents must furnish all applicable information requested on the Form 3-177 and must certify that the information furnished is true and complete to the best of his/her knowledge and belief. 50 C.F.R. § 14.61.

---

[10] REVIEW OF *MACACA FASCICULARIS* IN CAMBODIA AND VIET NAM, CITES 28th meeting of Animals Committee, 2015, https://cites.org/sites/default/files/eng/com/ac/28/Inf/E-AC28-Inf-32.pdf (stating "in October 2010 permits for the collection and/or harvesting of *M. fascicularis* from the wild were suspended for a minimum of five years. Cambodia states that the breeding stock in each of the captive breeding farms has been sufficient to produce enough F1 and F2 offspring for export and, as a result, no augmentation with wild *M. fascicularis* has been required . . . . Viet Nam states that M. fascicularis live in protected areas where trapping and trading are prohibited."); CITES Mgm't Authority in Cambodia, Aug. 25, 2014, https://cites.org/sites/default/files/eng/com/ac/28/AC28-09-03-A2.pdf (same).

[11] https://cites.org/eng/node/130909

### E. The Endangered Species Act Implements the CITES Convention

96. USFWS, an agency within the U.S. Department of the Interior, is designated by Congress pursuant to the ESA as the CITES enforcement authority within the U.S. The Department of the Interior publishes regulations to implement CITES in 50 C.F.R. Part 23. A list of all species protected by CITES and the ESA implementation program is maintained pursuant to the Convention by the CITES Secretariat. 50 C.F.R. §§ 23.7 and 23.9.

97. The provisions of CITES are implemented through the ESA, which states in relevant part, "[i]t is unlawful for any person . . . to engage in any trade in any specimens [of wildlife] contrary to the provisions of . . . [CITES] or to possess any specimens [of wildlife] traded contrary to the provisions of . . . [CITES]." "Trade" means, among other things, "export." CITES, Art. I, ¶(c). "Specimen" means "any animal . . . whether alive or dead." CITES, Art. I, ¶(b).

98. Separately, the Lacey Act combats trafficking of illegally taken wildlife, fish, or plants. The Lacey Act made it unlawful for any person to import, export, transport, sell, receive, acquire, or purchase any wildlife taken, possessed, transported, or sold in violation of any law, treaty, or regulation of the U.S. 16 U.S.C. § 3372(a)(l). The Lacey Act also made it unlawful for any person to make or submit any false record, account, or label for, or any false identification of, any wildlife which has been, or is intended to be (1) imported, exported, transported, sold, purchased, or received from any foreign country; or (2) transported in interstate or foreign commerce. 16 U.S.C. §§ 3372(d)(l) and (2). The Lacey Act defines "wildlife" as "any wild animal, whether alive or dead, including without limitations any wild mammal . . . whether or not bred, hatched, or born in captivity, and includes any part, product, egg, or offspring thereof." 16 U.S.C. § 3371(a).

### F. Charles River Assured Investors That It Monitored Its Supply Chain for Legal Compliance

99. Before and during the Class Period, Charles River assured investors that it maintained and enforced standards of conduct concerning its suppliers. In response to the COVID-19 pandemic, the Company stated that it modified its business practices, including suppliers, management of production inventory, and supply chain risk management, and Defendants repeatedly stated that Charles River formed a tiered structure of designated COVID-19 crisis management teams throughout the Company to identify, implement and monitor such actions as required by the dynamic exigencies arising from the pandemic.

100. Before and during the Class Period, Charles River referred investors to the Company's Code of Business Conduct and Ethics and Supplier Code of Conduct that, among other requirements, provided that Charles River's executives, officers and employees, and the Company's suppliers "must comply with the international agreements and conventions, as well as the national, regional and local laws and regulations that apply to our global and international business," "[b]e truthful and accurate in all representations and certifications made to government agencies," "[w]e must always be truthful and accurate about our products and services," and "we must all be vigilant in meeting and going beyond our responsibilities to comply with relevant laws and regulations . . . ." The Company's Code of Business Conduct and Ethics and Supplier Code of Conduct were posted on Charles River's website throughout the Class Period.

101. Charles River's reputation for regulatory compliance and monitoring its supply chain were materially important to its customers and investors. Indeed, on May 27, 2021, Ms. Girshick, Charles River's former Executive VP and Chief Operating Officer stated: "[o]ur integrated comprehensive portfolio is taking complexity out of our clients' drug development efforts and supply chain. Our reputation for deep science and regulatory compliance as well as our

broad geographic coverage gives our clients the confidence that we are a reliable partner for their programs."

### G. Charles River Loses Access to its Principal Supply of Long-Tailed Macaques Due to China's Export Ban and Charles River Pivots to Cambodia

102. Before 2020, Charles River obtained over 60% of its supply of long-tailed macaques from China. According to the CDC, in 2019 32,273 long-tailed macaques were imported into the U.S., with 19,322, or approximately 60%, from China.

103. In early 2020, the Chinese government banned the transport and sale of wild animals in response to the spread of COVID-19.[12,13] While the ban reportedly provided an exemption for use in research, subject to "strict approvals" by the Chinese government, in practice strict application of the new ban effectively halted the trade in NHPs from China.[14]

104. At that time, Charles River had a majority ownership interest in a Chinese supplier of NHPs. As explained by Defendant Foster after the Class Period, the rationale for an economic stake in a Chinese supplier of NHPs was to secure a preferred supply source: "[o]ur preference was to get those animals out of China and use that for safety assessment [in Charles River's Safety Assessment studies in the DSA segment]."[15]

---

[12] https://www.washingtonpost.com/world/asia_pacific/china-bans-wild-animal-trade-until-coronavirus-epidemic-eliminated/2020/01/26/0e05a964-4017-11ea-971f-4ce4f94494b4_story.html.

[13] https://www.nytimes.com/2020/02/27/science/coronavirus-pangolin-wildlife-ban-china.html

[14] April 2, 2020, *Globe and Mail* published a story titled "Chinese wildlife ban freezes export of test monkeys amid worldwide push for COVID-19 vaccine."

[15] According to a May 11, 2023 research report published by Evercore ISI, during a call with Evercore representatives, Charles River management stated that "several years ago, CRL had acquired a business in China with the intent of supplying their SA [Safety Assessment] needs. As a result of China shutting down exports, CRL has been supplying the local market with NHPs sourced from that region," and according to a March 27, 2023 research report published by Jefferies, Charles River owns 90% of the Chinese NHP supplier. According to Charles River's Annual Report filed with the SEC on Form 10-K on February 11, 2020, "[o]n August 28, 2019, the Company acquired an 80% equity interest in a supplier, which included a 20% redeemable noncontrolling interest."

105. Having access to a preferred supplier was important to Charles River because it provided the Company with control over its supply chain, including the Company's ability to monitor and control compliance with applicable laws and regulations concerning the breeding and import of NHPs into the U.S., and ensured a steady and timely supply of long-tailed macaques.

### H. Cambodia Replaces China as Charles River's Primary Source of Long-Tailed Macaques

106. Following China's export ban, Charles River pivoted to Cambodia for its supply of long-tailed macaques.

107. Cambodia substantially increased the export of long-tailed macaques based on data from CITES and the United Nations Comtrade databases, with exports to the U.S. increasing in 2020 by up to 86% over 2019.

108. On February 22, 2023, Defendant Foster stated "in recent years, NHPs sourced from Cambodia have been responsible for approximately 60% of the NHPs supplied to the United States and to Charles River for drug research and development."

### I. The Rapid Increase in Supply of Long-Tailed Macaques Was Implausible Based on Captive Breeding Alone

109. It was very unlikely that captive-breeding farms in Cambodia legally increased their numbers of long-tailed macaques from the production levels in 2019 to the massive increases reported in 2020-22 given the constraints on breeding long-tailed macaques.

110. The gestation period for long-tailed macaques is roughly six months, and provided a pregnancy results in a live birth, a long-tailed macaque pregnancy typically results in one offspring.

111. Long-tailed macaques are not usually exported until they are at least two years old, which is the age required by medical researchers because by that time the animal has sufficiently matured. Thus, a minimum period of 30 months from the onset of pregnancy to the animals being

ready for shipment (six months gestation plus 24 months of post-natal growth before animals can be shipped at 2 years old) is needed to produce an offspring ready for export.

112. Thus, the scaled production reported in 2020 in response to the COVID-19 pandemic could not have been available for export until at least late 2022 at the earliest.

113. A major supplier of long-tailed macaques, the Vanny Group (defined below), confirmed the constraints on the rapid increase in production from Cambodian breeding farms. The website of the Vanny Group indicated a minimum period of 30 months from the onset of pregnancy to animals being ready for shipment (macaque gestation length is roughly 6 months plus 24 months of post-natal growth before animals can be shipped at 2 years old), and further indicated that it could take up to five years to have offspring to export.[16]

114. Given the constraints of rapidly increasing the production of captive-bred animals, Defendants knew, or at least disregarded with a high degree of recklessness, that after losing China as a supply source, Cambodia's supply chain of long-tailed macaques could not have been so rapidly increased from captive breeding alone. Indeed, the major constraints in increasing supply outlined above were explicitly acknowledged by Ms. Girshick, Charles River's former Executive Vice President and Chief Operating Officer, who admitted after the Class Period: "none of the nonhuman primate farms can scale really, really quickly. So that—as you said, the gestation doesn't allow that. The animals have to be a certain age."[17]

115. Indeed, according to one analyst report, from a supply chain due diligence perspective, the rapid increase in production from Cambodia was a red flag: "given the gestation periods and fecundity of primates, the rapid increase in supply originating in Cambodia simply

---

[16] http://vannylifesciences.com.hk/perdiemprogram.html (last accessed Sept. 26, 2023).

[17] Transcript of Charles River Laboratories International, Inc. at Jefferies Healthcare Conference event, June 8, 2023.

was not possible without including (illegally-sourced) wild animals into the mix." (June 13, 2023 UBS analyst report).

**J. Charles River's Suppliers of Long-Tailed Macaques from Southeast Asia**

116. Before the Class Period, Charles River directly imported or otherwise obtained long-tailed macaques from Cambodia from various suppliers or animal brokers, including the following:

**1. Inotiv, Inc.**

117. Inotiv, a publicly traded U.S. Company, was a supplier of long-tailed macaques to Charles River through its subsidiaries, Orient BioResource and Envigo. According to its annual report filed with the SEC on Form 10-K on December 21, 2021 for the fiscal year ending September 30, 2021, Inotiv purported to be the "largest importer of NHPs in North America, with long-established relationships with the source breeders around the world," including from "breeding farms principally located in Cambodia, Vietnam, and Mauritius Island," and "focuses on "securing critical supply chain issues particularly related to research models."

118. On November 5, 2021, Inotiv acquired Envigo, and on January 27, 2022, Inotiv acquired Orient BioResource. According to records obtained through freedom of information requests, Charles River obtained at least 2,262 long-tailed macaques from Orient BioResource and Envigo.

**2. Inotiv's Primary Supplier of Long-Tailed Macaques in Cambodia is the Vanny Group**

119. Inotiv's principal supply of long-tailed macaques came from Cambodia. Inotiv's principal supplier of long-tailed macaques in Cambodia was a network of related companies that did business as the "Vanny Group," which was based in Hong Kong, China, and had operations in Cambodia and Vietnam. Mr. James Lau was the Vanny Group CEO ("Mr. Lau").

120. The Vanny Group's product is "Indochinese cynomolgus" monkeys, *i.e.*, long-tailed macaques, and its principal business is production, breeding, husbandry of long-tailed macaques for use in scientific and academic research.

121. The Vanny Group companies include Vanny HK, KHI, Vanny Cambodia, Vanny Chain Technology (HK) Ltd. ("Vanny Chain Tech"), and Nafovanny, also known as the Vietnam Monkey Breeding and Development Joint-Venture, based in Vietnam, of which the Vanny Group is reportedly the joint owner with the government of Vietnam.

**3. K.F. (Cambodia) Ltd.**

122. KF Cambodia directly supplied Charles River with long-tailed macaques. According to the CITES Management Authority of Cambodia, since 2005, KF Cambodia managed a farm to breed and export young animals from Golden China Group Co., Ltd. Prior to 2005, the farm had been managed by Golden China Group Co., Ltd.

123. Golden China Group Co., Ltd. reportedly had been involved in the capture of wild long-tailed macaques for export to the U.S., and Cambodian authorities have asserted that the Company had engaged in illegal wildlife trading.[18]

124. According to records obtained through freedom of information requests, since May 2020 Charles River obtained over 10,000 long-tailed macaques from KF Cambodia with a total value of approximately $86 million—ranging from a value per animal in 2020 of $2,300, to as high as $17,500 per animal in late 2022, an increase of over 660%. In 2020, Charles River directly imported approximately 3,763 live long-tailed macaques from KF Cambodia; in 2021, Charles River directly imported approximately 3,182 live long-tailed macaques from KF Cambodia; and in 2022 Charles River directly imported approximately 3,096 live long-tailed macaques from KF

[18] https://www.phnompenhpost.com/national/road-gangs-turn-monkey-business

Cambodia.

**4. Worldwide Primates, Inc.**

125. WW Primates is a Miami, Florida-based company that purports to be a "leading supplier of ***premium quality*** non-human primate models for research, including government, university, and pharmaceutical level facilities" and purportedly strives "to be the *Go To* company not only for **on demand** and **last minute** needs, but also for your standard day to day requirements." (Emphasis in original). WW Primates Primate Research Models include long-tailed macaques. According to records obtained through freedom of information requests, during 2022, Charles River obtained at least 956 long-tailed macaques from WW Primates.

**5. Nafovanny**

126. In addition to sourcing long-tailed macaques from Cambodia, Charles River obtained long-tailed macaques directly from Nafovanny, a member of the Vanny Group of companies based in Vietnam. Nafovanny was established by Mr. Lau of the Vanny Group through a joint venture between Vanny Chain and the government of Vietnam. According to records obtained through freedom of information requests, Charles River obtained at least 512 long-tailed macaques directly from Nafovanny.

**6. KHI Bioservices Ltd.**

127. According to records obtained through freedom of information requests, Charles River directly obtained over 1,000 specimens or extracts derived from long-tailed macaques from KHI, a member of the Vanny Group of companies.

**K. Defendant Foster Assured Investors That Charles River Had Alternative Supplies for Long-Tailed Macaques**

128. As a result of the abrupt interruption of the supply of long-tailed macaques from China in early 2020, Charles River pivoted to obtain NHPs directly or indirectly from suppliers in

Southeast Asia, principally from suppliers who obtained animals in Cambodia.

129. On March 11, 2020, during a Charles River conference call with analysts and investors, Defendant Foster stated the following concerning the impact of COVID-19 on the Company's supply of NHPs from China:

> So we use some large animals in our toxicology business. There was some noise about supply sources being limited out of China. That doesn't seem to be an ongoing problem. Even if it was, **we've made arrangements with other supply sources around the world. So we won't be interrupted there to any material degree.**

(Emphasis added).

130. On August 5, 2020, during a Charles River earnings conference call with analysts and investors attended by Defendant Foster, Defendant Foster made the following statements:

> **Rivka Regina Goldwasser – Morgan Stanley, Research Division – MD**: Okay. And the next one is just on supply sourcing a little bit. Last time we spoke, you mentioned that you're actively reevaluating outsourcing strategy and also reducing dependency on Asia. So any updates there in how it impacts the business and opportunities for the future?
>
> **Defendant Foster**: Yes. We're working really hard at our supply chain and critical tools that we need to do our work. And I think we've done a very good job ensuring that **we have sufficient products to do our work, both living and in inanimate from a variety of sources, some new, many increase from where they were historically** and some reduced from where they were historically. **So we feel really good about supply chain for the balance of this year, and we'll be very well prepared for next year as well.**

(Emphasis added).

131. Also on October 29, 2020, during a Charles River earnings conference call with investors and analysts, Defendant Foster made the following representations concerning Charles River's long-tailed macaque supply chain:

> **Jack Meehan – Nephron Research LLC – Research Analyst**: Jim, there's been some [discussion] around some supply chain constraints when it comes to nonhuman primates just being shipped around. I was curious if you've seen any of that? And how you manage through it?

> **Defendant Foster**: So an important part of research in a whole host of areas, particularly for large molecules and have – it's a model that's been important for years. Supply sources are pretty much external. **They're coming from places like China and Mauritius and Cambodia and Vietnam.**
>
> And so **we work really hard to have multiple supply sources from multiple geographies and multiple suppliers within those geographies and have close working relationships with them to ensure exceptional veterinary oversight and supply numbers that are consistent and preferably and hopefully always well in advance of when we need these animals because it's an important resource. And so we have always worked really hard at ensuring that supply – overall supply** and the numbers have ticked up over the last few years, so more suppliers are necessary.
>
> And **we feel really good about our supply situation about our road to have certainly a sufficient number of [animals] for the balance of this year and well into next year**.
>
> And it's a continual dialogue with the suppliers to try to match the supply with what we anticipate the need will be based upon what we hear from our clients. But I think **we're doing very well resourcing in [N]HPs**.

132. On February 17, 2021, Defendant Foster caused the Company to file its Form 10-K with the SEC for the quarter and year ended December 26, 2020 (the "2020 10-K"), which was signed by Defendant Foster. The 2020 10-K represented the following concerning Charles River's large research models:

> The research models we supply have been, and continue to be, some of the most extensively used in the world, largely as a result of our geographic footprint and continuous commitment to innovation and quality. . . . We are also a premier **provider of high quality, purpose bred, SPF large research models to the biomedical research community**.

133. On June 2, 2021, during a conference call in connection with the William Blair Growth Stock Conference in which Defendant Foster participated on behalf of the Company, Defendant Foster was asked "[w]e all hear a lot of questions about sort of supply chain stresses in the new every day. Are you seeing any of that in your business?"

134. In response, Defendant Foster stated "I think we did a very good job throughout COVID in protecting our supply chain with a whole host of different thing[s] that we buy. So it

was never a problem for us and doesn't feel like a challenge at the moment. I think we're managing that well and not having any sort of external or artificial roadblocks."

### L. An Executive of a Charles River NHP Supplier is Indicted in Connection with a U.S. Government Investigation of the NHP Supply Chain

135. As a result of a nonpublic investigation that began before the Class Period (in or around 2017), on or around August 4, 2021, the DOJ issued a press release titled "Man Convicted of Lying to Federal Agents During International Wildlife Trafficking Investigation," in connection with *U.S. v. Tucker*, 21-cr-20263 (S.D. Fl.) (the "*Tucker* Action").

136. According to the press release, Mr. Tucker, an executive of Orient BioResource, a Charles River supplier of Cambodian long-tailed macaques, admitted to lying to Special Agents of the USFWS during an interview concerning potential illegal trafficking of wildlife:

> During the interview, **agents asked Tucker about his involvement in the procurement and importation to the United States of long-tailed macaques -- small non-human primates regularly employed in scientific research -- from Southeast Asia**. . . . In particular, agents asked Tucker whether he or others working for his employer, Orient BioResource Center (OBRC), prepared or submitted to OBRC any audits or reports concerning visits to supplier sites in Cambodia. . . the existence of site visit reports or audits was material to **the on-going investigation into the trafficking of the primates**, whose possession, sale, export and import is highly regulated by the international community and the United States under the Convention on International Trade in Endangered Species of Wild Fauna and Flora, to which the United States is a party, and the U.S. Endangered Species Act, Title 16, United States Code, Section 1538, et seq. Congress has tasked the USFWS to administer and enforce the provisions of the Treaty.

(Emphasis added).

137. On October 14, 2021, the DOJ issued a press release titled "Man Sentenced for Lying to Federal Agents During International Wildlife Trafficking Investigation" concerning Mr. Tucker of Orient BioResource that stated:

> A Texas man was sentenced in federal district court in Fort Lauderdale, Florida yesterday for knowingly and willfully making a materially false, fictitious, and

> fraudulent statement and representation to Special Agents of the United States Fish & Wildlife Service during **a criminal investigation of international trafficking of primates into the United States**.
>
> Gary Tucker, 64, of Alice, Texas, was sentenced to serve a three-year term of probation, with a special condition of home confinement for a period of three months, and to pay a criminal fine in the amount of $5,000 by U.S. District Judge William P. Dimitrouleas. . . . In connection with his guilty plea, Tucker admitted that in the course of an interview by Special Agents of the United States Fish & Wildlife Service (USFWS) **about potential illegal trafficking of wildlife, he was asked about his involvement in the procurement and importation to the U.S. of long-tailed macaques -- small non-human primates regularly employed in scientific research -- from Southeast Asia**. . . .

(Emphasis added).

138. The Sentencing Memorandum in the *Tucker* Action, dated October 7, 2021 (ECF No. 27 in the *Tucker* Action), identified Tucker as Vice President of Orient BioResource, and stated the following:

> **the Government has been investigating whether foreign exporters and, potentially, U.S. importers are improperly importing wild-caught non-human primates into the United States despite the animals being labeled as captive bred in regulatory and related documents** . . . The conduct at issue in this case arose from the U.S. Attorney's Office for the Southern District of Florida and **the USFWS's ongoing investigation into the non-human primate importation industry** . . . news of [Tucker's] conviction has been disseminated by local and national sources. . . . Gary [Tucker]'s conduct, especially **the widespread knowledge of it among members of the industry** and his community, will forever stain his reputation and legacy.

(Emphasis added.)

### M. Charles River Supplier Envigo Receives DOJ Grand Jury Subpoena

139. On February 16, 2022, Inotiv disclosed in a filing with the SEC that on "June 15, 2021, Envigo Global Services, Inc., a subsidiary of the Company acquired in the Envigo acquisition, was served with a grand jury subpoena issued by the Department of Justice in Miami, Florida requiring the production of documents related to the importation into the United States of live non-human primates originating from or transiting through China, Cambodia and/or Vietnam

. . . ."

140. By this point in time, Charles River had acquired at least 1,918 long-tailed macaques from Inotiv or through its subsidiaries since May 2020. In 2021 Envigo and Orient BioResource supplied over 814 long-tailed macaques to Charles River, accounting for approximately 5% the of the long-tailed macaques Charles River used in 2021 according to the USDA.

### N. Charles River Supplier Orient BioResource Receives DOJ Grand Jury Subpoena

141. On May 16, 2022, Inotiv disclosed in a filing with the SEC that not only had the DOJ's investigation of Envigo continued, but also that Orient BioResource was under investigation:

> On June 15, 2021, Envigo Global Services, Inc. ("EGSI"), a subsidiary of the Company acquired in the Envigo acquisition, received a grand jury subpoena requested by the U.S. Attorney's Office for the Southern District of Florida ("USAO") for the production of documents related to the procurement of non-human primates ("NHPs") from foreign suppliers for the period January 1, 2018 through June 1, 2021. The subpoena relates to an earlier grand jury subpoena requested by the USAO and received by EGSI's predecessor entity, Covance Research Products, in April 2019. Envigo acquired EGSI from Covance, Inc. ("Covance"), a subsidiary of Laboratory Corporation of America Holdings, in June 2019. . . .
>
> On January 27, 2022, EGSI acquired OBRC, which owns and operates a primate quarantine and holding facility located near Alice, Texas. In 2019, OBRC received grand jury subpoenas requested by the USAO requiring the production of documents and information related to its importation of NHPs into the United States. On June 16, 2021, OBRC received a grand jury subpoena requested by the USAO requiring the production of documents related to the procurement of NHPs from foreign suppliers for the period January 1, 2018 through June 1, 2021.

### O. USFWS Refuses to Clear Shipment of over 1,000 Long-Tailed Macaques Sourced from KF Cambodia to Charles River

142. On or around September 21, 2022, the USFWS, which along with the DOJ was conducting an ongoing criminal investigation into the NHP importation industry, refused to clear

a shipment of 360 long-tailed macaques with a reported value of $3,240,000 from KF Cambodia to Charles River at Dulles International Airport in Virginia.

143. Under 50 C.F.R. § 14.53, any USFWS officer may refuse clearance of imported or exported wildlife when there are responsible grounds to believe that a federal law or regulation has been violated. When a shipment is refused, the USFWS "will mail a notice of detention by registered or certified mail, return receipt requested, to the importer or consignee, or exporter, if known or easily ascertainable. Such notice must describe the detained wildlife or other property, indicate the reason for the detention, describe the general nature of the tests or inquiries to be conducted, and indicate that if the releasability of the wildlife has not been determined within 30 days after the date of the notice, or a longer period if specifically stated, that the Service will deem the wildlife to be seized and will issue no further notification of seizure."

144. According to USFWS data, before the refusal to clear the shipment on or around September 21, 2022, no imports of long-tailed macaques imported from KF Cambodia had ever been refused by the USFWS.

145. At or around that time, USFWS contacted primate sanctuaries to determine whether they had capacity to host the blocked shipment of 360 long-tailed macaques, presumably for purposes of preserving evidence in connection with its ongoing criminal investigation.

146. Subsequently, the USFWS refused to clear additional shipments from KF Cambodia to Charles River in the U.S.

147. On or around December 29, 2022, the USFWS refused to clear two shipments of 360 long-tailed macaques (720 in total) with a reported value of $5.4 million for each shipment ($10.8 million in total value) from KF Cambodia to Charles River at Dulles International Airport in Virginia.

148. On or around January 22, 2023, the USFWS refused to clear two shipments of 105 long-tailed macaques and 84 long-tailed macaques, respectively, with a reported value of $1,837,500 and $1,470,000, respectively ($3,307,500 in total reported value) from KF Cambodia to Charles River at Houston International Airport in Texas.

149. In total, permits for 1,269 purportedly captive-bred long-tailed macaques from KF Cambodia with a market value over $17.4 million were refused by the USFWS, which represented nearly 8% of the total NHPs used by Charles River in 2022 as reported by the USDA.

### P. September 28-29, 2022 Bloomberg and Jefferies Reports

150. On September 28, 2022, *Bloomberg* published an article titled "Lab Monkeys Are the Latest Covid Shortage; Beijing's ban on macaque exports—needed to test vaccines and other lifesaving drugs—could give its pharma industry an edge" that stated:

> With the shortage has also come a spike in costs: Average price[s] have more than doubled since just before the pandemic . . . to about . . . ($11,000) per animal. One research industry executive says it's worse in some cases, rising to more than $35,000 per primate at times . . . .

151. On September 29, 2022, Jefferies issued a research report titled "Dramatic NHP Supply Changes Explain Mgt's Confidence" that described the NHP supply shortage and nearly 500% price increase in three years and stated "[w]e believe this is new information to the market," and that this trend was driving growth in Charles River's Safety Assessment "pricing, revenue and backlog" and was material to Charles River's outlook.

152. According to the September 29, 2022 Jefferies report, NHP demand for use in preclinical studies was driving most of Charles River's pricing, revenue and backlog growth in the Company's DSA segment:

> Secularly, pipeline evolution toward large molecules and advanced therapies is increasing demand for NHPs, the model of choice for preclinical studies (immune system biology). This supply/demand imbalance is driving a ~6x price increase over 3 yrs, based on data we've pulled together. If China becomes a net importer

of NHPs for the first time, the price squeeze could actually accelerate. **This scenario is positive for CRL and other CROs offering NHP tox studies**, but exposes the tenuous NHP supply chain.

**NHP Pricing in DSA Overwhelms Broader Weakness**. NHP pricing benefits research model suppliers, but also DSA businesses that price NHPs into studies. Protecting, if not enhancing, DSA margin is the dynamic that SA study protocols often are finalized shortly before study start (not at time of booking), so NHP prices can be "marked to market" proximate to study start. We believe NHPs account for DSA's stronger pricing, revenue growth, and bookings deep in the future. For CRL, we estimate 48% of SA revenue will come from NHP studies in '23, up from 24% in '20, which assumes only 4% volume growth but 40% price growth annually. This strength is sufficiently covering up softness in Discovery and non-NHP SA, which we believe were flattish on a CC basis in 1HQ22.

**'23 Guidance Likely Exceeds Consensus**. Using current NHP pricing of $20K-$25K per model and conservative assumptions, we think DSA revenue can exceed current consensus ($2.54B) while absorbing 180 bps of incremental FX headwind since 2Q and LSD% declines in Discovery and non-NHP SA (Exhibit 3). Elevated DSA cancellations are anticipated, mitigated by an unusually large backlog, particularly for large animal (canines, NHPs) studies. A 10% NHP price increase should drive $100M of DSA revenue. . . .

**NHPs create an unusual moat for CRL, as 1 of 2 NHP players**. The drug pipeline is not moving away from large molecule, and the supply challenge is not quickly solvable.

153. According to the September 29, 2022 Jefferies report, Charles River's DSA-segment margins were positively impacted by the shortage of long-tailed macaques and related price increases:

Exhibit 5 - CRL's Vertically Integrated Model In NHP SA Has Likely Allowed For Meaningful Gross Margin Expansion



154. On September 30, 2022, *Reuters* published an article titled "BUZZ-Charles River jumps after Jefferies raises to 'buy' on lab monkey shortfall," that stated:

> ** Shares of contract research firm Charles River Laboratories International Inc rise ~8% to $205.30 after Jefferies upgrades rating to "buy" from "hold"
>
> ** Brokerage also raises PT by $10 to $240; believes China's halt on non-human primate (NHP) exports is driving prices higher in co's clinical trial business; fears scarce supply may not abate

**Q. The DOJ Indictment of Charles River's Suppliers**

155. On November 16, 2022, the Indictment was unsealed in which two Cambodian government officials responsible for implementation and oversight of CITES, and six executives of the Vanny Group were charged with taking part in a smuggling scheme involving long-tailed macaques.

156. The indictment identified two unnamed co-conspirators—a Florida company with its principal place of business in the Southern District of Florida that was engaged in the importation and sale of NHPs, including long-tailed macaques, and a Texas company with its principal place of business in Alice, Texas.

157. The unnamed co-conspirators were Worldwide Primates in Miami, Florida, and Inotiv or its subsidiaries Orient BioResource and Envigo, in Alice, Texas.

158. The action was captioned *U.S. v. Omaliss Keo, et al.*, 22cr20240 and filed in U.S. District Court for the Southern District of Florida. According to a DOJ press release, dated November 16, 2022:

> Members of an international primate smuggling ring have been charged with multiple felonies for their role in bringing wild long-tailed macaques into the United States.
>
> The eight-count indictment charges two officials of the Cambodian Forestry Administration, Ministry of Agriculture, Forestry and Fisheries; the owner/founder of a major primate supply organization and its general manager; and four of its employees with smuggling and conspiracy to violate the Lacey Act and the

Endangered Species Act. The defendants facing these felony charges are:

- Omaliss Keo, 58, of Phnom Penh, Cambodia, Director General of the Cambodian Forestry Administration, Ministry of Agriculture, Forestry and Fisheries

- Masphal Kry, 46, of Phnom Penh, Cambodia, Deputy Director of the Department of Wildlife and Biodiversity for the Cambodian Forestry Administration, Ministry of Agriculture, Forestry and Fisheries

- James Man Sang Lau, 64, of Hong Kong, Founder/Owner Vanny Resources Holdings, Ltd., and Vanny Bio Research (Cambodia) Corporation Ltd.[19]

- Dickson Lau, 29, of Hong Kong, General Manager Vanny Resources Holdings Ltd.

- Sunny Chan, a resident of Hong Kong, Deputy General Manager (Operations) at Vanny Group

- Raphael Cheung Man, 71, of Phnom Penh, Cambodia, Public Relations and Export Manager for Vanny Bio Research (Cambodia) Corporation Ltd.

- Sarah Yeung, a Hong Kong resident and Finance Officer of Vanny Group

- Hing Ip Chung, 61, of Phnom Penh, Cambodia, General Manager of Vanny Bio Research (Cambodia) Corporation Ltd.

If convicted, each defendant faces up to 5 years in prison on the charge of conspiracy in count 1 and up to 20 years imprisonment on each of the smuggling charges in counts 2 through 8. There also are potential fines with respect to each count of up to $250,000 or twice the financial gain to the defendants.

159. The Indictment alleged that Mr. Lau and Dickson Lau, operating from Hong Kong, owned and managed a series of related corporations (Vanny Group) that conspired with black market collectors and corrupt officials in Cambodia to acquire wild-caught macaques and launder them through the Cambodian entities for export to the U.S. and elsewhere, falsely labelled as captive bred.

160. In order to make up for a shortage of suitable monkeys at the putative breeding

[19] Mr. Lau, as noted above, is affiliated with Vanny Chain Tech, which is a joint venture partner with the government of Vietnam in Nafovanny.

facilities in Cambodia, the co-conspirators enlisted the assistance of the CITES authority in Cambodia and the Ministry of Agriculture, Forestry and Fisheries (MAFF) to deliver wild-caught macaques taken from national parks and protected areas in Cambodia. These macaques were taken to breeding facilities and provided false CITES export permits. A collection quota of 3,000 "unofficial" monkeys was allowed, for which MAFF officials received cash payments.

161. The conspiracy charge of the indictment listed 31 representative "overt acts" undertaken by one or more of the co-conspirators in their efforts to carry out their criminal enterprise. These included meetings, financial transactions, shipments of hundreds of macaques—wild caught mixed in with captive bred—to locations in Florida (Worldwide Primates) and Texas (Inotiv) under false documents. Wild long-tailed macaques also were said to have been delivered by defendant Kry and other employees of MAFF to a facility in Pursat, Cambodia.

162. Between December 2017 and September 2022, Kry was alleged to have taken part in conversations regarding the pricing for wild macaques to be captured and delivered to monkey breeding facilities operated by the co-conspirators. Kry, who participated personally in delivering these "unofficial" macaques to the facilities, including Vanny Cambodia, also was provided payments for the illegal monkeys from the co-conspirators.

163. The Indictment alleged, in part, the following:

> 4. The defendants and their unindicted co-conspirators established facilities in Cambodia purporting to breed long-tailed macaques for sale on the world market.
>
> 5. The defendants and their unindicted co-conspirators engaged with customers in the United States and elsewhere and entered into contractual agreements to sell and export purportedly captive-bred macaques from Cambodia to the United States.
>
> 6. The defendants and their unindicted co-conspirators established a logistics system to allow buyers to inspect macaques prior to sale, including through the use of veterinarians, to test the monkeys for disqualifying conditions, quarantine shipments prior to export, and arrange the necessary ground and air transportation

to facilitate the transactions.

7. The defendants and their unindicted co-conspirators arranged to illegally purchase additional long-tailed macaques from black market suppliers in Cambodia and Thailand to make up for the lack of supply of suitable monkeys at their purported breeding operations. The blackmarket suppliers, including MAFF, identified in Vanny HK and VBRC records through the use of the letters A, B, C, D, E, F, G, H, K, P, and X, would primarily deliver the illegally acquired monkeys to the VBRC facility at Pursat.

8. The defendants and their unindicted co-conspirators utilized the services of MAFF and its employees to further the purpose and objects of the conspiracy, and:

a. To secure CITES export permits which falsely identified wild-caught macaques as captive bred in the VBRC facilities;

b. To act as the source, under the designation of Black Market Supply "A," of wild-caught macaques from National Parks and protected areas which MAFF employees delivered to VBRC for later sale and export;

c. To provide Transport Permits which allowed macaques unsuitable for the export trade to be sent from the Pursat facility to the Phnom Penh facility where they were euthanized and their identification tags transferred to wild-caught macaques to make it appear the black-market monkeys were captive bred at VBRC facilities;

d. To provide unofficial collection quotas, for which cash payments to MAFF were authorized at Vanny HK and made by VBRC employees.

9. The defendants and their unindicted co-conspirators delivered and caused the delivery of wild-caught long-tailed macaques to various international airports in the United States, accompanied by Cambodian CITES Permits and FWS Form 3-177s falsely identifying the monkeys as captive bred.

10. Upon entry into the United States, the long-tailed macaque shipments would be forwarded by truck from the port of entry to a quarantine facility designated by the importers/consignees, who were located in various states, including the Southern District of Florida.

164. On November 17, 2022, Inotiv filed a report with the SEC on Form 8-K that stated the Indictment had "criminally charged employees of **the Company's principal supplier of non-human primates ("NHPs"),** along with two Cambodian officials, with conspiring to illegally

import NHPs into the United States from December 2017 through January 2022 and in connection with seven specific imports between July 2018 and December 2021." (Emphasis added).

165. At the time, investors were unaware that Inotiv was a material supplier of Cambodian long-tailed macaques to Charles River. Indeed, analysts concluded that Charles River had no exposure to Vanny Cambodia or Inotiv and in fact could benefit from a further restriction of the supply of long-tailed macaques. On November 29, 2022, Wells Fargo issued a research report concerning Charles River that stated "**pre-clinical CROs with secure supply, such as CRL who has no direct or indirect exposure to the supplier in question, could stand to benefit** from share gains as well as increased pricing power as a result of potential price elasticity leaking into the small animal model market (CRL does not breed/sell NHPs, only small animal models) supported by the FDA's 1Q22 guidance update effectively increasing the fungibility of large animal models for small animal models in-lieu of NHP shortages . . . ." (Emphasis added).

## V. DEFENDANTS CHARLES RIVER'S AND FOSTER'S MATERIALLY FALSE AND MISLEADING STATEMENTS

166. On November 30, 2022, Charles River filed a report with the SEC on Form 8-K that stated the following in advance of Defendant Foster's representations at the Evercore ISI 5th Annual HealthCONx Conference:

> a. Charles River was not named or referenced in the DOJ proceedings, and **the Company does not have any direct supply contracts with the indicted Cambodian supplier**.
>
> b. **Charles River has global supply sources, including other sources in Cambodia**, which is the primary country of origin of NHP imports to the United States and to Charles River. However, in light of the indictment, and subsequent statements made by the Cambodia government, Charles River is operating under the expectation that for some time period supply of Cambodia-sourced NHPs will be difficult to obtain in the United States; and
>
> c. The Company is diligently working to mitigate any Cambodia NHP supply impact with ongoing efforts to procure NHPs under different supply arrangements and from other global sources.

167. During the Evercore ISI 5th Annual HealthCONx Conference, Defendant Foster made the following statements:

> **Elizabeth Hammell Anderson Evercore ISI Institutional Equities, Research Division - MD & Fundamental Research Analyst**: I know this has become a hot topic this fall, but can you sort of provide us an update with supply situation given recent developments, there's been a lot of speculation and whatnot. So how does that -- what's the lay of the land right now on that?
>
> **Defendant Foster**: So very complex. NHP situation is always complex. It's a very fluid situation, and NHPs have been an increasingly higher demand over time as biologics have exploded and that's kind of the model of choice for testing biologics. And during recent times, we've seen analysts and media reports talk about pricing and supply chain. And most recently, there's been an indictment of one of the Cambodian NHP suppliers.
>
> So we get a bunch of our NHPs from Cambodia. Charles River was named or referenced and these proceedings that charge the Cambodian supplier, there were also a couple of Cambodian officials that were named in this indictment, and **we don't have any direct contacts with that supplier either**. So the supplier runs [afoul] of the sort of transportation and shipping laws with the Department of Justice and they pulled back. So we have -- as we've talked about a lot, we worked arduously for the last few years, in particular, to have additional supply sources, which we have.
>
> We have multiple supply sources and multiple suppliers in individual countries, including Cambodia, but Cambodia is still the primary country of origin of most of the imports into the U.S. and into Charles River. But in light of this indictment and subsequent statements made by the Cambodian government, we anticipate that for some period of time, there's going to be some disruption and difficulty in getting NHPs into the U.S. That is speculation. We have no idea how pronounced that will be, how long it will be.
>
> And as I said, it's totally fluid. Obviously, we're **working really hard to mitigate any potential adverse impact with other supply sources with our current supplier in Cambodia**, with government, et cetera. So we're all over this to enhance and improve our supply arrangements. And I guess the last thing I would say is we work really hard with our supplier due diligence in terms of their management practices, veterinary practices, shipping practices, husbandry practices to ensure the quality of the supplier relationships and to ensure that what we do is fully compliant with U.S. and international regulations.
>
> So really complex [] situation at the moment, more complex by the fact that **one of the big suppliers from Cambodia, who's not a supplier of ours is unable to ship. So that's going to hurt some folks.** And we have a little bit of a dialogue from government officials who were displeased with the action taken by the DOJ

with regard to one of the Cambodian suppliers. They were, I think, defensive and a bit reverent about the U.S. government saying that things aren't being done well that there's – we're concerned about some pushback by the government. So we don't know that for a fact, but watching it closely. So I would say that the complex NHP situation at the moment is more complex, but we're confident that we will work through as well.

**Elizabeth Hammell Anderson Evercore ISI Institutional Equities, Research Division - MD & Fundamental Research Analyst:** Got it. And then when do you sort of see like from a COVID perspective, like obviously, there's been changing in the supply arrangement. When do you see that supply constraint kind of easing? Is that like a -- like a cross 2023 event? Is that more of a 2024 event in terms of supply increases in that market?

**Defendant Foster:** Tough to say. I would say as a general proposition, we have had a sufficiency of supply for '22. And directionally, have had – have developed sufficient supply for the next fiscal year, subject to our now concern that the government of Cambodia could be problematic. So I think that we have and will continue to do a really positive job in staying close to our suppliers, increasing our relationships with our suppliers both contractually and otherwise, we have some joint ventures. We have the elongation of contracts. We have new geographies.

COVID made it a little bit difficult for us to go and inspect all of these facilities. **Facility that we work with in Cambodia is extremely high quality one, all the ones that we work with are high quality ones.** So we'll keep up that oversight and our intention, obviously, is to work really hard. So we don't have any disruption of supply for ourselves and obviously for our clients. . .

**Elizabeth Hammell Anderson Evercore ISI Institutional Equities, Research Division - MD & Fundamental Research Analyst:** . . . Is there anything you can say on either one, the percentage of revenues from NHPs and then -- or maybe like the percent of NHP supply that comes from Cambodia and sort of like -- can you replace all of that? Can you replace most of it? Is that like a work in progress? Is there anything else you can say on that front?

**Defendant Foster**: Sure. Without being too granular, it's a -- the majority of the animals that come for everyone, including us at the moment from Cambodia. So it's a central supply source. And just a quick history for people that don't recall, most of the monkeys used to come from China, who stopped shipping them a couple of years ago to keep them in China for their own benefit. So we all pivoted to Cambodia where the quality is actually good, and the genetics is similar and the health status is good and the numbers are good. So -- and **we have a really good supplier over there and a good relationship and a big supply contract**.

So if we don't have undue government -- Cambodian government intrusion and preventing that from happening, it's possible we'll be fine. This is just -- and obviously, we have other sources of supply, some of which we've had for years,

> some of which are new, some of which are more nascent than others and kind of the background data on the animal models is not quite as well known, but I do think that both we and our clients will be comfortable using whatever models are available because we don't want to just have a chilling effect on drug development.
>
> So – it's -- this whole thing is so new, the sort of allegations on the supplier in Cambodia was sort of dramatic. **It's not a supplier of ours. It's not directed to us**. . . . So has no real short-term impact. We'll do everything we can to reduce the impact, obviously, on our clients.

168. Defendants Charles River's and Foster's representations that Charles River did not have any "direct supply contracts" with the specific Vanny Group company whose executives were indicted (Vanny Cambodia) and that the facility "we work with in Cambodia is extremely high quality one, all the ones that we work with are high quality ones" were materially false and misleading because Charles River and Foster failed to disclose Charles River had obtained long-tailed macaques indirectly from the Vanny Group through the unnamed co-conspirators in the Indictment, Worldwide Primates and Inotiv through Envigo and Orient BioResource. Moreover, Defendant Foster's statement that the Indictment was "not related to us," was materially false and misleading because it failed to disclose that, in September 2022, the USFWS had already refused or rejected Charles River's import of long-tailed macaques from its direct supplier, KF Cambodia, in connection with its ongoing criminal investigation and, like Vanny, KF Cambodia was unable to export to the U.S.

169. Defendants' misrepresentations created a false impression with investors and analysts that Charles River's supply chain did not include suppliers mentioned in or implicated by the Indictment.

170. On November 30, 2022, UBS issued a research report concerning Charles River that based on Foster's false statements "we believe the impact of this news to be modest, but note that the Discovery and Safety Assessment (DSA) business performs a wide variety of studies, some of which require NHPs. . . we believe the issues to be temporary and note that the company

is already working to obtain supply from alternative sources."

171. Also on November 30, 2022, Stephens issued a research report concerning Charles River that stated the following:

> this is new news to ourselves and the Company . . . CRL does not have any direct supply contracts with the indicated Cambodian supplier. However, CRL did suggest there could be an impact on the export of these models out of Cambodia in the near-term (CRL's largest NHP supplier is located in Cambodia).
>
> **Some Context**. . . . If we assume NHPs generate $40 thousand - $60 thousand of revenue/animal, this would imply $545 mil. - $818 mil. of revenue from NHPs in FY22. This would represent ~28% of DSA revenue or ~17% of FY22 revenue.
>
> • CRL said today the majority of their (and the industry's) NHPs come from Cambodia after China stopped exporting in recent years. . . .
>
> • CRL does not believe this will impact near-term results, but it could impact their FY23 outlook.

172. On December 15, 2022, UBS published a research report that, in response to Charles River's statements on November 30, 2022, stated that "[w]e think CRL would be in a positive position relative to peers in case of a[n] export ban from Cambodia, due to its alternatives sources and could potentially leverage further price increases due to the shortages."

## VI. <u>THE TRUTH IS REVEALED</u>

173. Through a series of partial disclosures, the truth that Defendants' materially false and misleading representations concealed was ultimately revealed.

174. On January 12, 2023, Jefferies published a research report titled "Sponsor Survey; CRL to Hold on Weak Early Dev and NHP Risks," that began to reveal that, in contrast to Defendants' representations on November 30, 2022 that Vanny was "not a supplier of ours," approximately 24% of the Company's NHP's supply relied on the indicted supplier likely through an indirect relationship:

> Our previous NHP supply chain work concluded CRL's NHP tox business was in a privileged position and controlled its own destiny. **The indictment of Vanny and**

**other Cambodian officials alters that viewpoint** as we estimate ~24% of CRL's U.S. NHP usage relies on Vanny supply (likely through an indirect relationship), a perspective underappreciated by investors. Immediately finding new supply in an undersupplied market seems unlikely, putting at risk a high growth contributor. . .

In our upgrade of CRL shares in late September, we captured data on NHP export/import dynamics by country, but not organization, and did not realize how important one breeding farm was to the global NHP supply picture. The SDOF DOJ's indictment of Vanny and Cambodian gov't officials shed light on this dependence and now alters the global supply chain. After further investigation we believe CRL received 20%+ of its NHP supply from Vanny in '21 and '22, through an indirect relationship. The situation between Vanny and the SDOF DOJ, combined with the DOJ's detailed indictment by shipment and willingness to prosecute complex cases of this nature, make us cautious about Cambodian availability. . .

CRL issued in a statement that, "the Company [CRL] does not have any direct supply contracts with the indicted Cambodian supplier [Vanny]". However, data suggests that other Cambodian suppliers do not export enough animals to fill the 50% of total NHPs that CRL gets from Cambodia . . . .

From public data sources, we know that the number of NHPs exported to the U.S. from Cambodia has hovered around 19,000/year. In our channel checks, we were told that Vanny supplied between 40-50% range of total US NHPs. This was supported by a tweet from the head of Cambodia's Ministry of Agriculture, Forestry and Fisheries (MAFF), Dith Tina. According to Mr. Tina, Vanny has exported an average of ~13,500 HNPs annually into the U.S. over the last 3 years which coincides with the 40-50% range of U.S. supply we hear from industry contacts. That would leave the number of Cambodian NHPs from non-Vanny sources at ~4,000/year over the last 2 years.

We then compared non-Vanny exports to CRL imports. CRL uses ~17,000 NHPs in U.S. tox studies each year. Allowing for some double-counting in certain types of studies (per CRL), the 4,000 does not come close to the 50%+ from Cambodia of CRL total imports (17,000 – minus the double-counted). . . . which would suggest that CRL is getting 3,500+ NHPs from an intermediate supplier than does source from Vanny.

Industry conversations have backed our analysis on CRL's NHP suppliers . . . .

Exhibit 4 - CRL Likely Getting Some NHPs from Vanny

| | 2020 | 2021 | 2022TD | | Source: |
|---|---|---|---|---|---|
| (1) Cambodian Exports to US | 19,751 | 18,586 | 17,278 | | *Public Data* |
| (2) Vanny Exports to US | 12,978 | 14,684 | 13,102 | | *Dith Tina Tweet* |
| (3) **Cambodian Exports, Non-Vanny** | **6,773** | **3,902** | **4,176** | (1)-(2) | |
| (4) CRL NHP Usage (US only) | 15,769 | 17,105 | 15,675 | | *Public Data* |
| (5) CRL Reused | 2,057 | 2,231 | 2,045 | | *Reuse rate: 15%* |
| (6) CRL Imports | 13,712 | 14,874 | 13,630 | (4)-(5) | |
| (7) **CRL Cambodian Imports** | **7,542** | **8,181** | **7,497** | (6)*55% | *% CRL Imports from Cambodia: 55%* |
| (8) **CRL Imports from Vanny** | **769** | **4,279** | **3,321** | (3)-(7) | |

Source: Public Data and Jefferies

175. On January 12, 2023, Charles River's stock declined from a close on January 11, 2023 of $246.94 per share to close at $232.25 per share, a decline of $14.69 per share, or approximately 6% on heavier than usual trading volume.

176. Analysts connected the revelations in the January 12, 2023 Jefferies report to the decline in Charles River's stock price. For example, on January 12, 2023, Bloomberg published an article titled "Charles River Falls as Jefferies Cuts on Primate Supply Risk" that reported that Charles River stock had declined as much as 6.8% after Jefferies downgraded the stock due to "'heightened uncertainty'" around non-human primate supplies, and that Charles River's common stock was the worst performing stock in the S&P index on January 12, 2023.

177. Then on February 22, 2023, before the market opened, Charles River revealed that, contrary to Foster's representations on November 30, 2022 that "one of the big suppliers from Cambodia, who's not a supplier of ours is unable to ship. So that's going to hurt some folks" and that "[the] [f]acility that we work with in Cambodia is extremely high quality one, all the ones that we work with are high quality ones," the Company revealed that it was voluntarily suspending shipments of NHPs from Cambodia—which accounted for over 60% of the Company's NHP supply—and that this would negatively impact its earnings for 2023 and would reduce revenue growth by approximately $80-160 million for the Company's Safety Assessment business. The Company further disclosed procedures it used to ensure that its importation of NHP's was compliant with U.S. law were inadequate, and that new, additional procedures were needed to

ensure that NHPs imported by Charles River into the U.S. from Cambodia were purpose-bred. The Company also disclosed that the DOJ and USFWS were investigating Charles River's conduct and its direct supplier (KF Cambodia) regarding shipments of NHPs from Cambodia that were seized at the U.S. border before the start of and during the Class Period.

178. The Company's press release titled "Charles River Laboratories Announces Fourth-Quarter and Full-Year 2022 Results and Provides 2023 Guidance," revealed the following:

> James C. Foster, Chairman, President and Chief Executive Officer, said, . . . "2023 presents challenges with respect to NHP supply that we will proactively manage . . . .
>
> **<u>U.S. Department of Justice Investigation into Non-Human Primate Supply Chain</u>**
>
> On February 17th, the Company received a subpoena from the U.S. Department of Justice relating to an investigation into the Cambodian non-human primate (NHP) supply chain. The Company has been informed that **this investigation relates specifically to several shipments of NHPs received by Charles River from its Cambodian supplier**. Charles River intends to fully cooperate with the U.S. government as part of their investigation. Due to ongoing investigations and the heightened focus on the Cambodian NHP supply chain in recent months, Charles River has voluntarily suspended NHP shipments from Cambodia at this time.
>
> **<u>2023 Guidance</u>**
>
> The Company is providing financial guidance for 2023. The 2023 revenue growth outlook reflects the impact of NHP supply constraints, which is expected to reduce our consolidated revenue growth forecast by approximately 200 to 400 basis points this year. This will pressure the DSA segment's revenue growth rate in 2023 . . . .
>
> Earnings per share in 2023 will be affected by the impact of NHP supply constraints. . . .

(Emphasis added).

179. Also on February 22, 2023, following the issuance of the press release and before the market opened, Charles River hosted a conference call with investors and analysts in which Defendant Foster participated. The following statements were made during the conference call:

**Defendant Foster:** I want to provide an update on the nonhuman primate or NHP supply situation. As many of you are aware, there has been an ongoing industry-wide investigation into NHP imports from Cambodia.

On February 17, we received a subpoena from the U.S. Department of Justice related to an investigation into the Cambodian NHP supply chain. We have been informed **this investigation relates specifically to shipments of NHPs received by Charles River from our Cambodian supplier**. . . .

Based on ongoing investigations and a heightened focus on the Cambodia NHP supply chain, in recent months, we have voluntarily suspended planned future shipments of Cambodian NHPs **until such time that we and the U.S. Fish and Wildlife Service can develop and implement new procedures to reinforce confidence that the NHPs we import from Cambodia are purpose-bred. This will take time to implement and the duration of which is unknown.**

**The investigation in current NHP supply situation will result in study delays in our Safety Assessment business**. By way of background, NHPs are the most scientifically relevant large model for the regulatory required safety testing of biologic drugs as mandated by the FDA and other international regulatory agencies.

Biologic drugs cannot be approved for commercial use without NHPs. And given the proliferation of biologic drug development activity in recent years, NHPs have been in high demand. . . . In recent years, NHPs sourced from Cambodia have been responsible for approximately 60% of the NHPs supplied to the United States and to Charles River for drug research and development. While there is no other near-term global source to replace this supply, we are continuing to actively work to diversify our NHP supply chain. . . .

The current Cambodian NHP supply constraints and the corresponding impact to our Safety Assessment business are expected to reduce our consolidated revenue growth forecast by approximately 200 to 400 basis points this year, resulting in organic revenue growth guidance of 4.5% to 7.5% for the total company.

The non-GAAP earnings per share are expected to be in a range of $9.70 to $10.90 in 2023 with the wider ranges encompassing a number of scenarios related to the timing of the resumption of Cambodian NHP imports this year. . . .

***

**CFO Pease**: Our 2023 guidance ranges reflect multiple scenarios with regards to the estimated impact from the NHP supply constraint, as [Defendant Foster] outlined, the impact of which is expected to result in reported revenue growth of 1.5% to 4.5% and organic revenue growth of 4.5% to 7.5% in 2023. . . As a reminder, the Cambodian NHP supply situation does not have an impact on our RMS segment as these large models are sourced and used to support our Safety Assessment operation.

> For the DSA segment, we expect the organic growth rate will be between low to mid-single digits based on our NHP supply assumptions around the timing of the resumption of imports. . . .
>
> For the operating margin, we would have expected to generate moderate margin improvement in 2023 without an NHP supply impact. But given this meaningful headwind, we expect the 2023 operating margin to be flat to down 150 basis points depending on the timing of the resumption of Cambodia NHP shipment. . . .

(Emphasis added).

180. During the question and answer segment of the conference call, an analyst asked Defendant Foster about the impact of the criminal and civil investigations on the Company's customers, to which Defendant Foster stated:

> **Defendant Foster**: . . . with regard to Cambodia, where 60% of the animals come from, we are all at least temporarily foreclosed from bringing new animals in and utilizing them on studies in the United States. . . .
>
> So we are -- our focus now is to work with [USFWS] to come up with a collaborative methodology that they're in agreement with, and we can execute to show parentage, which is sort of the underlying issue here. . . They're saying that they're concerned about parentage. . . .
>
> ***
>
> **Daniel Louis Leonard - Crédit Suisse AG, Research Division - Research Analyst**: And if I could ask a quick follow-up, can you help me better understand the complexity of showing parentage for NHPs? Presumably, this isn't just a 23andMe test. It's more complicated than that, but I'd love to be able to better understand that?
>
> **Defendant Foster:** Yes. It's -- I don't think it's all that complicated. You just – you're proving genetics. And there are also sort of genetic assays that are available.

181. Furthermore, Defendant Foster confirmed that USFWS blocked the use of long-tailed macaques from KF Cambodia until the Company could confirm that the animals were legally sourced:

> **Defendant Foster: . . .** Subpoena is relatively recent, Eric. And we're a subject here, meaning that they want to get information from us. Just to back up, you know that another Cambodian supplier was indicted in November, and that's not

somebody that we work with. And [we think] a couple of our competitors [] work with, and that started the whole questioning and to prove through the methodology. And so they are now looking at all of the suppliers in Cambodia, one of whom we get our monkeys from. . . .

***

**Defendant Foster**: . . . The U.S. government is saying, you can't bring them in yet. And the ones that you have in country, and we have some in country, you can't use yet until we sort of work out and ensure that they are indeed purpose-bred. . . .

182. During the February 22, 2023 conference call, analysts asked Defendants Foster whether the NHP supply constraints in 2023 could impact the Company's 2024 financial results. In response, Defendant Foster refused to answer, stating "I don't want to comment on what the impact is in '24" and "I'm going to stay away from '24."

183. Also on February 22, 2023, before the market opened, Defendant Foster caused Charles River to file the 2022 10-K with the SEC, which was signed by Defendant Foster. The 2022 10-K stated the following:

in November 2022 the U.S. Department of Justice (DOJ) announced that a Cambodia supplier of non-human primates and two Cambodian officials had been criminally charged in connection with illegally importing non-human primates into the United States. While the Company was not named or referenced in the November 2022 proceedings, **the Company shortly thereafter announced that Cambodia was the primary country of origin of non-human primates imports to Charles River**, and that it had begun to operate under the expectation that for some time period supply of Cambodia-sourced non-human primates (which according to CDC statistics, account for approximately 60% of supply to the United States) would be difficult to obtain in the United States. Subsequent to the Company's announcement, USFWS denied clearance to certain shipments of non-human primates the Company had received from Cambodia. . . .

***

***U.S. Department of Justice Investigation into Non-Human Primate Supply Chain***

On February 16, 2023, we were informed by the U.S. Department of Justice (DOJ) that in conjunction with the U.S. Fish and Wildlife Service (USFWS), it had commenced an investigation into our conduct regarding several shipments of non-human primates from Cambodia. On February 17, 2023 we received a grand jury

> subpoena requesting certain documents related to such investigation. We are aware of a parallel civil investigation being undertaken by the DOJ and USFWS. . . . we have voluntarily suspended future shipments of non-human primates from Cambodia until such time that we and USFWS can agree upon and implement additional procedures to reasonably ensure that non-human primates imported to the United States from Cambodia are purpose-bred. While these discussions with USFWS are ongoing, we have also agreed to continue to care for the Cambodia-sourced non-human primates from certain recent shipments that are now in the United States. The carrying value of the inventory related to these shipments is approximately $20 million. . . . .

(Emphasis added).

184. On this news, Charles River's stock price declined from a close on February 21, 2023 of $243.60 per share to close at $219.09 per share at the close of trading on February 22, 2023, a decline of $24.51 per share, or over 10% on unusually heavy trading volume.

185. Analysts that covered Charles River attributed the stock price decline to the disclosures on February 22, 2023. For example, Citi Research issued a report that stated "[w]e expect the biggest negative driver of the stock today to be the discussion around the impact of the DOJ subpoena and the NHP supply dynamics given the 200-400[basis points] revenue headwind and the $1.30 impact to 2023 EPS at the midpoint."

186. On February 23, 2023, Jefferies published a research report titled "4 Key Insights+: CRL 4Q22" that stated:

> The previous view was that the DOJ might be gathering information from industry players to better inform its previously disclosed case against Vanny and Cambodia MAFF officials. Now, **this is a grand jury investigation and specifically into CRL conduct**. . . .
>
> A frequent investor response in the context of these NHP supply issues has been "won't they just find other suppliers/more volume?" In 1Q23, statements by CRL's primary competitor that it had secured domestic supply and added more NHP vendors.
>
> Investors and observers of this situation should keep in mind the parameters.
>
> • These animals generally have one offspring per pregnancy, not a litter. This point was reinforced on CRL's call.

> • The gestation period is ~6 months.
> • The "yield" of research animals annually is ~20% of the breeding stock.
> • **Multiple mgt teams in this sector have told us that building up an adequate breeding stock to supply research animals takes years.** Mr. Foster called CRL's previous effort a decade of losses.
> • These animals have been in short supply for years, and more specifically since China stopped exporting. CRL mgt mentioned 2018. We see China imports to the US going to zero in the US data in 2H20. One should assume that preclinical players have been exhausting sources of additional supply for a couple of years. This didn't just start in the last 6 months.
> • Total US imports had averaged 31.6k in '18-'19. In 2020, that dropped to 28.9k with China ceasing exports during the year. However, that recovered to 32.3k in 2021.
> • Cambodia increased from ~11.4k US imports in 2019 to 18.6k US imports in 2021. The ex-US volumes are not adequate to explain the difference (e.g., if Cambodia pivoted a bunch of volume away from ex-US clients to US).
> • **How did Cambodia ramp to that? Based on the DOJ's actions, the answer may be . . . illegally**.
>
> We acknowledge the country of origin does matter. What makes the alleged actions by Vanny illegal is 1) shipping wild-caught animals for research is illegal in Cambodia. . . . 2) Falsifying the export documents (saying wildcaught NHPs are captive-bred) is a violation of the Lacey Act. . . .
>
> Long story short, **if a player in the NHP market (RMS or DSA) says they've secured thousands more animals from Cambodia, we should be cautious until either a "parentage" test is successfully developed and scaled or the DOJ is unsuccessful in its case to show illegal wild-catching of NHPs in Cambodia**.

(Emphasis added).

## VII. THE END OF THE CLASS PERIOD

187. The Class Period ends on March 15, 2023 when it was revealed that, in contrast to Foster's representation on November 30, 2022 that the indictment would "ha[ve] no real short-term impact," the Company faced revenue and earnings headwinds from NHP issues into 2024, and Foster admitted for the first time that, in contrast to his false representations on November 30, 2022 that concealed the fact that Charles River had obtained long-tailed macaques indirectly from Vanny Cambodia through the unnamed co-conspirators in the Indictment, and that all the Company's NHP suppliers were "high quality," Charles River had, in fact, sourced NHPs from

animal brokers like Envigo or Orient BioResource and WW Primates that do not "care where the animals come from or what the background is."

188. Specifically, on March 15, 2023, a Baird Equity Research revealed an NHP headwind that would be particularly strong in the second quarter of 2023 ("2%-4% headwind from NHP issues. Decremental margins on NHP, higher interest expense, and higher tax rate drive EPS -13% to -2%"), forecasted reduced Charles River's revenue and earnings for 2024 and cut the price target for Charles River stock from $283 per share to $268 per share, or by over 7%.

189. Also on March 15, 2023, Barclays hosted a conference call for analysts and investors in which Defendant Foster participated on behalf of Charles River during which Foster revealed the following:

> **Barclays Research Analyst:** we've heard from [] some early-stage customers that have managed to supply enough of their NHPs from U.S. bred sources. Where would those be coming from? . . .
>
> **Defendant Foster:** So there are no U.S. breeding sources. There are a couple of companies that sort of brokers that get animals from wherever. **We have used those folks to some extent historically.** I'm trying to be careful picking my words here. **We prefer not to use them. Reputationally, I just don't think they're the best possible people to use. And I don't actually think they care where the animals come from or what the background is** and they've been kind of inappropriate with pricing. So there are probably -- people say there are, I assume they're telling the truth. There are probably animals in country brought in from the outside, including it could be from Cambodia. It could be from the source that DOJ is looking at. I don't know that. We're just not using them, number one. Number two, I don't think it's large numbers of the [animals]. Number three, I don't know how sustainable that is. . . .

(Emphasis added).

190. On March 15, 2023, Charles River's stock declined from a closing price on March 14, 2023 of $205.02 per share to close at $194.90 per share, a decline of $10.12 per share approximately 5%, on heavier than usual trading volume.

191. On March 30, 2023, Charles River filed its 2023 Proxy Statement pursuant to Section 14(a) of the Exchange Act on Schedule 14 that stated:

> We recognize that recent events have raised questions regarding non-human primate importation practices, which are affecting the biomedical research industry, including investigations into shipments of non-human primates received by our Company from Cambodia. We are committed to working with the U.S. government and our industry partners to develop and implement additional procedures to reinforce confidence that the non-human primates we import are purpose-bred in accordance with applicable laws.

## VIII. CLASS ACTION ALLEGATIONS

192. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Charles River securities during the period November 30, 2022 and March 15, 2023, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

193. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Charles River's common stock actively traded on the NYSE. As of January 25, 2023, there were 50,985,527 shares of Charles River common stock outstanding. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Charles River shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by Charles River or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

194. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

195. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

196. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period were materially false, misleading and omitted and misrepresented material facts about the business, operations, and prospects of Charles River; and

c. to what extent the members of the Class have sustained damages and the proper measure of damages.

197. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX. UNDISCLOSED ADVERSE FACTS

198. The market for Charles River's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements, and failures to disclose, Charles River's securities traded at artificially inflated prices during the Class Period.

Plaintiff and other members of the Class purchased or otherwise acquired Charles River's securities relying upon the integrity of the market price of the Company's securities and market information relating to Charles River, and have been damaged thereby.

199. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Charles River's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. The statements and omissions were materially false and misleading because they failed to disclose material adverse information and misrepresented the truth about Charles River's business, operations, and prospects as alleged herein.

200. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements alleged above. These material misstatements and omissions had the cause and effect of creating in the market a positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## X. LOSS CAUSATION

201. During the Class Period, Defendants made materially false statements and statements that were materially misleading because Defendants failed to disclose material facts that they had a duty to disclose and engaged in a course of conduct that artificially inflated the

prices of Charles River common stock and operated as a fraud or deceit on purchasers of Charles River common stock.

202. As detailed above, when the truth about Charles River's misconduct was revealed through a series of partial disclosures, the value of the Company's stock declined precipitously as the prior artificial inflation came out of the stock's price. The declines in the price of Charles River's shares were the direct result of the nature and extent of Defendants' fraud being revealed to investors and the market, and include the declines in Charles River's stock price as alleged above (Jan. 12, 2023 disclosure and stock price decline); (February 22, 2023 disclosure and stock price decline); and (March 15, 2023 disclosure and stock price decline). The materialization of the risks and material negative facts that were undisclosed during the Class Period caused Charles River's stock to significantly decline.

203. The timing and magnitude of the share price declines negate any inference that the losses suffered by Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company specific facts unrelated to the Defendants' fraudulent conduct. The declines in price of Charles River's stock on January 12, February 22 and March 15, 2023 were statistically significant, meaning that the significant declines in Charles River's stock price show that investors were responding to new, material information specific to Charles River and that the stock price declines were not the result of normal random market fluctuations. The economic loss, *i.e.*, damages, suffered by Plaintiff and other Class members, was a direct result of Defendants' fraudulent scheme to artificially inflate the price of the Company's stock and was reflected in the subsequent significant declines in the value of the Company's stock when Defendants' prior misrepresentations, undisclosed material risks and other fraudulent conduct were revealed.

204. At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members. Throughout the Class Period, Defendants issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing the price of Charles River's common stock to be artificially inflated. Plaintiff and other Class members purchased Charles River common stock at those artificially inflated prices, causing them to suffer damages.

205. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

## XI. ADDITIONAL SCIENTER ALLEGATIONS

206. As alleged herein, Defendants acted with scienter since Defendants knew, or at least acted with a high degree of recklessness, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew, or at least disregarded with a high degree of recklessness, that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendant Foster, by virtue of his receipt of information reflecting the true facts regarding Charles River, his control over, and receipt and modification of Charles River's allegedly materially misleading misstatements and his association with the Company which made him privy to confidential proprietary information concerning Charles River, participated in the fraudulent scheme alleged herein.

207. Defendant Foster had the motive and opportunity to commit the acts alleged herein in order to inflate the price of Charles River common stock and sell his personal shares at artificially inflated prices, and sold artificially inflated shares of Charles River common stock at a

time that was unusual and suspicious, and for unusual amounts, as alleged above. Defendant Foster had the motive (concrete benefits that could be realized by the materially false and misleading statements alleged herein) and the opportunity (the means and likely prospect of achieving concrete benefits by the means alleged) to commit the fraud alleged.

208. As alleged above, Defendant Foster sold Charles River common stock while in possession of material nonpublic adverse or negative information concerning the Company, conduct that he knew, or disregarded with a high degree of recklessness, was wrongful and violated the law, the Sept. 2018 Code, and the 2021 Code:

> Dealing in Securities: Insider Trading
>
> As you do your job, you may become aware of material information about Charles River, a client or supplier or another company before it is announced to the public. You may not sell or buy a company's stock or other securities while you have material inside information about that company. It is also against the law and Company policy to share or "tip" material inside information to anyone (including a family member or friend) who uses that information to trade or to simply recommend that they buy or sell that company's securities. Material inside information should not be disclosed to anyone, except to those within Charles River who need to know it as part of their jobs and to others outside the Company, to the extent you have been specifically authorized to disclose it to them.

209. The scienter of Charles River's executives, officers and employees who acted within the scope of their authority and as agents of Charles River during the Class Period, including Defendant Foster, is imputed to Defendant Charles River.

210. On April 7, 2022, the Company issued a press release titled "Charles River Laboratories Publishes 2021 Corporate Citizen Report" that quoted Defendant Foster as stating "[t]his ethos is embedded in our culture and extends to our entire organization." The Company's 2021 Corporate Citizen Report stated that the Company holds "annual and periodic meetings with key suppliers" and states the following:

> Responsible Supply Chain Management . . . .

> Our supply chain is managed by the Vice President of Global Procurement, who reports to the Corporate Vice President of Procurement and Facilities Support, who in turn **reports to the CFO**. To manage supply chain efforts, our JAGGAER Supplier Management Module provides visibility into key supplier characteristics that help manage strategic relationships through a focus on mutual, continuous improvement. Our JAGGAER Supplier Management Module also helps **Charles River evaluate potential new supply chain partners by assessing potential risk from both a business continuity and ethics perspective**.
>
> **To assess additional supply chain risks, we use tools that improve the completeness and accuracy of our supplier data, while also allowing us to gather information identifying potential associated risks**.
>
> **For new and existing suppliers, we leverage these tools to build new processes and procedures for:**
> **• Continuously monitoring key risk indicators** . . . .
>
> Moving forward, we will streamline our supply chain to increase visibility, reduce risk, and increase meaningful engagement with supplier partners over the long term . . . .

(Emphasis added).

## XII. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

211. The market for Charles River's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and misleading statements and failures to disclose material facts Defendants had a duty to disclose, Charles River's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Charles River's securities and market information relating to Charles River, and have been damaged thereby.

212. During the Class Period, the artificial inflation of Charles River's shares was caused by the material misrepresentations and omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the

Class Period, Defendants made or caused to be made a series of materially false and misleading statements about Charles River's business, prospects, and operations. These material misstatements and omissions created an unrealistically positive assessment of Charles River and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

213. At all relevant times, the market for Charles River's securities was an efficient market for the following reasons, among others:

a. Charles River shares met the requirements for listing, and the Company's stock was listed and actively traded on the NYSE, a highly efficient and automated market;

b. As a regulated issuer, Charles River filed periodic public reports with the SEC;

c. Charles River regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. Charles River was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms, including BofA Securities, Baird, Citi Research, Deutsche Bank Research, Evercore ISI, Guggenheim Securities,

Jefferies, J.P. Morgan, Morgan Stanley, Morningstar, Stephens, TD Cowen, UBS, Wells Fargo Securities, and William Blair. Each of these reports was publicly available or entered the public marketplace.

214. As a result of the foregoing, the market for Charles River's securities promptly digested current information regarding Charles River from all publicly available sources and reflected such information in Charles River's share price. Under these circumstances, all purchasers of Charles River's securities during the Class Period suffered similar injury through their purchase of Charles River's securities at artificially inflated prices and a presumption of reliance applies.

215. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information and material undisclosed negative risks regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material omissions set forth above, that requirement is satisfied here.

## XIII. NO SAFE HARBOR

216. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be

characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Charles River who knew that the statement was false when made.

## XIV. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violation of Section 10(b) of the Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

217. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

218. During the Class Period, Defendants caused, disseminated or approved the false and misleading statements alleged above, which they knew (consciously intended to defraud) were materially false and misleading, or they at least acted with a high degree of recklessness, in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

219. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) Employed devices, schemes and artifices to defraud;

(b) Made untrue statements of material facts or omitted to state material facts

necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

(c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Charles River's securities during the Class Period.

220. Plaintiff and members of the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Charles River's securities. Plaintiff and the Class would not have purchased Charles River's securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' false and misleading statements.

221. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Charles River's securities during the Class Period.

**SECOND CLAIM FOR RELIEF**
**Violation of Section 20(a) of the Exchange Act**
**(Against Defendant Foster)**

222. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

223. Defendant Foster acted as a controlling person of Charles River within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of his high-level position, and his ownership and contractual rights, participation in and awareness of the Company's operations and intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, he had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

Defendant Foster was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

224. In particular, Defendant Foster had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

225. As set forth above, Charles River and Defendant Foster each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of his position as a controlling person, Defendant Foster is liable pursuant to Section 20(a) of the Exchange Act.

226. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a. Determining that the Action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b. Awarding compensatory damages in favor of Plaintiff and the other members of the proposed Class against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in the Action, including counsel fees and expert fees; and

d. Such other and further relief as the Court may deem just and proper.

## XVI. JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 15, 2026

Respectfully submitted,

*/s/ Frederic S. Fox*

Frederic S. Fox (admitted *pro hac vice*)
Donald R. Hall (admitted *pro hac vice*)
Jeffrey P. Campisi (admitted *pro hac vice*)
**Kaplan Fox & Kilsheimer LLP**
800 Third Avenue, 38th Floor
New York, NY 10022
T: (212) 687-1980
F: (212) 687-7714
ffox@kaplanfox.com
dhall@kaplanfox.com
jcampisi@kaplanfox.com

*Co-Lead Counsel for Oklahoma Firefighters and the Proposed Class*

Steven B. Singer (admitted *pro hac vice*)
**Saxena White P.A.**
10 Bank Street, 8th Floor
White Plains, NY 10606
T: (914) 437-8551
F: (888) 631-3611
ssinger@saxenawhite.com

*Co-Lead Counsel for Oklahoma Firefighters and the Proposed Class*

Edward F. Haber (BBO# 215620)
**Shapiro Haber & Urmy LLP**
One Boston Place, Suite 2600
Boston, MA 02108
T: (617) 439-3939
F: (617) 439-0134
ehaber@shulaw.com

*Liaison Counsel*

# Exhibit A – Indictment

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**22-20340-CR-WILLIAMS(s)**

**CASE NO.**

**16 U.S.C. § 3372(a)(1)**
**16 U.S.C. § 3373(d)(1), (2)**
**16 U.S.C. § 3374**
**18 U.S.C. § 371**
**18 U.S.C. § 545**
**18 U.S.C. § 2**
**18 U.S.C. § 982(a)(2)(B)**

FILED BY KAN D.C.
Nov 3, 2022
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Miami

**UNITED STATES OF AMERICA**

**v.**

**OMALISS KEO,**
**MASPHAL KRY,**
**JAMES LAU,**
**DICKSON LAU,**
**SUNNY CHAN,**
**RAPHAEL CHEUNG MAN,**
**SARAH YEUNG, and**
**HING IP CHUNG,**

**Defendants. /**

## SUPERSEDING INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times material to this Indictment:

1. The Lacey Act made it unlawful for any person to import, export, transport, sell, receive, acquire, or purchase any fish or wildlife or plant taken, possessed, transported, or sold in violation of any law, treaty, or regulation of the United States. 16 U.S.C. § 3372(a)(1).

2. The Lacey Act, 16 U.S.C. §§ 3372(d)(1) and (2), also made it unlawful for any person to make or submit any false record, account, or label for, or any false identification of, any

Case 1:22-cr-20340-KMM32 Document 9 Filed 09/15/26 Page 2 of 27

wildlife which has been, or is intended to be - (1) imported, exported, transported, sold, purchased, or received from any foreign country; or (2) transported in interstate or foreign commerce.

3. The Lacey Act defines "wildlife" as "any wild animal, whether alive or dead, including without limitations any wild mammal, bird, reptile, amphibian, fish, mollusk, crustacean, arthropod, coelenterate, or other invertebrate, whether or not bred, hatched, or born in captivity, and includes any part, product, egg, or offspring thereof." 16 U.S.C. § 3371(a).

4. In order to protect certain species against over-exploitation, the United States became a signatory to an international treaty known as the Convention on International Trade in Endangered Species of Wild Fauna and Flora (hereinafter "CITES"). Depending on the required level of protection needed by a species, CITES uses a system of Appendixes to classify protected wildlife and plants. Appendix I of CITES includes species which are threatened with extinction and for which trade must be subject to particularly strict regulation and for which no trade is allowed for commercial purposes. CITES, Art. II at ¶ 1. Appendix II of CITES includes wildlife species which although not necessarily threatened with extinction now, may become so unless trade in specimens of such species is strictly regulated. CITES, Art. II at ¶ 2.

5. The United States and the Kingdom of Cambodia, along with over 180 other countries, were parties to CITES, and bound to abide by its provisions and restrictions. Parties to the Convention regulate trade in specimens of various species and their parts, products, and derivatives through a system of permits ("CITES Permit"). Such documents enable the Convention parties to monitor the effects of the volume and type of trade to ensure trade is legal and not detrimental to the survival of the species included in the various Appendixes.

6. The United States Fish and Wildlife Service ("FWS"), Department of the Interior, is designated by Congress pursuant to the Endangered Species Act (ESA), Title 16, United States

Code, Section 1537(a), as the CITES enforcement authority within the United States. The Department of the Interior publishes regulations to implement CITES in 50 C.F.R. Part 23. A list of all species protected by CITES and the ESA implementation program is maintained pursuant to the Convention by the CITES Secretariat. 50 C.F.R. §§ 23.7 and 23.9.

7. The provisions of CITES are implemented through the ESA, which states in relevant part, "It is unlawful for any person . . . to engage in any trade in any specimens [of wildlife] contrary to the provisions of ... [CITES] or to possess any specimens [of wildlife] traded contrary to the provisions of ... [CITES]." "Trade" means, among other things, "export." CITES, Art. I at ¶ (c). "Specimen" means "any animal ... whether alive or dead." CITES, Art. I at ¶ (b).

8. Long-tailed macaques (*Macaca fascicularis*), sometimes also known as crab-eating macaques, are protected under Appendix II of CITES. 50 C.F.R. §§ 23.7 and 23.9; https://checklist.cites.org/#/en/search/output_layout=alphabetical&level_of_listing=0&show_synonyms=1&show_author=1&show_english=1&show_spanish=1&show_french=1&scientific_name=Macaca+fascicularis&page=1&per_page=20. The long-tailed macaque has been regulated under CITES since 1977.

9. Before importing a specimen of any animal protected under Appendix II of CITES into the United States, a valid CITES export permit must be obtained from the competent authority of the country of export or re-export. A separate original or a true copy of a CITES Permit must be issued before the import occurs and the document must accompany each shipment and be presented to FWS upon importation. CITES, Art IV §§ 1 and 2; 50 C.F.R. § 23.20(c), 23.26(b).

10. CITES Permits are individually numbered and include information such as the importer of record, exporter, species being traded, a description of the specimens, the CITES Appendix number, a source code, the quantity, and the date of issuance. The source code indicates

Case 1:23-cv-21132-DJC Document 9 Filed 09/15/26 Page 4 of 27

the particulars of the specimen(s) listed on the CITES Permit: among others, the code "W" denotes a specimen taken from the wild; "R" denotes a ranched specimen, taken as an egg or juvenile from the wild and reared in a controlled environment; "C" denotes animals bred in captivity; all subject to certain other terms and provisions on the Convention.

11. Under Title 50, Part 14, of the Code of Federal Regulations, all imports of wildlife, including long-tailed macaques, must be declared to the FWS on a completed, signed, and certified Declaration for Importation or Exportation of Fish and Wildlife (Form 3-177) and made available for inspection. Form 3-177 requires importers or their agents to provide, among other information, the source of the wildlife they are importing, specifically whether the wildlife was captive-bred, farm-raised, or wild-caught. Importers or their agents must furnish all applicable information requested on the Form 3-177 and must certify that the information furnished is true and complete to the best of his/her knowledge and belief. 50 CFR 14.61.

12. **OMALISS KEO** was the Director General of the Ministry of Agriculture, Forestry and Fisheries (MAFF) of the Government of Cambodia and Chairman of the CITES Scientific Authority for Terrestrial Forest and Wildlife Resources, with oversight and responsibility for the issuance of CITES export permits.

13. **MASPHAL KRY** was the Deputy Director of the Department of Wildlife and Biodiversity within the Forestry Administration of the Ministry of Agriculture, Forestry and Fisheries (MAFF) of the Government of Cambodia.

14. **JAMES LAU** was the President, Chief Executive Officer, and owner of Vanny Bio-Research Center ("Vanny HK"), later re-named Vanny Science Development LTD, which was a Hong Kong-based company engaged in, among other business, the capture and laundering of wild-caught long-tailed macaques in Cambodia, for export to the United States and elsewhere.

15. **DICKSON LAU** was the General Manager of Vanny HK and also served as the Scientific Manager for Vanny HK.

16. **SUNNY CHAN** was the Manager of Operations for Vanny HK. **CHAN** handled the coordination of shipments of wild caught long-tailed macaques exported to the United States from Cambodia.

17. **RAPHAEL CHEUNG MAN** was the Public Relations Manager and Export Manager for two facilities of Vanny HK in Cambodia operated by a subsidiary, Vanny Bio-Research Cambodia ("VBRC"), at Phnom Penh and Pursat. **CHEUNG** coordinated the delivery of wild-caught long-tailed macaques to the VBRC facilities in Cambodia for export to the United States.

18. **SARAH YEUNG,** who was physically located at the offices of Vanny HK, was the Finance Manager for VBRC. **YEUNG** executed the financial transactions that provided funding to VBRC's Phnom Penh and Pursat facilities for payment to black market collectors and MAFF employees for wild long-tailed macaques captured by them and delivered to VBRC's facilities for export to the United States.

19. **HING IP CHUNG** was General Manager and Managing Director of VBRC. **CHUNG** facilitated payments to Cambodian government officials for their involvement in the capture of wild long-tailed macaques and payments made to black market collectors of wild-caught long-tailed macaques for export to the United States.

20. Unindicted Co-Conspirator 1 (UCC-1) was a company formed under the laws of the State of Florida, with its listed place of business in the Southern District of Florida, which engaged in the importation and sale of non-human primates, including long-tailed macaques.

21. Unindicted Co-Conspirator 2 (UCC-2) was a company formed under the laws of the State of Texas, with its listed place of business in Alice, Texas, which engaged in the importation and sale of non-human primates, including long-tailed macaques.

**COUNT 1**
**Conspiracy**
**(18 U.S.C. § 371)**

1. The General Allegations section of this Indictment is realleged and incorporated reference herein, as though set forth in its entirety.

2. Beginning on an unknown date, but at least as early as on or about December 19, 2017, and continuing through on or about January 30, 2022, in the Southern District of Florida and elsewhere, the defendants,

**OMALISS KEO,**
**MASPHAL KRY,**
**JAMES LAU,**
**DICKSON LAU,**
**SUNNY CHAN,**
**RAPHAEL CHEUNG MAN,**
**SARAH YEUNG, and**
**HING IP CHUNG,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with each other and with other persons both known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

a. to import, export, transport, sell, receive, acquire, and purchase any wildlife, that is, long-tailed macaques (*Macaca fascicularis*), knowing that said wildlife was taken, possessed, transported, and sold in violation of any law, treaty, and regulation of the United States, in violation of Title 16, United States Code, Section 3372(a)(1);

b. to make and submit any false record, account, and label for, and any false identification of, any wildlife, that is, long-tailed macaques (*Macaca fascicularis*), which has been, and is intended to be, imported, exported, transported, sold, purchased, and received from any foreign country; and

transported in interstate or foreign commerce, in violation of 16 U.S.C. § 3372(d)(1), (d)(2); and

c. to fraudulently and knowingly import and bring into the United States any merchandise contrary to any law and regulation of the United States, in violation of Title 18, United States Code, Section 545.

**Purpose of the Conspiracy**

3. The purpose of the conspiracy was for the defendants and their co-conspirators, known and unknown to the Grand Jury, to smuggle CITES Appendix II protected species, that is, long-tailed macaques (*Macaca fascicularis*), into the United States for financial gain.

**Manner and Means of the Conspiracy**

The manner and means by which the defendants sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

4. The defendants and their unindicted co-conspirators established facilities in Cambodia purporting to breed long-tailed macaques for sale on the world market.

5. The defendants and their unindicted co-conspirators engaged with customers in the United States and elsewhere and entered into contractual agreements to sell and export purportedly captive-bred macaques from Cambodia to the United States.

6. The defendants and their unindicted co-conspirators established a logistics system to allow buyers to inspect macaques prior to sale, including through the use of veterinarians, to test the monkeys for disqualifying conditions, quarantine shipments prior to export, and arrange the necessary ground and air transportation to facilitate the transactions.

7. The defendants and their unindicted co-conspirators arranged to illegally purchase additional long-tailed macaques from black market suppliers in Cambodia and Thailand to make up for the lack of supply of suitable monkeys at their purported breeding operations. The black-market suppliers, including MAFF, identified in Vanny HK and VBRC records through the use of

the letters A, B, C, D, E, F, G, H, K, P, and X, would primarily deliver the illegally acquired monkeys to the VBRC facility at Pursat.

8. The defendants and their unindicted co-conspirators utilized the services of MAFF and its employees to further the purpose and objects of the conspiracy, and:

a. To secure CITES export permits which falsely identified wild-caught macaques as captive bred in the VBRC facilities;

b. To act as the source, under the designation of Black Market Supply "A," of wild-caught macaques from National Parks and protected areas which MAFF employees delivered to VBRC for later sale and export;

c. To provide Transport Permits which allowed macaques unsuitable for the export trade to be sent from the Pursat facility to the Phnom Penh facility where they were euthanized and their identification tags transferred to wild-caught macaques, to make it appear the black-market monkeys were captive bred at VBRC facilities;

d. To provide unofficial collection quotas, for which cash payments to MAFF were authorized at Vanny HK and made by VBRC employees.

9. The defendants and their unindicted co-conspirators delivered and caused the delivery of wild-caught long-tailed macaques to various international airports in the United States, accompanied by Cambodian CITES Permits and FWS Form 3-177s falsely identifying the monkeys as captive bred.

10. Upon entry into the United States, the long-tailed macaque shipments would be forwarded by truck from the port of entry to a quarantine facility designated by the importer/consignees, who were located in various states, including the Southern District of Florida.

## Overt Acts

In furtherance of the conspiracy, and to effect the objects and purpose thereof, there were committed and caused to be committed by at least one of the co-conspirators herein, within the Southern District of Florida and elsewhere, at least one of the following overt acts, among others:

1. On or about December 19, 2017, **RAPHAEL CHEUNG MAN** met with **OMALISS KEO** and discussed **KEO**'s role in the collection of wild long-tailed macaques from Cambodian National Parks.

2. On or about December 19, 2017, **RAPHAEL CHEUNG MAN** advised **JAMES LAU, HING IP CHUNG,** and **SARAH YEUNG** by email that **OMALISS KEO** would arrange for MAFF staff to collect somewhere around 2,000 monkeys for VBRC, for which VBRC would be charged a "Royalty tax of US 31.50 to Nation Treasure . . . ," and that **KEO** "will instruct the Director of the National Park to work out a survey report of the animal population."

3. On or about May 4, 2018, **RAPHAEL CHEUNG MAN** emailed **JAMES LAU, HING IP CHUNG,** and **SARAH YEUNG** advising them that he had told **OMALISS KEO** that they were short of animals to export and needed 300 to 500 heads to fulfill a July order and that **KEO** would try to persuade his superior to allow collection of the needed monkeys. The email further reported that any collection by MAFF personnel would have to be after upcoming July 29 elections to avoid unnecessary attention from the public and non-governmental organizations (NGOs), but that VBRC could collect monkeys immediately and they would be off set against a collection quota of 2,000 monkeys that would be issued on May 17. The email also requested that the defendants arrange to make a payment of $40,000 to MAFF.

4. On or about June 14, 2018, **RAPHAEL CHEUNG MAN** reported in an email addressed to **JAMES LAU, HING IP CHUNG, SARAH YEUNG,** and **SUNNY CHAN** that **CHEUNG MAN** received information from **OMALISS KEO** that the Minister had approved and issued the collection quota and final payment should be made to MAFF.

5. Later on June 14, 2018, in an email addressed to **JAMES LAU, HING IP CHUNG, SARAH YEUNG,** and **SUNNY CHAN, RAPHAEL CHEUNG MAN** requested from **YEUNG** a "firm date for remittance" as he needed to respond to **OMALISS KEO** and advised the recipients that "besides election campaigns start most officials need the fund."

6. On or about June 25, 2018, **RAPHAEL CHEUNG MAN**, along with **HING IP CHUNG, SARAH YEUNG,** and **SUNNY CHAN**, received a remittance document from an employee at Vanny HK reflecting that $83,259.00 originating from Vanny Chain Technology (Hong Kong) Limited passed through the Bank of America, N.A. in New York, NY and was received by VBRC's Cambodian bank. Itemized on the remittance was $40,000.00 for "PP Animal Collection 2000 Heads."

7. On or about June 26, 2018, an employee of Vanny HK sent an email to **RAPHAEL CHEUNG MAN, HING IP CHUNG, SUNNY CHAN,** and **SARAH YEUNG** with an attached VBRC internal accounting document "PP Purchase Application Form PF Number C1/E/18-06-18" which reflected a "Donation for CPP Party (Request from Mr. Omaliss)" in the amount of $10,000.00. The document was signed by **CHUNG** and **CHEUNG MAN** and contained a notation that read, "Spoke to Mr. Lau."

8. Later on June 26, 2018, **RAPHAEL CHEUNG MAN** by email provided a copy of MAFF Collection Permit No. 6298, for the collection of 2,000 monkeys by VBRC to **JAMES LAU, HING IP CHUNG, SARAH YEUNG,** and **SUNNY CHAN.**

9. On or about July 21, 2018, VBRC shipped 440 samples of blood serum drawn from long-tailed macaques to an analytical laboratory in San Antonio, Texas to be tested; shipping documents accompanying the samples identified them as related to shipment

USA1811, and the accompanying CITES Permit KH1324 identified the source of the monkeys as captive bred.

10. On or about July 25, 2018, UCC-1, located in the Southern District of Florida, imported a shipment identified as USA1810 containing 150 long-tailed macaques from VBRC at John F. Kennedy Airport (JFK), New York.

11. On or about July 25, 2018, an FWS Form 3-177 and CITES Permit KH1294 were presented to FWS at JFK which reflected that shipment USA1810 was composed entirely of captive bred macaques.

12. On or about August 13, 2018, **RAPHAEL CHEUNG MAN** reported to **JAMES LAU, DICKSON LAU, HING IP CHUNG, SARAH YEUNG**, and **SUNNY CHAN** that he had met with MAFF officials, including **MASPHAL KRY,** known to **CHEUNG MAN** as "MARK SOPHAL," during which they discussed the price for the official quota of $150 for each of the 2,000 monkeys, and a price of $220 each for the unofficial quota of 3,000, which MAFF employees would collect and transport to the VBRC facility at Pursat. **CHEUNG MAN** further reported that MAFF preferred to begin collecting as soon as possible during the rainy season, expected to complete all necessary collection before the end of the year, and MAFF would provide VBRC 4 to 6 hours of notice prior to the deliveries, with the likely arrival time at night, and that **OMALISS KEO** verified these points several days later. MAFF had also assured **CHEUNG MAN** that "unofficial animals" would not appear on VBRC's monthly report, and MAFF would conceal the unofficial monkeys from the local Phnom Penh and Pursat officials.

13. On or about August 24, 2018, UCC-1, located in the Southern District of Florida, imported a shipment identified as USA1811 containing 360 long-tailed macaques from VBRC at JFK Airport, New York.

14. On or about August 24, 2018, an FWS Form 3-177 and CITES Permit KH1320 were presented to FWS at JFK which reflected that shipment USA1811 was composed entirely of captive bred macaques.

15. On or about November 2, 2018, **RAPHAEL CHEUNG MAN** sent an email to **DICKSON LAU, HING IP CHUNG, SARAH YEUNG**, and **SUNNY CHAN** in which he reported having met with the MAFF collection team leader, **MASPHAL KRY**, known to **CHEUNG MAN** as "MARK SOPHAL," and advanced US$10,000 to him to carry on the collection, that they had mutually agreed that MAFF would collect and deliver 300 animals weighing between 2 to 4 kgs within the month to VBRC, and that the MAFF employee was aware that VBRC wouldn't accept and would reject any inferior animal. **CHEUNG MAN** asked his superiors for the funds necessary to settle before the end of the month, representing the amounts owed to MAFF for the 300 monkeys and for Royalty taxes due on the official quota animals.

16. On or about May 11, 2019, a shipment of 360 long-tailed macaques, containing approximately 74 wild caught monkeys, and identified as USA1973, was imported into the United States at JFK, and delivered to UCC-2 in Alice, Texas.

17. On May 11, 2019, an FWS Form 3-177 and CITES Permit KH1391 were presented to FWS at JFK in New York, which reflected that shipment USA1973 was composed entirely of captive bred macaques.

18. On or about June 27, 2019, a shipment of 360 long-tailed macaques, containing approximately 194 wild caught monkeys and identified as USA1974, was imported into the United States at JFK, and delivered to UCC-2 in Alice, Texas.

19. On June 27, 2019, an FWS Form 3-177 and CITES Permit KH1407 were presented to FWS at JFK in New York, which reflected that shipment USA1974 was composed entirely of captive bred macaques.

20. On or about August 29, 2019, **MASPHAL KRY,** accompanied by two other MAFF employees, delivered 13 wild long-tailed macaques to the VBRC facility at Pursat.

21. On or about September 1, 2019, **MASPHAL KRY,** accompanied by two other MAFF employees, delivered 24 wild long-tailed macaques to VBRC's facility in Pursat, during which **KRY** suggested that the land immediately behind the VBRC facility should be purchased to make a road that would make it "more safe for the smuggling."

22. On or about September 3, 2019, Black Market Supplier D was paid approximately $10,380 for the delivery of approximately 60 wild caught long-tailed macaques to the VBRC facility at Pursat.

23. On or about October 8, 2019, **HING IP CHUNG** informed **SARAH YEUNG** by email that VBRC didn't have enough cash on hand after having made payments to MAFF and requested $30,000.00 from **YEUNG** for the collection fund to pay for an additional 100 animals which were on their way.

24. On or about October 20, 2019, **MASPHAL KRY**, accompanied by two other MAFF employees, delivered 20 wild long-tailed macaques to the VBRC facility in Pursat.

25. On or about December 13, 2019, Black Market Supplier A was paid approximately $8,360 for the delivery of approximately 38 wild caught long-tailed macaques to the VBRC facility at Pursat.

26. On or about January 16, 2020, a shipment of 288 long-tailed macaques, containing approximately 237 wild caught monkeys and identified as USA2071, was imported into the United States at JFK, and delivered to UCC-2 in Alice, Texas.

27. On or about January 16, 2020, an FWS Form 3-177 and CITES Permit KH1523 were presented to FWS at JFK in New York, which reflected that shipment USA2071 was composed entirely of captive bred macaques.

28. On or about January 30, 2020, Black Market Supplier C was paid approximately $10,645 for the delivery of approximately 68 wild caught long-tailed macaques to the VBRC facility at Pursat.

29. On or about February 21, 2020, a shipment of 288 long-tailed macaques, containing approximately 138 wild caught monkeys and identified as USA1916, was imported into the United States at Newark, New Jersey, and delivered to UCC-1 in Miami, Florida.

30. On or about February 21, 2020, an FWS Form 3-177 and CITES Permit KH1524 were presented to FWS at Liberty International Airport in Newark, New Jersey which reflected that shipment USA1916 was composed entirely of captive bred macaques.

31. From on or about March 11, 2020, to on or about October 20, 2020, VBRC paid approximately $2,515,954 for approximately 14,323 wild caught long-tailed macaques received from 7 black market suppliers.

32. On or about June 21, 2020, **MASPHAL KRY** delivered 35 wild long-tailed macaques to the VBRC facility in Pursat and provided contact information using the name "PHAL."

33. On or about June 29, 2020, Black Market Supplier A was paid approximately $4,840 for the delivery of approximately 22 wild caught long-tailed macaques to the VBRC facility at Pursat.

34. On November 11, 2020, a shipment of 396 long-tailed macaques, containing approximately 323 wild caught monkeys and identified as USA2011, was imported into the United States at Dulles International Airport, Virginia, and delivered to UCC-1 in Miami, Florida.

35. On or about January 26, 2022, in an exchange of social media app communications, **RAPHAEL CHEUNG** discussed the delivery by Black Market Supplier D of wild caught long-tailed macaques to VBRC and received return confirmation that 115 macaques had in fact been received and discussed the expected delivery by Black Market Supplier K of 170 wild caught long-tailed macaques.

All in violation of Title 18, United States Code, Section 371.

**<u>COUNTS 2 - 8</u>**
**Smuggling**
**(18 U.S.C. § 545)**

1. The General Allegations section of this Indictment is realleged and incorporated by reference herein, as though set forth in its entirety.

2. On or about the dates identified below with respect to each Count, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**OMALISS KEO,
MASPHAL KRY,
JAMES LAU,
DICKSON LAU,
SUNNY CHAN,
RAPHAEL CHEUNG MAN,
SARAH YEUNG, and
HING IP CHUNG,**

did fraudulently and knowingly import and bring into the United States any merchandise, that is, wild caught long-tailed macaques (*Macaca fascicularis*), contrary to any law and regulation of the United States, through the presentation of false and fraudulent CITES Permits and FWS Form 3-177s:

| COUNT | DATE | SHIPMENT NUMBER | MACAQUES QUANTITY/ DECLARED VALUE | AIRPORT OF ENTRY | CONSIGNEE LOCATION |
|---|---|---|---|---|---|
| 2 | 07/25/18 | USA1810 | 150 / $306,000 | JFK | Miami, FL |
| 3 | 08/24/18 | USA1811 | 360 / $661,680 | JFK | Miami, FL |
| 4 | 05/30/19 | USA1907 | 360 / $714,600 | JFK | Miami, FL |
| 5 | 02/21/20 | USA1916 | 288 / $697,500 | Newark Liberty | Miami, FL |
| 6 | 11/11/20 | USA2011 | 396 / $1,162,800 | Dulles Int'l. | Miami, FL |
| 7 | 05/27/21 | USA2104 | 540 / $1,755,000 | Dulles Int'l. | Miami, FL |
| 8 | 12/17/21 | USA2109 | 540 / $4,050,000 | O'Hare | Miami, FL |

In violation of Title 18, United States Code, Sections 545 and 2.

**FORFEITURE**

1. The allegations of this Superseding Indictment are hereby realleged and by this reference fully incorporated herein for the purpose of alleging forfeitures to the United States of America of certain property in which the defendants, **OMALISS KEO, MASPHAL KRY,**

**JAMES LAU, DICKSON LAU, SUNNY CHAN, RAPHAEL CHEUNG MAN, SARAH YEUNG,** and **HING IP CHUNG**, have an interest.

2. Upon conviction of a conspiracy to commit, or a violation of, Title 16, United States Code, Section 3372, as alleged in this Superseding Indictment, the defendants shall forfeit to the United States any and all wildlife imported, exported, transported, sold, received, acquired, or purchased contrary to Title 16, United States Code, Section 3372, pursuant to Title 16, United States Code, Section 3374.

3. Upon conviction of a violation of Title 18, United States Code, Section 545, as alleged in this Superseding Indictment, the defendants shall forfeit to the United States of America any and all property, real or personal, which constitutes or is derived from proceeds traceable to the offense or offenses, pursuant to Title 18, United States Code, Section 982(a)(2)(B).

All pursuant to Title 16, United States Code, Section 3374(d), Title 18, United States Code, Section 982(a)(2)(B), and the procedures set forth in Title 21, United States Code, Section 853, as incorporated by 28, United States Code, Section 2461.

A TRUE BILL

FOREPERSON

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

Thomas Watts-FitzGerald
Assistant United States Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**UNITED STATES OF AMERICA** **CASE NO.:** 22-20340-CR-WILLIAMS(s)

**v.**

OMALISS KEO, ET AL.

______________________________/
Defendants.

# CERTIFICATE OF TRIAL ATTORNEY*

**Superseding Case Information:**

**Court Division** (select one)
- ☑ Miami ☐ Key West ☐ FTP
- ☐ FTL ☐ WPB

New Defendant(s) (Yes or No) Yes
Number of New Defendants 1
Total number of New Counts 0

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.
2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. §3161.
3. Interpreter: (Yes or No) Yes
   List language and/or dialect: Mandarin Chinese; Kmer
4. This case will take 15 days for the parties to try.
5. Please check appropriate category and type of offense listed below:

| (Check only one) | | (Check only one) |
|---|---|---|
| I | ☐ 0 to 5 days | ☐ Petty |
| II | ☐ 6 to 10 days | ☐ Minor |
| III | ☑ 11 to 20 days | ☐ Misdemeanor |
| IV | ☐ 21 to 60 days | ☑ Felony |
| V | ☐ 61 days and over | |

6. Has this case been previously filed in this District Court? (Yes or No) Yes
   If yes, Judge Williams Case No. 22-20340-CR-WILLIAMS
7. Has a complaint been filed in this matter? (Yes or No) No
   If yes, Magistrate Case No. ______________________
8. Does this case relate to a previously filed matter in this District Court? (Yes or No) Yes
   If yes, Judge ______________________ Case No. Please see attached form
9. Defendant(s) in federal custody as of ______________________
10. Defendant(s) in state custody as of ______________________
11. Rule 20 from the District of
12. Is this a potential death penalty case? (Yes or No) No
13. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) No
14. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss? (Yes or No) No

By: ______________________
Thomas Watts-FitzGerald
Assistant United States Attorney
FLA Bar No. 0273538

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 22-20340-CR-WILLIAMS(s)**

**UNITED STATES OF AMERICA**

**v.**

**OMALISS KEO, ET AL. /**

**CERTIFICATE OF TRIAL ATTORNEY CONTINUED**

PREVIOUSLY FILED MATTERS IN DISTRICT COURT

1:18-mj-2184-JJO
1:18-mj-2580-Mcaliley
1:18-mj-3808-JJO
1:19-mj-2184-McAliley
1:19-mj-2185-McAliley
1:19-mj-2920-JJO
1:20-mj-2267-McAliley
1:20-mj-2592-Reid
1:20-mj-2674-AOR
1:20-mj-2730-EGT
1:20-mj-4080-EGT
1:20-mj-4133-Louis
1:21-mj-2251-AOR
1:21-mj-2252-AOR
1:21-mj-2253-AOR
1:21-mj-2294-AOR
1:21-mj-3113-AOR
1:22-mj-2071-Louis
1:22-mj-2115-Reid

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

PENALTY SHEET

**Defendant's Name:** Omaliss Keo

**Case No:** 22-20340-CR-WILLIAMS(s)

Count(s) #: 1

Conspiracy

Title 18, United States Code, Section 371
*** Max. Term of Imprisonment: 5 Years Imprisonment**
*** Mandatory Min. Term of Imprisonment (if applicable): N/A**
*** Max. Supervised Release: 3 Years**
*** Max. Fine: Greater of $250,000 or twice the pecuniary gain/loss**

Count(s) #: 2-8

Smuggling

Title 18, United States Code, Section 545
*** Max. Term of Imprisonment: 20 Years Imprisonment**
*** Mandatory Min. Term of Imprisonment (if applicable): N/A**
*** Max. Supervised Release: 3 Years**
*** Max. Fine: Greater of $250,000 or twice the pecuniary gain/loss**

***Refers only to possible term of incarceration, supervised release and fines. It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

PENALTY SHEET

**Defendant's Name:** Masphal Kry

**Case No:** 22-20340-CR-WILLIAMS(s)

Count(s) #: 1

Conspiracy

Title 18, United States Code, Section 371

*** Max. Term of Imprisonment: 5 Years Imprisonment**
*** Mandatory Min. Term of Imprisonment (if applicable): N/A**
*** Max. Supervised Release: 3 Years**
*** Max. Fine: Greater of $250,000 or twice the pecuniary gain/loss**

Count(s) #: 2-8

Smuggling

Title 18, United States Code, Section 545

*** Max. Term of Imprisonment: 20 Years Imprisonment**
*** Mandatory Min. Term of Imprisonment (if applicable): N/A**
*** Max. Supervised Release: 3 Years**
*** Max. Fine: Greater of $250,000 or twice the pecuniary gain/loss**

***Refers only to possible term of incarceration, supervised release and fines. It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

Case 1:23-cv-21132-DJD Document 9 Filed 09/15/26 Page 22 of 27

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name:** James Lau

**Case No:** 22-20340-CR-WILLIAMS(s)

Count(s) #: 1

Conspiracy

Title 18, United States Code, Section 371

*** Max. Term of Imprisonment: 5 Years Imprisonment**
*** Mandatory Min. Term of Imprisonment (if applicable): N/A**
*** Max. Supervised Release: 3 Years**
*** Max. Fine: Greater of $250,000 or twice the pecuniary gain/loss**

Count(s) #: 2-8

Smuggling

Title 18, United States Code, Section 545

*** Max. Term of Imprisonment: 20 Years Imprisonment**
*** Mandatory Min. Term of Imprisonment (if applicable): N/A**
*** Max. Supervised Release: 3 Years**
*** Max. Fine: Greater of $250,000 or twice the pecuniary gain/loss**

***Refers only to possible term of incarceration, supervised release and fines. It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

Case 1:23-cv-21132-DMC Document 9 Filed 09/15/26 Page 23 of 27

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

PENALTY SHEET

**Defendant's Name:** Dickson Lau

**Case No:** 22-20340-CR-WILLIAMS(s)

Count(s) #: 1

Conspiracy

Title 18, United States Code, Section 371

*** Max. Term of Imprisonment: 5 Years Imprisonment**
*** Mandatory Min. Term of Imprisonment (if applicable): N/A**
*** Max. Supervised Release: 3 Years**
*** Max. Fine: Greater of $250,000 or twice the pecuniary gain/loss**

Count(s) #: 2-8

Smuggling

Title 18, United States Code, Section 545

*** Max. Term of Imprisonment: 20 Years Imprisonment**
*** Mandatory Min. Term of Imprisonment (if applicable): N/A**
*** Max. Supervised Release: 3 Years**
*** Max. Fine: Greater of $250,000 or twice the pecuniary gain/loss**

***Refers only to possible term of incarceration, supervised release and fines. It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:** Sunny Chan

**Case No:** 22-20340-CR-WILLIAMS(s)

Count(s) #: 1

Conspiracy

Title 18, United States Code, Section 371

*** Max. Term of Imprisonment: 5 Years Imprisonment**
*** Mandatory Min. Term of Imprisonment (if applicable): N/A**
*** Max. Supervised Release: 3 Years**
*** Max. Fine: Greater of $250,000 or twice the pecuniary gain/loss**

Count(s) #: 2-8

Smuggling

Title 18, United States Code, Section 545

*** Max. Term of Imprisonment: 20 Years Imprisonment**
*** Mandatory Min. Term of Imprisonment (if applicable): N/A**
*** Max. Supervised Release: 3 Years**
*** Max. Fine: Greater of $250,000 or twice the pecuniary gain/loss**

***Refers only to possible term of incarceration, supervised release and fines. It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:** Raphael Cheung Man

**Case No:** 22-20340-CR-WILLIAMS(s)

Count(s) #: 1

Conspiracy

Title 18, United States Code, Section 371
*** Max. Term of Imprisonment: 5 Years Imprisonment**
*** Mandatory Min. Term of Imprisonment (if applicable): N/A**
*** Max. Supervised Release: 3 Years**
*** Max. Fine: Greater of $250,000 or twice the pecuniary gain/loss**

Count(s) #: 2-8

Smuggling

Title 18, United States Code, Section 545
*** Max. Term of Imprisonment: 20 Years Imprisonment**
*** Mandatory Min. Term of Imprisonment (if applicable): N/A**
*** Max. Supervised Release: 3 Years**
*** Max. Fine: Greater of $250,000 or twice the pecuniary gain/loss**

***Refers only to possible term of incarceration, supervised release and fines. It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

Case 1:23-cv-21132-DMC Document 84 Filed 09/15/26 Page 106 of 108

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name:** Sarah Yeung

**Case No:** 22-20340-CR-WILLIAMS(s)

Count(s) #: 1

Conspiracy

Title 18, United States Code, Section 371

*** Max. Term of Imprisonment: 5 Years Imprisonment**
*** Mandatory Min. Term of Imprisonment (if applicable): N/A**
*** Max. Supervised Release: 3 Years**
*** Max. Fine: Greater of $250,000 or twice the pecuniary gain/loss**

Count(s) #: 2-8

Smuggling

Title 18, United States Code, Section 545

*** Max. Term of Imprisonment: 20 Years Imprisonment**
*** Mandatory Min. Term of Imprisonment (if applicable): N/A**
*** Max. Supervised Release: 3 Years**
*** Max. Fine: Greater of $250,000 or twice the pecuniary gain/loss**

***Refers only to possible term of incarceration, supervised release and fines. It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name:** Hing Ip Chung

**Case No:** 22-20340-CR-WILLIAMS(s)

Count(s) #: 1

Conspiracy

Title 18, United States Code, Section 371

*** Max. Term of Imprisonment: 5 Years Imprisonment**
*** Mandatory Min. Term of Imprisonment (if applicable): N/A**
*** Max. Supervised Release: 3 Years**
*** Max. Fine: Greater of $250,000 or twice the pecuniary gain/loss**

Count(s) #: 2-8

Smuggling

Title 18, United States Code, Section 545

*** Max. Term of Imprisonment: 20 Years Imprisonment**
*** Mandatory Min. Term of Imprisonment (if applicable): N/A**
*** Max. Supervised Release: 3 Years**
*** Max. Fine: Greater of $250,000 or twice the pecuniary gain/loss**

***Refers only to possible term of incarceration, supervised release and fines. It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

**CERTIFICATE OF SERVICE**

I, Frederic S. Fox, hereby certify that, on September 15, 2026, I caused the foregoing to be served on all counsel of record by filing the same with the Court using the CM\ECF system which will send electronic notices of the filing to all counsel of record.

*/s/ Frederic S. Fox*
Frederic S. Fox